1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PORT OF VANCOUVER, USA,       )
                              )       No. _____
        Plaintiff,            )
                              )       COMPLAINT TO ENFORCE
                              )       CONFIRMED ARBITRATION
                              )       AWARDS; TRESPASS
                              )
BNSF RAILWAY COMPANY,         )
                              )
        Defendant.            )

Plaintiff Port of Vancouver, USA, by and through its attorneys Noah Jarrett, Molly

Henry, and Adam Murray of Schwabe, Williamson & Wyatt, P.C., alleges as follows:

**PARTIES**

1.       Plaintiff Port of Vancouver USA (the "Port," "POV," or "Plaintiff") is a

Washington port district existing under the laws of the State of Washington.

2.       BNSF Railway Company ("BNSF") is a Delaware corporation with its

principal place of business in Texas that conducts railroad operations in many Western states,

including the State of Washington, and serves the Port.

**JURISDICTION AND VENUE**

3.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332

because this is an action between citizens of different states and the value of the object of this

Page 1 – COMPLAINT

litigation greatly exceeds $75,000, exclusive of costs and interest.

4.      Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the Port's claims occurred, and continue to occur, in the Western District of Washington.

<u>**NATURE OF THE CASE**</u>

5.      This Complaint seeks an Order enforcing a judgment on confirmed arbitration Awards, as well as relief under a separate claim arising from Defendant's trespass and unauthorized use of the Port's facilities in violation of that same judgment and under Washington law.

6.      On or about August 10, 2019, the Port submitted certain disputes between the Port and BNSF to binding arbitration under the West Vancouver Freight Access Agreement and Industrial Track Agreement ("WVFAA"), a copy of which is attached hereto as Exhibit A.

7.      The dispute was arbitrated before an Arbitration Panel consisting of the Honorable Vaughn R. Walker (Chair) (retired), Nancy F. Lesser, and Paul A. Cunningham. An arbitration hearing was conducted in Washington, D.C. beginning February 28 and concluding March 5, 2022.  Closing arguments were held on April 4, 2022.

8.      On May 9, 2022, the Arbitration Panel entered a Partial Final Award ("PFA"), a redacted copy of which is attached as Exhibit B.  On December 19, 2022, the Panel entered its Statement of Reasons for Final Award After Hearing and Final Award ("Final Award"), a redacted copy of which is attached as Exhibit C.  The PFA and Final Award, referred to herein as the "Awards," were redacted pursuant to orders of the Panel so that they could be public documents.  The redactions are minimal and do not modify any provisions of the Awards that were at issue when the Judgement (explained below) was issued or through the claims raised in this Complaint.

Page 2 – COMPLAINT

9. The Awards granted the Port certain monetary relief for past harms and non-monetary relief on a going-forward basis.

10. On February 9, 2023, the Port petitioned this Court for an Order Confirming the Arbitration Awards, and BNSF failed to petition for either vacation or modification.

11. On June 2, 2023, the parties jointly petitioned the Court for the entry of a stipulated Order and Judgment confirming the Awards. The stipulated petition was granted on June 8, 2023. A copy of the Stipulated Order and Judgment Confirming Arbitration Awards is attached as Exhibit D.

12. While BNSF has satisfied its obligations under the Awards to make certain payments ordered by the Arbitration Panel relating to damage BNSF caused to Port property and mis-use of Port property for railcars not moving to or from Port tenants and customers ("alien cars"), BNSF has failed to abide by the Judgement in all respects.

13. Through this action the Port requests that the Court enter an order enforcing the existing Judgment and incorporating the same into a further judgment of this Court.

14. Plaintiff also seeks damages and injunctive relief for BNSF's continued unauthorized use of Port property, in violation of limitations clearly delineated in the confirmed Final Award, which unauthorized use constitutes a trespass under Washington law.

I. **STATEMENT OF FACTS**

A. **THE WEST VANCOUVER FREIGHT ACCESS PROJECT**

15. The Port is a port district formed in 1912 pursuant to the predecessor of 53.04 RCW as an independent public agency of the State of Washington to operate port facilities located on the Columbia River in the City of Vancouver, Clark County, Washington. The Port's mission is to provide economic benefit and employment opportunities to the surrounding community through leadership, stewardship, and partnership in marine, industrial, and waterfront development. To that end, the Port owns and controls marine

Page 3 – COMPLAINT

terminals and industrial facilities, including substantial rail infrastructure, within its complex in Vancouver, Washington.

16.     Before 2008, the rail lines around the Port were congested, resulting in frequent delays and disruptions of commercial rail service.

17.     Commencing in 2008, the Port led the West Vancouver Freight Access Project ("Project"), a $251-million project to expand and upgrade the Port's rail and other infrastructure, improve rail service, reduce rail congestion, provide improved rail access to existing and potential additional customers at the Port, and attract jobs and other economic development to the Port, the City of Vancouver, Clark County, and the surrounding area.

B.  **WEST VANCOUVER FREIGHT ACCESS AND INDUSTRIAL TRACK AGREEMENT**

18.     In conjunction with the Project, the Port and BNSF entered into the West Vancouver Freight Access and Industrial Track Agreement ("WVFAA"), to accomplish several primary and related purposes.  Exhibit A.

19.     First, the Port wished to expand and upgrade the Port's infrastructure in order to attract new tenants and promote local economic development.  A key part of the Project was the development and installation of an efficient and continuous railroad loop track to facilitate the Port's handling of unit trains.  As part of the Project, the Port acquired two tracts of land within the Port, and the associated rail line, from BNSF under the WVFAA. *E.g.,* the WVFAA A at 1-2 (Recitals).

20.     Second, the Port proposed to create a new "Trench" entrance to the Port to allow BNSF to transport unit and other trains to and from the Port without blocking BNSF's main track located next to the Port.  WVFAA at Exhibit B (Master Plan).  This new entrance was designed to relieve congestion on BNSF's main line near the Port and improve operational efficiencies for BNSF and other carriers in the area, including Union Pacific Railroad Company ("UP") and Amtrak.

Page 4 – COMPLAINT

21.     Third, while BNSF was to remain the only railroad that physically served the Port, BNSF was obligated to provide commercial access to UP so that the two carriers would compete at the Port and make the Port a competitive and desirable location for existing and new tenants, especially those needing unit train service.  Section 1 of Article III of the WVFAA states that "the Port grants BNSF the exclusive right to access, serve, operate and use the Track and the Property and shall in all respects be the exclusive rail operator." Section 3 of Article III of the WVFAA states that "BNSF agrees to offer all Rail Customers Commercial Access to UP for so long as the Port is not in default under this Agreement," and defines Commercial Access to include establishing rates as well as service terms on "reasonable and customary terms and conditions consistent with BNSF's own freight service for such freight business."

22.     The WVFAA also contains an arbitration provision at Article IX in the event any disputes arise.

## C. **BNSF'S NONCOMPLIANCE WITH THE WVFAA**

23.     Despite the $251-million investment in the Project, the Port has not received the benefit of competitive commercial access under the WVFAA, while BNSF has extracted benefits beyond what it was intended to receive, because BNSF has not complied with the WVFAA in several critical aspects.

24.     First, the Port, despite diligent efforts, has been unable to attract new rail-served tenants to the Port.  Most opportunities that have emerged or been developed have been UP-based, but the Port was informed by potential tenants that BNSF refused to establish competitive rates for UP access.  Only one substantial BNSF-based opportunity emerged, but that project failed to obtain the required approvals, despite the diligent efforts of the Port.

Page 5 – COMPLAINT

25.     Absent the competitive access rates that the WVFAA was intended to ensure, the Port has not been able to attract new rail-served tenants and has not received the employment and other economic development benefits that were intended to be achieved through the WVFAA.  No new or existing tenant has constructed rail-served facilities at the Port.

26.     Second, BNSF regularly used, and continues to use, the Port's track to place, switch, stage, and store alien cars.  Some of these alien cars were used to carry hazardous materials ("hazmats").  BNSF's use of the Port track in this manner exceeds BNSF's contractual authorization.

27.     The Port became aware of BNSF's alien car practices and requested that BNSF terminate them, but BNSF did not.  The Port then established a tariff to apply to the alien cars staring February 2018, and invoiced BNSF for alien cars under that tariff, but BNSF refused to pay the invoices based on its contention that its status under the WVFAA as Exclusive Rail Operator entitled it to use the Port track for alien cars as it pleased, even for purposes having nothing to do with the WVFAA, the Port, or its tenants.

28.     Third, BNSF generally refused to pay for damage to the Port track caused by its train crews on the grounds that the Port was responsible for maintenance activities, even if the damage was caused by BNSF negligence or alien cars.

**D.  <u>THE ARBITRATION</u>**

29.     The Port repeatedly attempted to resolve its disputes with BNSF regarding commercial access for UP, alien cars, and BNSF-caused track damage caused, but was unsuccessful as BNSF insisted that the WVFAA allowed BNSF to set access rates that blocked competition at the Port, use Port property for unauthorized purposes, and avoid liability for damages BNSF caused to Port facilities.

Page 6 – COMPLAINT

30.     On or about August 10, 2020, the Port served on BNSF a demand for arbitration pursuant to Article IX of the WVFAA seeking declaratory, monetary, and other relief.

31.     BNSF denied the Port's claims, claiming that it had complied with its commercial access obligations under the WVFAA, that its status as the exclusive rail operator entitled it to use the Port track for alien cars without charge or liability, and that the Port was responsible for all track maintenance and repair costs, even for damage caused by BNSF negligence and/or its failure to provide rail service consistent with applicable law.

32.     In accordance with the WVFAA, the parties appointed a panel of arbitrators to decide their dispute.   Following discovery, the parties proceeded to an arbitration hearing that was deemed to occur in the State of Washington, although the actual hearing was conducted before the Panel in Washington, D.C., on February 28 through March 5, 2022 with closing arguments on April 4, 2022.

33.     The Panel issued its PFA on May 9, 2022.  Exhibit B.

34.     The Partial Final Award called for additional briefing.  The Panel later issued its Final Award on December 19, 2022.  Exhibit C.

35.     The Panel's Awards ruled for the Port in substantial part.  The Panel ruled, among other things, that:  (a) BNSF's commercial access obligations applied to all the Port (except to the extent that UP had service to particular Port locations under separate agreement(s) between BNSF and UP); (b) the commercial access rates specified in WVFAA Exhibit F were maximum rates and did not override BNSF's obligation to establish lower rates to meet its duty to provide access to UP "on reasonable and customary terms and conditions"; (c) BNSF was required to establish rates for UP access equivalent to BNSF's rates for BNSF's own access to the Port; (d) BNSF's access rates could not hobble the Port from attracting business from UP customers or from competing with other ports; and (e) BNSF efforts to offset or subsidize high rates for service at the Port with lower line haul rates

Page 7 – COMPLAINT

would be contrary to the covenant of good faith and fair dealing present in every contract under Washington law and trigger appropriate remedies.

36.     The Panel also ruled that the WVFAA did not entitle BNSF to use the Port for alien cars and awarded the Port damages for BNSF's unauthorized use of Port property for alien cars.

37.     The Panel further ruled that BNSF was, and remains, responsible for damage to Port track caused by the negligence or improper conduct of BNSF crews and trains and that the Port's maintenance obligations did not extend to such damage.  The Panel also awarded the Port monetary relief for BNSF's damage to Port property.

38.     Neither the Partial Final Award nor the Final Award were vacated under 9 U.S.C. §10 or modified or corrected under 9 U.S.C. §11.

39.     On June 2, 2023, BNSF and the Port stipulated to entry of an order and judgment confirming the Awards, and the Awards and that Judgment were entered on June 7, 2023.  Exhibit D.

### E.  BNSF'S CONTINUING VIOLATIONS OF THE AWARDS AND JUDGMENT ENTERING THE CONFIRMED AWARDS

40.     The Awards, as recently confirmed by the Court's Judgment, grant the Port monetary relief for past damages, as well as prospective relief that prohibits BNSF from using the Port for alien cars and requires BNSF to establish rates for competitive rail access.

41.     BNSF has complied with the now-confirmed Arbitration Awards only in limited part.  BNSF has continued to violate the awards by continuing to use the Port's property for alien cars and failing to provide competitive rail access.

42.     BNSF has satisfied the Judgment in part by paying for the past track damage addressed in the Final Award as well as some later-occurring track damage.

43.     BNSF has also satisfied the Judgment in part to the extent BNSF has paid for alien cars for the February 2018-December 2022 period.

Page 8 – COMPLAINT

44.     However, after entry of the Final Award, BNSF continued, and still continues, to bring alien cars onto Port property, without authorization from the Port, and despite issuance of the Judgment confirming the finding in the Final Award that such use is not permitted under the WVFAA.

45.     BNSF has also not complied with the Final Award regarding the competitive access provisions of the WVFAA and the requirement in the Final Award that BNSF provide a rate schedule of reasonable and customary rates that would not hobble competitive access to UP at the Port.

46.     Rather than provide a rate schedule of reasonable and customary rates as required by the Final Award, BNSF's counsel sent a letter addressing BNSF's position regarding competitive access on February 10, 2023.  A copy of that letter is attached hereto as Exhibit E.  Page 3 of that letter presented BNSF's Switching Rate Schedule for the Port of Vancouver Terminals 4 & 5 ("Switching Rate Schedule").

47.     BNSF has established unit train rates in the Switching Rate Schedule ranging between $460 to $600 per car (round trip) for unit trains for Terminals 4 and 5, depending on the commodity and train length, as of February 10, 2023.  BNSF also specified single car rates for auto carriers for Terminals 4 and 5.  BNSF's Switching Rate Schedule did not include any rates for other areas of the Port.  Exhibit E.

48.     BNSF recently published the Terminal 4 and Terminal 5 rates in its Switching Rate Schedule in its Switching Book 8005-D for "Tristar Transload PNW Inc" and "Future Potential Facilities."  BNSF's 8005-D also specifies a switch rate for Terminals 2 and 3 of the Port of $750 per car that applies regardless of whether the traffic is in single cars or unit trains, so long as the traffic is not hazmat or dimensional (oversize).

49.     In contrast, BNSF's 8005-D publication specifies BNSF switching fees of $105 per car for unit trains and $295 per car for single cars at competing ports such as

Page 9 – COMPLAINT

Grandview, Hoquiam, Interbay, Seattle, Spokane, Sunnyside, and Tacoma in Washington, and Portland, and Salem in Oregon.

50.     BNSF's newly-established switching rates are neither reasonable nor customary as required by the Final Award.  The level of rate disparity between the switching rates for the Port and the Port's logical competitors hobbles the Port's ability to compete with those other locations to attract business and does not comply with the Court's Judgment confirming the Awards.

51.     Under such circumstances, the Port is unable to attract new tenants, the Port will not receive the intended benefits of the WVFAA, and BNSF is in violation of the Judgment.

## FIRST CAUSE OF ACTION

## Enforcement of Judgment.

52.     The Port incorporates the allegations in paragraphs 1 through 51, above.

53.     BNSF is not complying with the Judgment confirming and entering the Awards by (a) continuing to bring alien cars into the Port and (b) failing to establish "reasonable and customary" competitive access rates for UP access to the entire Port.

54.     BNSF's noncompliance with the Judgment on the Awards has harmed and continues to harm the Port by (a) exposing the Port to costs, risks, and harms from alien cars, (b) impairing the Port's efforts to bring rail-served business to the Port, and (c) depriving the Port of the benefit of its investment in the Project.

55.     The Port seeks an Order that finds that BNSF is not complying with the Court's Judgment and that requires BNSF to comply with the Partial Final and Final Awards.

56.     The Port seeks damages for BNSF's failure to comply with the Judgment as to alien cars entering the Port after January 1, 2023.

57.     Monetary relief is an inadequate remedy for the ongoing harm resulting from BNSF's ongoing failure to comply with the Judgment and the Partial and Final Awards.

Page 10 – COMPLAINT

58.     The Port specifically seeks an order requiring BNSF to:

    a.   cease bringing alien cars onto Port track, absent specific authorization from the Port in advance; and

    b.   establish rates for UP commercial access to the entire Port that conform to the Final Award and Judgment.

## SECOND CAUSE OF ACTION

### Trespass

59.     The Port incorporates the allegations in paragraphs 1 through 58, above.

60.     BNSF's use of Port track for alien cars is deliberate, not casual or inadvertent.

61.     BNSF's use of Port track for alien cars is not permitted under the Judgment.

62.     BNSF's use of Port track for alien cars under such circumstances is not authorized by the Port and constitutes trespass.

63.     The Port seeks all available damages and injunctive relief against BNSF's trespass.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Port of Vancouver USA asks for judgment against BNSF as follows:

(a)     For findings that BNSF has violated the Judgment by its continuing alien car practices and failing to establish Commercial Access rates for UP on reasonable and customer terms and conditions;

(b)     For an order enforcing the Judgment and requiring BNSF to cease using Port track for alien cars and requiring BNSF to establish reasonable and customary Commercial Access rates for UP;

Page 11 – COMPLAINT

1   (c)      For an order finding that BNSF has engaged in trespass by bringing alien cars

2   on to Port property, directing BNSF to cease such trespass, and awarding the Port appropriate

3   damages;

4   (d)      For an injunction requiring BNSF to comply with the requirements of the

5   Judgment with respect to alien cars and commercial access;

6   (e)      For reimbursement of attorney's fees, costs, and expenses incurred by the Port

7   in prosecuting this claim for enforcement of the Judgment confirming and entering the

8   arbitrators' Awards;

9   (f)      For statutory and/or contractual interest under the WVFAA on the judgment

10   from the date judgment is entered until paid in full; and

11   (g)      For such other amounts and relief as the Court deems just and equitable.

12   Dated this 23rd day of June, 2023.

13                                  SCHWABE, WILLIAMSON & WYATT, P.C.

14

15                                  /s/ Molly J. Henry
                                    Noah Jarrett, WSBA # 31117
16                                  Email:  njarrett@schwabe.com
                                    Molly J. Henry, WSBA #40818
17                                  Email:  mhenry@schwabe.com
                                    Adam P. Murray, WSBA #48553
18                                  Email:  amurray@schwabe.com
                                    Schwabe Williamson & Wyatt
19                                  1420 5th Avenue, Suite 3400
                                    Seattle, WA  98101-4010
20                                  Tel: 206.622.1711

21                                  *Attorneys for the Port of Vancouver, USA*

22

23

24

25

26

Page 12 – COMPLAINT

# EXHIBIT A

## WEST VANCOUVER FREIGHT ACCESS AND INDUSTRIAL TRACK AGREEMENT

THIS WEST VANCOUVER FREIGHT ACCESS AND INDUSTRIAL TRACK AGREEMENT ("**Agreement**") is entered into by and between BNSF RAILWAY COMPANY, a Delaware corporation ("**BNSF**"), and PORT OF VANCOUVER, USA, a port district formed pursuant to Chapter 53.04 RCW ("**Port**"), as of the 23rd day of December, 2008 (the "**Effective Date**"). BNSF and Port may be referred to herein sometimes individually as a "Party" and collectively as the "Parties".

## **RECITALS**

A.    The Port owns and controls marine terminals and industrial facilities, including substantial rail infrastructure within the Port complex located in the City of Vancouver, Clark County Washington for the purpose of economic benefit to the community and will undertake a major redevelopment and expansion of the Port's marine terminals and industrial facilities that will improve network, regional and local rail capacity and operations in and around the Port complex. In conjunction therewith, the Port desires commercial rail access to all of the Port's facilities for the Union Pacific Railroad Company in a manner that protects the integrity of BNSF's exclusive rail operator and franchise rights as contemplated in this Agreement.

B.    The Port plans to construct the West Vancouver Freight Access Project ("**WVFA Project**") as shown on that certain master plan dated July 28, 2008, prepared by Thomas W. Wiser, P.E., of Wiser Rail Engineering (the "**Master Plan**") attached hereto as **Exhibit B**.

C    BNSF owns or controls certain real property, consisting of Tract 1 and Tract 2 (as hereinafter defined) and located in or near the City of Vancouver, Clark County, Washington (the "**BNSF Property**"). The Port desires to acquire the BNSF Property for the WVFA Project as described below.

D.    BNSF, as seller, and the Port, as buyer, are entering into that certain "Real Estate Purchase and Sale Agreement" ("**Tract 1 PSA**"), as of an even date herewith, for a certain portion of BNSF Property ("**Tract 1**"), Tract 1 being more specifically described on **Exhibit A-1** attached hereto.

E    BNSF, as seller, and the Port, as buyer, are entering into that certain "Real Estate Purchase and Sale Agreement" ("**Tract 2 PSA**"), as of an even date herewith, for a certain portion of the BNSF Property ("**Tract 2**"), Tract 2 being more specifically described on **Exhibit A-2** attached hereto. All other property owned or controlled by the Port or covered by the Master Plan is sometimes referred to herein as the "**Port Property**", with Tract 1 and Tract 2, together with the Port Property, sometimes referred to herein collectively as the "**Property**".

F    The Port has agreed to perform certain construction and related activities on the Property and provide certain access upon, along, and across the Property and comply with certain other terms agreed upon by the Parties. The Port has agreed to grant BNSF the Exclusive Rail Operator status on all of the Port's track and property for the purpose of rail operations to provide rail switching services to all Port customers. BNSF has established maximum rates for Commercial Access (as hereinafter defined) during the Initial Access Period (as hereinafter defined) for Union Pacific Railroad and its successor and assigns ("UP") as described in **Article III, Section 3.A**.

1

G.     The Port and BNSF wish to work collaboratively, to the mutual benefit of both parties, to construct the WVFA Project and operate the Port's rail infrastructure as contemplated herein to enhance the economic benefit to the community by increasing the capacity of rail cargo movements at the Port and providing additional employment opportunities to the community.

H.     BNSF and the Port hereby enter into this Agreement to set forth the terms and conditions of the Parties' mutual obligations hereunder.

<u>**AGREEMENTS**</u>

For and in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and confessed, BNSF and the Port agree as follows:

**ARTICLE I**
**CONSTRUCTION**

**Section 1.     <u>Plans</u>.**

A.     <u>Master Plan</u>.  The Parties acknowledge that BNSF and the Port have each previously reviewed and accepted the Master Plan and related matters affecting the Property, including without limitation: (i) the Port's construction of certain improvements on Tract 1 and Tract 2 and (ii) access, maintenance, and operational issues affecting the Property.  The Port shall not make any changes to the Property that would or could affect BNSF's rights under this Agreement in any manner whatsoever without BNSF's prior written consent to such changes, such consent not to be unreasonably withheld.

B.     <u>Project Plans and Specifications</u>.       The Port agrees to construct on the Property all the improvements shown or otherwise contemplated by the Master Plan or deemed necessary by BNSF in the event of a Capacity Event (as hereinafter defined)  (referred herein collectively as the "**Improvements**").  The Master Plan has been divided into multiple projects as identified on <u>**Exhibit "C"**</u> (each referred to as a "**Project**").  The Improvements to be constructed on the Property by the Port include, but are not limited to, the Port's construction of certain rail, ties, ballast, and related appurtenances (collectively, the "**Track**").  The term "Track" includes, but is not limited to, all rail, ties, ballast and related appurtenances currently located or to be constructed in the future on Tract 1, Tract 2 and the Port Property.

(1)     Not less than One Hundred Twenty (120) days before commencing work on a Project, the Port shall submit to BNSF for its review and acceptance preliminary construction plans and specifications for such Project based on the Master Plan (for each Project, the "**Preliminary Project Plans and Specifications**" for such Project) for the construction and related activities comprising such Project, including but not limited to the proposed alignment and positioning of the Improvements on the Property.

(2)     BNSF shall either accept or reject the Preliminary Project Plans and Specifications for such Project (such acceptance not to be unreasonably withheld) by written notice delivered to the Port within thirty (30) days after receipt of the same from the Port.  In the event that the Port notifies BNSF in writing that the Port reasonably needs BNSF's review of a particular Preliminary Project Plans and Specifications to occur more quickly than the thirty (30)

2

day period described above in order to meet the construction schedule, BNSF will reasonably cooperate with the Port and attempt to complete its review within fifteen (15) days; provided, however this will be done as a courtesy to the Port and BNSF shall not have any obligation to so perform.

(3)    In the event of rejection of any set of Preliminary Project Plans and Specifications, BNSF shall specify the reasons for such rejection, in which case the Port shall promptly revise and resubmit the Preliminary Project Plans and Specifications for BNSF's review and acceptance in accordance with the process and timelines noted above until such time as the Preliminary Project Plans and Specifications for such Project are satisfactory to BNSF. If BNSF fails to deliver notice to the Port of BNSF's acceptance or rejection of the Preliminary Project Plans and Specifications within the time period discussed above, the Preliminary Project Plans and Specifications shall be deemed rejected. If Preliminary Project Plans and Specifications are deemed rejected because BNSF fails to deliver notice, the Port shall give written notice of such failure to BNSF and any unexpired Interim Completion Dates and Final Completion Date shall be extended by the number of days from the date BNSF receives the failure notice to the date BNSF gives notice of its acceptance or rejection.

(4)    Not less than Sixty (60) days before commencing work on a Project, the Port shall submit to BNSF for its review and acceptance detailed construction plans and specifications for such Project based on the Master Plan and the Preliminary Project Plans and Specifications accepted by BNSF (for each Project, the "**Detailed Project Plans and Specifications**" for such Project) for the construction and related activities comprising such Project, including but not limited to the final alignment and positioning of the Improvements on the Property.

(5)    BNSF shall either accept or reject the Detailed Project Plans and Specifications for such Project (such acceptance not to be unreasonably withheld) by written notice delivered to the Port within thirty (30) days after receipt of the same from the Port. In the event that the Port notifies BNSF in writing that the Port reasonably needs BNSF's review of particular Detailed Project Plans and Specifications to occur more quickly than the thirty (30) day period described above in order to meet the construction schedule, BNSF will reasonably cooperate with the Port and attempt to complete its review within fifteen (15) days; provided, however this will be done as a courtesy to the Port and BNSF shall not have any obligation to so perform.

(6)    In the event of rejection of any set of Detailed Project Plans and Specifications, BNSF shall specify the reasons for such rejection, in which case the Port shall promptly revise and resubmit the Detailed Project Plans and Specifications for BNSF's review and acceptance in accordance with the process and timelines noted above until such time as the Detailed Project Plans and Specifications for such Project are satisfactory to BNSF. If BNSF fails to deliver notice to the Port of BNSF's acceptance or rejection of the Detailed Project Plans and Specifications within the time period discussed above, the Detailed Project Plans and Specifications shall be deemed rejected. If Detailed Project Plans and Specifications are deemed rejected because BNSF fails to deliver notice, the Port shall give written notice of such failure to BNSF and any unexpired Interim Completion Dates and Final Completion Date shall be extended by the number of days from the date BNSF receives the failure notice to the date BNSF gives notice of its acceptance or rejection.

(7)    The Detailed Project Plans and Specifications for each Project as accepted by BNSF in writing shall be referred to hereinafter as the "**Project Plans and Specifications**" for each such Project.

3

(8)     If the Port desires to make any material revisions or modifications to the Project Plans and Specifications before or during the construction of the applicable Project, the Port must submit to BNSF for its review and acceptance plans and specifications detailing such revisions ("**Revised Project Plans and Specifications**").  BNSF shall either accept or reject the Revised Project Plans in the same manner as set forth in <u>**Article I, Section I.B(2) through (4)**</u> above.

(9)     BNSF will review the plans as described above; provided, however, BNSF will not review the design details or calculations for structural integrity or engineering accuracy. BNSF accepts no responsibility for errors or omissions in the design or engineering of the project.

(10)     The Port will be responsible for the cost and expense of one (1) BNSF staff member designated by BNSF in its sole and absolute discretion to be assigned to the WVFA Project Team to accommodate necessary meetings and design reviews at an annual rate of $250,000 for the duration of the design and construction related to the WVFA Project.  BNSF will be solely responsible for any other cost and expense incurred by BNSF in reviewing the Project Plans and Specifications.   The WVFA Project Team shall determine when this position is no longer required for the benefit of the WVFA Project and shall issue Thirty (30) days notice to BNSF to eliminate the position from the WVFA Project.

C.     <u>Plans for Future Improvements</u>.  If at any time the Port desires to construct additional improvements ("**Future Improvements**") affecting the Track on the Property, prior to commencing any construction activities the Port shall comply with all provisions of <u>**Article I, Section 1.B**</u> above, including without limitation preliminary and detailed plans and specifications for the Future Improvements to BNSF for its review and acceptance or rejection in accordance with the conditions and timeframes described above.

D.     <u>Legal Descriptions</u>.  Upon the closing under the Tract 1 PSA, the description set forth for Tract 1 on Exhibit A-1 to this Agreement shall be substituted with the legal description for Tract 1 used in the quitclaim deed for Tract 1 from BNSF to the Port under the Tract 1 PSA.  Upon the closing under the Tract 2 PSA, the description set forth for Tract 2 on Exhibit A-2 to this Agreement shall be substituted with the legal description for Tract 2 used in the quitclaim deed for Tract 2 from BNSF to the Port under the Tract 1 PSA.  The Parties agree to evidence any such substitutions by executing an amendment to this Agreement signed by both Parties.

**Section 2.**     <u>**Construction Requirements.**</u>

A.     <u>Work</u>.  The Port, at the Port's sole cost and expense, agrees to provide all labor, materials, supervision, equipment, machinery, tools, facilities, services, employee training and testing, scaffolding, hoisting facilities, shop drawings, storage and testing, security, transportation, disposal, the securing of all field dimensions necessary or required, permits and agreements, and any other items necessary to timely and fully complete the construction of the Improvements for each Project and any Future Improvements: (i) in a good and workmanlike manner, (ii) in strict accordance with each set of Project Plans and Specifications (or the accepted plans and specifications for Future Improvements) and all applicable Legal Requirements (defined below), and (iii), unless otherwise expressly agreed to by BNSF in writing in advance, using only new materials, or used materials as agreed to by the WVFA Project Team to maximize the reuse of existing materials (for each Project, the "**Work**").  The Port shall promptly correct, at its sole cost and expense, any Work found in any material respect to be defective or failing to conform to the Project Plans and Specifications and/or applicable Legal Requirements.

4

B.    Permits and Licenses.  The Port shall secure and pay for all building permits and all other permits and governmental fees, licenses and inspections necessary for the proper execution and completion of the Work and shall be responsible for obtaining all necessary approvals for completion of the Work from any applicable property owners association, declarant or architectural control committee or similar person or entity under any private restrictions or declarations affecting the Property.

C.    Compliance with Legal Requirements.  The Port shall give all notices and comply with all Legal Requirements bearing on the performance of the Work including, without limitation, those Legal Requirements relating to health, safety and the environment.

D.    Gateway Avenue Construction.  The Gateway Avenue crossings will need to be altered at certain points during the Work; provided, however, the Port agrees that it shall not at anytime allow more than four (4) lead tracks to cross Gateway Avenue, excluding the current industrial track used for Tri Star, or include any railroad switches in the crossings. The design and other plans for any temporary or other alterations to the Gateway Avenue crossings shall be subject to BNSF review and acceptance in accordance with **Article I, Section 1.B** above.  Should any alterations whatsoever be made to the existing crossings, the installation of crossing gates and lights as specified by BNSF will be required to protect the altered crossing.  The Port acknowledges that part of the completion of the Work under the Master Plan requires the removal of all at-grade crossings at Gateway Avenue by the Final Completion Date (as hereinafter defined) (the "Removal of Gateway Avenue At-Grade Crossings ").

E.    Other Crossings.  As part of the Work or any future improvements or alterations to the Track or the Property, the Port shall not construct any new at-grade crossings across the Track without written BNSF approval, which may be withheld at BNSF's sole and absolute discretion.

F.    Coordination.  All Work shall be coordinated in advance with BNSF local operating personnel to ensure adequate safety measures are in place and disruption to BNSF operations is minimized to the extent possible.

**Section 3.    Completion.**

A.    Completion of the Work.  "**Final Completion**" of all Improvements and all other construction obligations under the Master Plan shall have been achieved when (i) all Improvements have been fully completed in accordance with their respective Project Plans and Specifications; (ii) all necessary certificates of approval have been issued by applicable governmental authorities or private associations, as applicable; (iii) all punch list items have been certified by the engineer supervising such Work as being complete; and (iv) BNSF representatives have completed a final walkthrough and inspection of the Work and have accepted in writing the Work as satisfactory to BNSF, which acceptance shall not be unreasonably withheld or delayed.

B.    Timing of Completion.  The Parties acknowledge and agree that time is of the essence with respect to the Final Completion Date and Interim Completion Dates as further described below.

(1)    The Port acknowledges and agrees that Final Completion of all Improvements and all other construction obligations under the Master Plan must be achieved by the Port, at the Port's sole cost and expense, no later than December 31, 2017 (the "**Final Completion Date**").

(2)    The Port further acknowledges and agrees that certain specific activities and/or improvements must be completed to BNSF's satisfaction and in accordance with the Master Plan and the applicable Project Plans and Specifications, at the Port's sole cost and expense, by certain

5

dates prior to the Final Completion Date (each, an "**Interim Completion**").  The dates by which the Interim Completions must be completed (each, an "**Interim Completion Date**") are set forth on the schedule attached hereto as **Exhibit C** (the "**Completion Schedule**").

(3)     The Port covenants and agrees to promptly provide written notice to BNSF of additional traffic prior to the execution of any customer agreement to ensure rail service to existing customers is not negatively impacted or degraded.   Prior to entering into any arrangements or executing any Agreement which may result in additional Port or Rail Customer (as defined in **Article III, Section 3.A**) traffic within the Property, the Port shall provide written notice to BNSF of the details of the proposed additional rail traffic, including commodities, expected rail routes, expected rail volumes, and estimated commencement date of new traffic as well as infrastructure plans and timelines for installation as necessary to ensure the additional traffic can be handled without negatively impacting rail service to other Port customers or BNSF operations, including outside the Property.  If BNSF in its reasonable discretion anticipates the additional Port and/or Rail Customer traffic handled using the Port's proposed additional infrastructure installed on the Port's proposed timelines will nonetheless result in significant operating difficulties to either the Port within the Property or mainline rail service, a "**Capacity Event**" shall be deemed to have occurred.  BNSF shall provide written notice to the Port thereof and notice of necessary specified Improvements needed to accommodate the Capacity Event in addition to those proposed for installation, if any, by the Port.  Within twenty-four (24) months after the Port enters into any arrangement or executes any Agreement that triggered a Capacity Event, the Port agrees to achieve final completion of specified Improvements.  A Capacity Event may occur multiple times during the construction of the Project.  Until specified Improvements are completed by the Port, BNSF shall, in its sole discretion, handle such additional traffic on a case by case basis without any guarantees of any particular service level or priority of service; provided, however, in no event shall BNSF have the obligation to provide service or Commercial Access to any such customer until final completion of the required Improvements is achieved in accordance with this section.   In the event that the final completion of certain Improvements pursuant to this paragraph results in unavoidable delays in reaching certain Interim Completion Dates, the Parties agree to extend the affected Interim Completion Dates by a reasonable period as determined by the WVFA Project Team; provided, however, that nothing shall affect or extend the Final Completion Date, which shall remain unchanged in any event.

(4)     The Port and BNSF shall form a project team ("WFVA **Project Team**") consisting of two Port representatives and two BNSF representatives to meet regularly to review the status of the WVFA Project.  The WVFA Project Team shall confirm the project completion objectives and make recommendations for any modifications to the Interim Completion Dates for adjustments resulting from accelerated completion caused by a Capacity Event or otherwise contemplated in this Agreement.  No recommendations, variations, modifications or changes to the any completion dates or any other terms of this Agreement shall be binding or have any effect unless set forth in writing in a document signed by both Parties as required in **Article VIII, Section 6** of this Agreement.  The WVFA Project Team is charged with and has the authority to make recommendations and draft formal change requests that would modify the designs, schedules, and or completion dates. Approval of Project Team change requests shall not be unreasonably delayed or withheld by the Parties.

**ARTICLE II**
**MAINTENANCE**

**Section 1.**     **Maintenance Obligation.**  The Port shall at all times, and at its sole risk and expense, have the sole right and responsibility to maintain, or cause to be maintained, the Property, including

6

without limitation, (i) the Track, (ii) all Improvements, (iii) any Future Improvements, (iv) all Facilities (defined below), and (v) all Equipment (defined below), (if any), in a safe and satisfactory condition, in a good and workmanlike manner, in compliance with all Legal Requirements and in a condition satisfactory to BNSF. The Port shall not cause, permit, commit, or maintain any waste or nuisance in, on, or about the Track or the Property. As part of the Port's maintenance obligations hereunder, the Port agrees to assume as of the date of this Agreement all maintenance and related obligations of BNSF under any Existing BNSF/Port ITAs (as hereinafter defined) and any existing Industry Track Agreements or other agreements between BNSF and any customers of BNSF or the Port serviced by using the Track or any portion of the Property. All maintenance activities shall be coordinated in advance with BNSF local operating personnel to ensure adequate safety measures are in place and disruption to BNSF operations is minimized to the extent possible.

**Section 2.** <u>**Definition of Maintenance.**</u> Maintenance of the Track for the purpose of this Agreement includes, but is not limited to, responsibility for providing proper drainage along the Track and for keeping the Track free and clear of snow, ice, vegetation, structures, and other obstacles. Maintenance of the Track also includes, but is not limited to, responsibility for the maintenance of switches, grade crossing warning devices, passive warning signs, stop signs, gates, fences, barriers, roadways and roadway construction, track drainage facilities, lighting, track signals and signal maintenance.

**Section 3.** <u>**Facilities and Equipment.**</u> If the Port installs any gates or fencing across the Track, or a track scale, unloading pit, loading or unloading device, adjustable loading dock, warehouse door, or any other structure (collectively, "**Facilities**") affecting the Track, the Port shall be solely responsible for assuring the safe and satisfactory condition of the same and shall not allow any Facilities to be a source of danger to the safe operation of the Track. The Port shall also be solely responsible for assuring the safe and satisfactory condition of all of the Port's equipment touching, used in conjunction with or affecting the Track ("**Equipment**") and shall not allow any Equipment to be a source of danger to the safe operation of the Track. Before utilizing or unloading any equipment spotted onto the Track, the Port shall inspect the same and all other Equipment and Facilities for the safety of persons working on or about these items to assure compliance with the foregoing. The Port shall utilize all Facilities, Equipment, and spotted equipment so as not to adversely affect the safe and efficient operation over the Track. The Port shall, among other things: keep any gates across the Track open whenever necessary, in BNSF's sole judgment, to enable BNSF to safely and efficiently operate over the Track; keep unloading pits securely covered when not in actual use and at all times when the Track is being switched by BNSF; keep all doors firmly secured; and keep adjustable loading docks at warehouses securely fastened in an upright position when not in actual use and at all times when the Track is being switched by BNSF consistent with the Port of Vancouver Rail Safety Plan and the Port of Vancouver Marine Facility Security Plan.

**Section 4.** <u>**Existing Industry Track Agreements.**</u> The Parties acknowledge that there are existing Industry Track Agreements between the Port and BNSF affecting the Property ("**Existing BNSF/Port ITAs**"), including without limitation, those agreements listed on <u>**Exhibit E**</u> attached hereto. Upon the closing under the Tract 1 PSA, the Parties agree that any Existing ITAs solely between the Port and BNSF affecting Tract 1 shall terminate to the extent applicable to Tract 1. Upon the closing under the Tract 2 PSA, the Parties agree that any Existing ITAs solely between the Port and BNSF affecting Tract 2 shall terminate to the extent applicable to Tract 2. This Agreement shall control the Port's obligations with respect to Track maintenance.

**Section 5.** <u>**No BNSF Liability or Obligation.**</u> BNSF shall not have any liability or obligation to furnish or pay for any services or facilities of whatsoever nature or to make any repairs or alterations of whatsoever nature in or to the Track or the Property, or to maintain the Track or the Property in any manner.

7

## ARTICLE III
## OPERATIONS

**Section 1.**     **Exclusive Rail Operator.**

A.     Subject to any rights of UP as of the Effective Date of this Agreement, the Port grants BNSF the exclusive right to access, serve, operate and use the Track and the Property and shall in all respects be the exclusive rail operator (the "**Exclusive Rail Operator**") on the Track and the Property to provide rail service consistent with applicable law.  As Exclusive Rail Operator, BNSF shall have exclusive control over (i) all train and equipment movements, including the spotting and pulling of third party trains, on the Track, with the exception of intraplant switching performed by such customers in coordination with BNSF and (ii) the management and direction of the operation and use of the Track; provided, however, the Port or its designated agent(s) has the sole right and responsibility to enter upon the Property with maintenance equipment in order to perform the Port's obligations under this Agreement, subject to receipt of advance authority from BNSF.  If this Agreement is terminated in whole or in part because of a Default Event (as hereinafter defined) or otherwise, BNSF's right as Exclusive Rail Operator shall nevertheless survive and shall not be affected by any such termination.

B.     UP's and BNSF's rights under any agreements between UP and BNSF, including without limitation any joint facility agreements, can neither be abridged nor expanded by any actions of the Port. The Port shall not build new infrastructure which would directly or indirectly create access for UP by means of the existing joint facility agreements.

C.     BNSF and the Port will endeavor to meet at least once every year to discuss ways to maximize customer service and increase service efficiencies.  At these meetings the Parties may discuss operational issues including but not limited to joint marketing efforts, customer development, WVFA Project status, on time service, effective coordination and communication, rail operating plan, safety plans and security plans. BNSF will endeavor to (a) submit annually a Port Rail Operations Plan, based on the then existing Port rail infrastructure, (b) participate in quarterly rail user meetings for the purposes of project construction and normal operations coordination and communications only, and (c) provide reasonable performance reports.  These meetings, plans, reports, and the matters discussed therein are for the Parties' convenience only and shall not have any binding effect or otherwise affect either Party's rights under this Agreement.

**Section 2.**     **Additional Trackage and Connections.**  BNSF has the right, but not the obligation, to have additional trackage constructed on the Property for connections to other trackage located on adjacent property not owned or controlled by the Port, such construction to be performed by the Port at BNSF's sole cost and expense.  At no time shall BNSF have the right to request that the Port construct trackage as provided herein that materially interferes with the Master Plan.

**Section 3.**     **Commercial Access, Fees and Charges.**

A.     BNSF agrees to offer all Rail Customers Commercial Access to UP for so long as the Port is not in default under this Agreement.  From the Effective Date of this Agreement until 10 years from Final Completion of all Improvements ("**Initial Access Period**"), the terms of this Agreement shall govern such Commercial Access.  This **Article III, Section 3.A** shall not in any way affect BNSF's rights as Exclusive Rail Operator of the Track and Property.

(i) For purposes of this **Article III, Section 3.A**, "**Commercial Access**" shall mean any arrangements established by BNSF or otherwise implemented by BNSF pursuant to agreement, if any

8

may be reached at any time in BNSF's sole discretion, between BNSF and UP and/or between BNSF and a Rail Customer (including but not limited to any or a combination of haulage, ratemaking authority, handling carrier agreement, switching tariff, inter-carrier switching agreement(s), published rate authorities, or private or public contract rates) under which BNSF shall, upon reasonable demand or request of a Rail Customer, tender and/or receive on reasonable and customary terms and conditions consistent with BNSF's own freight service for such freight business, such customer's rail freight to UP at any commercially reasonable location to be designated by BNSF within a 15 mile radius of the Property for furtherance beyond.

(ii) The maximum total amount of compensation to BNSF for Commercial Access (whether charged to such Rail Customer, UP, or both collectively) may not exceed the rates, set out in the schedule of maximum rates (as adjusted over time) attached hereto as **Exhibit F** to the extent a rate for particular movements is set out in **Exhibit F**; provided, however, such rates do not include amounts for customary and usual tariff surcharges, demurrage and ancillary service charges, taxes and governmental fees which may be charged by BNSF in addition to the Commercial Access Rates.

(iii)    For purposes of this **Article III, Section 3.A**, "**Rail Customers**" shall mean rail freight customers owning, controlling and directing in their absolute discretion (i.e., no brokers of rail transportation service, etc.,), the terms of freight service for freight originating or terminating at rail accessible facilities located now or in the future on the Property, excepting any such customers (a) with the ability to receive rail service from UP pursuant to written agreements in effect between BNSF and UP as of the Effective Date of this Agreement; (b) shipping commodities and/or equipment expressly excluded, with no rates established, or not addressed in the rate schedule attached as **Exhibit F**; or (c) originating or terminating freight at a new transload facility which may be established on the Property unless BNSF shall, in its reasonable discretion, agree otherwise.

(iv)    Notwithstanding any provision to the contrary, at any time, BNSF may, in its sole discretion and without need of consent of the Port, offer to provide, and subject to written consent of UP, provide, temporary trackage rights to UP on standard terms and conditions consistent with industry custom and practice, sufficient to allow UP to serve a Rail Customer direct in lieu of providing Commercial Access to a Rail Customer.  In the event UP declines BNSF's offer of temporary trackage rights, BNSF shall have no obligation to provide Commercial Access to such Rail Customer under this Agreement.

(v)    The rates described above are subject to rate escalation on an annual basis beginning January 1, 2010, and thereafter annually on each January 1, equal to 100% of the Rail Cost Adjustment Factor - Unadjusted (RCAF-U) as published by the Association of American Railroads or its successor organization.  All adjustments shall be subject to increases only and applied against the most recent price.

B.  As Exclusive Rail Operator, BNSF shall not be liable for any fees or charges whatsoever for the access to or use of the Track, Property, and/or any Port owned or controlled facilities, except where BNSF has granted its prior written consent, such consent to be in BNSF's sole discretion.

(i)    The Port shall have the right to establish a reasonable Maintenance Fee and publish a Tariff annually to reflect the Maintenance Fee.   Maintenance Fees shall be based on the actual cost of maintenance from the previous calendar year and shall be calculated and charged on a per car basis directly to all Rail Customers and other Port, BNSF and UP rail customers using the Track.

(ii)    The Port shall have the right to establish a reasonable rail infrastructure repayment fee ("**Rail Infrastructure Repayment Fee**") and shall publish a Tariff annually to reflect the Rail Infrastructure Repayment Fee.  The Rail Infrastructure Repayment Fee shall be charged on a per rail car basis directly to Rail Customers using the Track and may only be applied to offset the Port's actual investments in the cost

9

of Improvements contemplated in this Agreement, net of externally contributed grants, and provide a return on such investment equivalent to the Port's historical and customary rate of return.  In no event shall the Rail Infrastructure Repayment Fee exceed $50.00 per rail car without the express written approval of BNSF.   The Rail Infrastructure Repayment Fee may not be charged once the cost of Improvements contemplated under this Agreement has been repaid.

(iii)     Once Rail Infrastructure Expansion Repayment Fees have terminated, the Port shall have the right to charge Rail Customers an Access Fee on a per rail car basis of an amount no greater than the Maintenance Fee for rail traffic that does not result in wharfage.

(iv)     The Port shall have the right, in its sole and absolute discretion, to charge fees to UP and UP traffic receiving Commercial Access.

(v)     All Port fees shall be subject to audit by BNSF to ensure these terms.  In no case may any fee discriminate against BNSF Rail Customers or other BNSF rail customers. Port may not charge BNSF Rail Customers or other BNSF rail customers any fees other than those permitted in this **Article III, Section 3.B**

(vi)     BNSF, as Exclusive Rail Operator, has the right to assess or charge customers and/or other railroads fees for switching, interchange, wheelage, and related services provided by BNSF, such fees to be in BNSF's sole discretion notwithstanding the provisions of **Article III, Section 3.A** .

**Section 4.**     **Hazardous Materials**.   The Port shall not request that BNSF transport or otherwise handle toxic inhalation hazards or poison inhalation hazards (as defined by applicable environmental laws) on the Property, including without limitation on the Track.

**Section 5.**     **Unsatisfactory Conditions**.   BNSF may refuse to operate over the Track whenever BNSF, in its sole discretion, determines that the Track is unsatisfactory for BNSF's operation. If and when the Port has remedied such condition to BNSF's sole satisfaction, BNSF may resume operation over the Track.  BNSF's operation over the Track with knowledge of an unsatisfactory condition is not a waiver of the Port's obligations contained herein.

**Section 6.**     **Insurance**.   Port shall, at its sole cost and expense, procure and maintain during the life of this Agreement the following insurance coverage:

A.     Commercial General Liability insurance that contains broad form contractual liability with a combined single limit of a minimum of $1,000,000 each occurrence and an aggregate limit of at least $2,000,000.  Coverage  must be purchased on a post 1998 ISO occurrence or equivalent and include coverage for, but not limited to, Bodily Injury and Property Damage, Products and completed operations. The definition of insured contract shall be amended to remove any exclusion or other limitation for any work being done within 50 feet of railroad property.

B.     Workers Compensation and Employers Liability insurance including coverage for, but not limited to:
•     Port's statutory liability under the worker's compensation laws of the state(s) in which the work is to be performed.  If optional under State law, the insurance must cover all employees anyway.
•     Employers' Liability (Part B) with limits of at least $500,000 each accident, $500,000 by disease policy limit, $500,000 by disease each employee.

In addition, Port shall comply with the following additional requirements with respect to such insurance:

Any insurance policy shall be written by a reputable insurance company with a current Best's Guide Rating of A- and Class VII or better, and authorized to do business in the state(s) in which the service is to be provide. If any portion of the operation is to be subcontracted by Port, Port shall require that the subcontractor provide and maintain insurance coverage as set forth herein.

Prior to commencing operations governed by this Agreement, Port shall furnish to BNSF an acceptable certificate(s) of insurance including an original signature of the authorized representative evidencing the required coverage, endorsements, and amendments and referencing the contract audit/folder number if available. The policy(ies) shall contain a provision that obligates the insurance company(ies) issuing such policy(ies) to notify BNSF in writing at least 30 days prior to any cancellation or non-renewal with such provision indicated on the certificate of insurance. In the event of a claim or lawsuit involving BNSF arising out of this agreement, Port will make available any required policy covering such claim or lawsuit.

Failure to provide evidence as required by this section shall entitle, but not require, BNSF to terminate this Agreement immediately. Acceptance of a certificate that does not comply with this section shall not operate as a waiver of Port's obligations hereunder. The fact that insurance (including, without limitation, self-insurance) is obtained by Port shall not be deemed to release or diminish the liability of Port including, without limitation, liability under the indemnity provisions of this Agreement. Damages recoverable by BNSF shall not be limited by the amount of the required insurance coverage.

## ARTICLE IV
## COMPLIANCE WITH LEGAL REQUIREMENTS; SAFETY

**Section 1.** **Compliance with Legal Requirements.** The Port shall be responsible for obtaining, without expense to BNSF, all necessary real property rights and public authority and permission, including applicable permits, for the maintenance and operation of the Track. The Port shall strictly comply with all laws, statutes, regulations, ordinances, orders, covenants, restrictions, or decisions of any court of competent jurisdiction, including, without limitation, those required by or pertaining to the Washington Utility and Transportation Commission and those pertaining to environmental matters (collectively, "**Legal Requirements**") and other BNSF requirements relating to the use of the Property, Track, Facilities, or Equipment.

**Section 2.** **Safety.** If the Port or its contractor(s) perform any Work that could affect BNSF's adjacent property, the Port shall complete and shall require its contractor to complete the safety training program at the appropriate internet website "http://contractororientation.com". This training must be completed no more than one year in advance of the Port's entry on BNSF's property.

**Section 3.** **Flagmen.** BNSF may require for safety purposes that the Port, at its sole cost and expense, provide flagmen (through BNSF as described below), lights, traffic control devices, automatic warning devices, or any such safety measure that BNSF deems appropriate in connection with the use of the Track, including but not limited to the furnishing of flagmen and any vehicle rental costs incurred. Flagging services, when deemed necessary by the BNSF's representative, will be performed by BNSF but the cost of such flagging services will be borne by the Port. The estimated cost for one (1) flagger is $600.00 for an eight (8) hour basic day with time and one-half or double time for overtime, rest days and holidays. The estimated cost for each flagger includes vacation allowance, paid holidays, BNSF and unemployment insurance, public liability and property damage insurance, health and welfare benefits, transportation, meals, lodging and supervision. Negotiations for BNSF labor or collective bargaining agreements and rate changes authorized by appropriate Federal authorities may increase actual or estimated flagging rates. The flagging rate in effect at the time of performance by the Port will be used to calculate the actual costs of flagging pursuant to this paragraph.

11

**Section 4.** **Minimal Clearances**. The Port shall not place, permit to be placed, or allow to remain, any permanent or temporary material, structure, pole, container, storage vessel, above-ground or underground tank, or other obstruction within 8½ feet laterally from the center (9 ½ feet on either side of the centerline of curved track) or within **23 ½** feet vertically from the top of the rail of the Track ("**Minimal Clearances**"), provided that if any Legal Requirement requires greater clearances than the Minimal Clearances, then the Port shall strictly comply with such Legal Requirement. The Port shall not place or allow to be placed any freight car within 250 feet of either side of any at-grade crossings on the Track. BNSF's operation over the Track with knowledge of an unauthorized reduced clearance will not be a waiver of the covenants of the Port contained in this **Article IV, Section 4**.

## ARTICLE V
## REPURCHASE OPTION

**Section 1.** **Option Events**. Beginning on the Commencement Date (defined below), at any time thereafter BNSF shall have the option to repurchase Tract 2 from the Port (the "**Repurchase Option**") if either:

      A.      The Port fails to complete any Interim Completion by the applicable Interim Completion Date set forth in the Completion Schedule in accordance with **Article I, Section 3.B(2)** and such failure continues for more than 30 days after written notice of such failure from BNSF to the Port ("**Interim Construction Trigger**"); or

      B.      The Port fails to achieve Final Completion of all Improvements and all other construction obligations under the Master Plan by the Final Completion Date in accordance with **Article I, Section 3.B(1)** and such failure continues for more than 30 days after written notice of such failure from BNSF to the Port ("**Final Completion Trigger**"); or

      C.      The Port fails to achieve Final Completion of all Improvements required by BNSF within twenty-four (24) months after the occurrence of a Capacity Event in accordance with **Article I, Section 3.B(3)** and such failure continues for more than 30 days after written notice of such failure from BNSF to the Port ("**Capacity Trigger**"), or

      D.      An event of material default of this Agreement by Port and such default continues for more than 30 days after written notice of such default from BNSF to the Port ("**Port Material Default Trigger**"), or

      E.      The Exclusive Rail Operator rights set forth in **Article III, Section 1** are illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement or are deemed illegal, invalid or unenforceable by a court of competent jurisdiction ("**Enforceability Trigger**").

      F.      If a failure or default described in A, B, C or D occurs and the failure or default cannot be reasonably cured within the 30 day cure period provided above and the Port has in good faith commenced cure within the 30 day period and is diligently proceeding, then the Port shall have an additional 30 days to cure.

      G.      The Interim Construction Trigger, Final Completion Trigger, Capacity Trigger, Port Material Default Trigger, and Enforceability Trigger shall each be deemed an "**Option Event**". Election of the Repurchase Option in event of a Port Material Default Trigger may be made without prejudice to any other rights or remedies which may be available at law or in equity.

12

**Section 2.** **Exercise of Option.**

A.      If an Option Event occurs, BNSF has the right, but not the obligation, in BNSF's sole discretion, to exercise the Repurchase Option by notifying the Port in writing of its election ("**Option Notice**") to be sent in accordance with **Article VIII, Section 3** hereof.

B.      BNSF has the right to exercise the Repurchase Option multiple times. If BNSF: (i) elects not to exercise the Repurchase Option upon the occurrence of an Option Event, or (ii) exercises the Repurchase Option upon the occurrence of an Option Event, but later terminates its exercise of the Repurchase Option pursuant to its right to do so under **Article V, Section 3.B** below, the Repurchase Option shall in any case not terminate and shall continue in full force and effect.

**Section 3.** **Terms and Conditions**.  If BNSF exercises the Repurchase Option as set forth above, the Port and BNSF shall enter into a Real Estate Purchase and Sale Agreement ("**Option Purchase Contract**"), which Option Purchase Contract shall include, without limitation, the following terms and conditions:

A.      The purchase price ("**Option Purchase Price**") to be paid by BNSF to the Port for Tract 2 is the "Purchase Price under the Tract 2 PSA less a transaction fee of $250,000.

B.      Within thirty (30) days after BNSF's exercise of the Repurchase Option, the Port shall deliver to BNSF (i) a current title commitment covering Tract 2 ("**Title Commitment**") issued by a title company selected by BNSF ("**Title Company**") and (ii) a current, on-the-ground, staked ALTA/ACSM survey performed by a registered public surveyor or engineer satisfactory to BNSF and the title company ("**Survey**").  If the Title Commitment or Survey reveal any encumbrances or other matters that are not acceptable to BNSF in BNSF's sole discretion, BNSF may elect to either (a) terminate its exercise of the Repurchase Option (but may subsequently exercise the Repurchase Option again at any time if another Option Event occurs), or (b) require the Port to cure such unacceptable encumbrance, or (c) waive such objection and proceed to the Option Closing.  All encumbrances and other matters disclosed by the Title Commitment and Survey not objected to by BNSF shall be considered "**Permitted Encumbrances**" hereunder; provided, however, in no event shall any monetary liens be considered Permitted Encumbrances, and the Port shall be obligated to fully remove any such liens on or before Option Closing (as hereinafter defined).

C.      BNSF shall have the right to go on to Tract 2, including any improvements, to make inspections, surveys, test borings, soil analyses, structural analyses and engineering inspections, and other tests, studies and surveys thereon and therein, including without limitation, environmental tests, borings, analyses and studies ("**Tests**") and BNSF will provide an indemnity to the Port for its activities and the activities of its representatives performing such inspections and tests.  As a condition precedent to Option Closing, BNSF must be satisfied in BNSF's sole discretion with the results of the Tests, including the results of any additional environmental site assessments of Tract 2 to be conducted by an environmental consultant acceptable to BNSF in BNSF's sole discretion.  The Port shall fully indemnify, defend and hold harmless BNSF for the environmental condition of Tract 2 as of the Option Closing.

D.      The closing of the Repurchase Option ("**Option Closing**") shall occur in the offices of the Title Company on or before One Hundred Eighty (180) days after BNSF's receipt of both the Title Commitment and Survey.  The exact date shall be selected by BNSF in BNSF's sole discretion ("**Option Closing Date**").

13

E.      At the Option Closing, all of the following shall occur, all of which shall be deemed concurrent conditions:

(1)      The Port shall deliver or cause to be delivered to BNSF a special warranty deed, acceptable to BNSF in form and substance, fully executed and acknowledged by the Port, conveying to BNSF the Port's right, title, and interest to Tract 2, subject only to the Permitted Encumbrances.

(2)      BNSF shall deliver to the Port cash or wired funds in an amount of money equal to the Option Purchase Price. BNSF shall obtain, at the Port's expense, an ALTA Standard Owner's Policy of Title Insurance covering Tract 2 in the amount of the Option Purchase Price, in form and substance reasonably acceptable to BNSF, and subject only to the Permitted Encumbrances.

(3)      The Port and BNSF shall each pay their respective attorneys' fees and shall pay their own share of closing costs as is customary in transactions involving commercial real property in the State of Washington.

F.      The Parties further agree to execute any and all other documentation reasonably necessary and customary for the purchase of commercial property in the State of Washington. Ad valorem and similar taxes and assessments relating to Tract 2 shall be assumed by BNSF as of the Option Closing.

**Section 4.      Restoration Obligation**. Notwithstanding anything else herein to the contrary, if an Option Event occurs, BNSF has the right, on written request to the Port ("**Restoration Notice**"), to elect to require the Port to restore, at the Port's sole cost and expense, the rail track on Tract 2 (the "**Tract 2 Track**") to the same functional utility as the Tract 2 Track had as of the Commencement Date (the "**Restoration Obligation**"). The Port shall complete its Restoration Obligations within One Hundred Eighty (180) days of the Port's receipt of the Restoration Notice.

**Section 5.      No Hazardous Materials**.

A.      In light of BNSF's Repurchase Option, the Port warrants and agrees that the Port will not (a) cause or permit the presence, use, generation, manufacture, production, processing, installation, release, discharge, spillage, escape, storage (including aboveground and underground storage tanks for petroleum or petroleum products), treatment, handling, or disposal of any Hazardous Materials (as defined below), on, in, under, or about Tract 2, or in any way affecting Tract 2 or which may form the basis for any present or future claim, demand or action seeking cleanup of Tract 2, or (b) cause or exacerbate any occurrence or condition on Tract 2 that is or may be in violation of Environmental Laws (as defined below).

B.      The Port further agrees at all times to comply with (i) all Environmental Laws, and (ii) all notices of violations of Environmental Laws before the issuance of any regulatory or judicial order or assessment of any fines. The Port must not cause or permit the migration of Hazardous Materials from Tract 2 to any other property or the environment or onto Tract 2 from any property or area adjacent to Tract 2. No Hazardous Materials may be transported to or placed on, in, under, or about Tract 2, or removed from Tract 2, provided, however that this **Article V, Section 5** shall not prohibit the Port from allowing its Rail Customers to transport Hazardous Materials over Tract 2 in strict compliance with Environmental Laws.

14

C.     For purposes of this Section, "Hazardous Materials" means all materials, chemicals, compounds, or substances (including without limitation asbestos, petroleum products, and lead-based paint) identified as hazardous or toxic under Environmental Laws. "Environmental Laws" includes Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901, et seq.); the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. 9601, et seq.); the Emergency Planning and Community Right-to-Know Act (42 U.S.C. 11001, et seq.); the Clean Water Act (33 U.S.C. 1251, et seq.); the Hazardous Materials Transportation Act of 1974 (49 U.S.C. 1801, et seq.); the Occupational Safety and Health Act (29 U.S.C. 651, et seq.); the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. 136, et seq.); the Safe Drinking Water Act (42 U.S.C. 300f, et seq.); the Toxic Substances Control Act (15 U.S.C. 2601, et seq.); and the Clean Air Act (42 U.S.C. 7401, et seq.), as any may be amended from time to time, and any comparable or successor provisions of federal, state or local law, and any regulations, orders, rules, procedures, guidelines and the like promulgated in connection therewith regardless of whether such laws and/or regulations exist on the date this Agreement is executed.

## Article VI
## INDEMNIFICATION

**Section 1.     TO THE FULLEST EXTENT PERMITTED BY LAW, PORT SHALL AND SHALL CAUSE ITS CONTRACTOR TO INDEMNIFY, DEFEND AND HOLD HARMLESS BNSF AND BNSF'S AFFILIATED COMPANIES, PARTNERS, SUCCESSORS, ASSIGNS, LEGAL REPRESENTATIVES, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS (COLLECTIVELY, "INDEMNITEES") FOR, FROM AND AGAINST ANY AND ALL CLAIMS, LIABILITIES, FINES, PENALTIES, COSTS, DAMAGES, LOSSES, LIENS, CAUSES OF ACTION, SUITS, DEMANDS, JUDGMENTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, COURT COSTS, ATTORNEYS' FEES AND COSTS OF INVESTIGATION, REMOVAL AND REMEDIATION AND GOVERNMENTAL OVERSIGHT COSTS) ENVIRONMENTAL OR OTHERWISE (COLLECTIVELY "LIABILITIES") OF ANY NATURE, KIND OR DESCRIPTION OF ANY PERSON OR ENTITY DIRECTLY OR INDIRECTLY ARISING OUT OF, RESULTING FROM OR RELATED TO (IN WHOLE OR IN PART):**

**(i) ANY BREACH OF THIS AGREEMENT AND ANY RIGHTS OR INTERESTS GRANTED TO THE PORT PURSUANT TO THIS AGREEMENT,**

**(ii) THE PORT'S OWNERSHIP, OCCUPATION AND USE OF THE PROPERTY OR THE TRACK,**

**(iii)   THE WORK PERFORMED HEREUNDER AND THE PORT'S MAINTENANCE OBLIGATIONS, and/or**

**(iv) ANY ACT OR OMISSION OF THE PORT OR PORT'S OFFICERS, AGENTS, INVITEES, EMPLOYEES, OR CONTRACTORS, OR ANYONE DIRECTLY OR INDIRECTLY EMPLOYED BY ANY OF THEM, OR ANYONE THEY CONTROL OR EXERCISE CONTROL OVER,**

**EVEN IF SUCH LIABILITIES ARISE FROM OR ARE ATTRIBUTED TO, IN WHOLE OR IN PART, ANY NEGLIGENCE OF ANY INDEMNITEE.   THE ONLY LIABILITIES WITH RESPECT TO WHICH PORT'S OBLIGATION TO INDEMNIFY THE INDEMNITEES DOES NOT APPLY ARE LIABILITIES TO THE EXTENT PROXIMATELY CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF AN INDEMNITEE.**

15

**Section 2.** PORT SHALL RELEASE, INDEMNIFY, DEFEND, AND HOLD THE INDEMNITEES HARMLESS FROM AND AGAINST ANY LIABILITIES UNDER CERCLA OR OTHER ENVIRONMENTAL LAWS ARISING OUT OF OR RELATED TO (IN WHOLE OR IN PART) ANY CLAIM THAT BY VIRTUE OF THE USE OF THE TRACK CONTEMPLATED IN THIS AGREEMENT BNSF IS (I) AN "OWNER", "OPERATOR", "ARRANGER" OR "TRANSPORTER" OF THE TRACK OR THE PROPERTY, OR (II) OTHER THAN A COMMON CARRIER WITH RESPECT TO THE TRACK REGARDLESS OF ANY NEGLIGENCE OR STRICT LIABILITY OF ANY INDEMNITEE.

**Section 3.** THE PORT FURTHER AGREES, AND SHALL CAUSE ITS CONTRACTOR TO AGREE, REGARDLESS OF ANY NEGLIGENCE OR ALLEGED NEGLIGENCE OF ANY INDEMNITEE, TO INDEMNIFY, AND HOLD HARMLESS THE INDEMNITEES AGAINST AND ASSUME THE DEFENSE OF ANY LIABILITIES ASSERTED AGAINST OR SUFFERED BY ANY INDEMNITEE UNDER OR RELATED TO THE FEDERAL EMPLOYERS' LIABILITY ACT ("FELA") WHENEVER EMPLOYEES OF THE PORT OR ANY OF ITS AGENTS, INVITEES, CONTRACTORS CLAIM OR ALLEGE THAT THEY ARE EMPLOYEES OF ANY INDEMNITEE OR OTHERWISE. THIS INDEMNITY SHALL ALSO EXTEND, ON THE SAME BASIS, TO FELA CLAIMS BASED ON ACTUAL OR ALLEGED VIOLATIONS OF ANY FEDERAL, STATE OR LOCAL LAWS OR REGULATIONS, INCLUDING BUT NOT LIMITED TO THE SAFETY APPLIANCE ACT, THE BOILER INSPECTION ACT, THE OCCUPATIONAL HEALTH AND SAFETY ACT, THE RESOURCE CONSERVATION AND RECOVERY ACT, AND ANY SIMILAR STATE OR FEDERAL STATUTE.

**Section 3.** Upon written notice from BNSF, the Port agrees to assume the defense of any lawsuit or other proceeding brought against any Indemnitee by any entity, relating to any matter covered by this Agreement for which the Port has an obligation to assume liability for and/or save and hold harmless any Indemnitee. The Port shall pay all costs incident to such defense, including, but not limited to, attorneys' fees, investigators' fees, litigation and appeal expenses, settlement payments, and amounts paid in satisfaction of judgments.

**ARTICLE VII**
**DEFAULT AND REMEDIES**

**Section 1.** <u>Default</u>. The following events shall constitute defaults hereunder: (i) creating or allowing to remain any condition, including without limitation, any environmental condition, on or about the Track, which in BNSF's sole judgment interferes with or endangers the operations of BNSF; (ii) assignment or transfer by operation of law of the Port's rights or obligations under this Agreement; (iii) occurrence of an Option Event or (iv) defaults on any of the covenants or agreements of the Port contained in this document (each a "**Default Event**").

**Section 2.** <u>Remedies</u>. If a Default Event occurs, in addition to and not in limitation of all other remedies available at law or in equity, BNSF may, without incurring any liability to the Port, (i) terminate this Agreement; (ii) discontinue BNSF's use of and rail operations on any or all the Track; (iii) sue the Port to recover damages, (iv) exercise Repurchase Option rights and/or (iv) enforce specific performance of this Agreement.

**ARTICLE VIII**

16

## MISCELLANEOUS

**Section 1.**     Time is of the essence of this Agreement.

**Section 2.**     This Agreement shall commence on the Effective Date and shall continue unless terminated by an agreement in writing between the Port and BNSF.  This Agreement shall survive the closings under the Tract 1 PSA and Tract 2 PSA.

**Section 3.**     All notices hereunder shall be in writing and addressed as set forth below, or to such other address as may be designated by the Party desiring its address to be changed in a notice to the other Party given in like manner:

> If to the Port:
>
> Port of Vancouver, USA
> 3103 Lower River Road
> Vancouver, WA 98686
> Attn: Executive Director
> Attn: Deputy Executive Director
> Attn: Director of Facilities
>
> If to BNSF:
>
> BNSF Railway Company
> 2500 Lou Menk Drive - AOB-3
> Fort Worth, Texas 76131-2830
> Attn: General Director- Corporate Real Estate
>
> BNSF Railway Company
> 2500 Lou Menk Drive – AOB-3
> Fort Worth, Texas 76131-2830
> Attn: Law Department

Notice will be deemed to have been served and given if (i) delivered in person to the address set forth above for the Party to whom the notice is given, (ii) delivered in person, (iii) placed in the United States mail, return receipt requested, addressed to such Party at the address specified above, or (iv) deposited into the custody of nationally recognized overnight delivery service  for next day delivery, addressed to such Party at the address specified above.

**Section 4.**     This Agreement binds and is for the benefit of the Parties and their permitted successors and assigns.  The Port shall not assign its rights and obligations under this Agreement without prior written consent of BNSF, which consent may be withheld in BNSF's sole and absolute discretion.  BNSF shall not assign its rights and obligations under this Agreement without prior written consent of Port, which consent may be withheld in Port's sole and absolute discretion, except that BNSF (a) may assign this Agreement to any person or entity (i) that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, BNSF, or (ii) that is or becomes a parent, successor or affiliate of BNSF, or is a successor of BNSF by reason of merger, consolidation or reorganization, or (iii) that acquires all or substantially all of the assets of BNSF in the Vancouver, Washington area, and (b) may freely subcontract its rights and obligations under this Agreement.

17

**Section 5.**     This Agreement is governed by and must be construed in accordance with the laws of the State of Washington.

**Section 6.**     This Agreement, together with its exhibits and the Tract 1 PSA, the Tract 2 PSA, and the Existing BNSF/Port ITAs contain the entire agreement between BNSF and the Port with respect to the matters set forth herein. Oral statements or prior written matters not specifically incorporated into this Agreement are superseded hereby.  No variation, modification, or change to this Agreement shall bind either Party unless set forth in a document signed by both Parties. No failure or delay of either Party in exercising any right, power or privilege hereunder shall operate as a waiver of such Party's right to require strict compliance with any term of this Agreement. The captions above the section numbers of this Agreement are for reference only and do not modify or affect this Agreement.  Each Party has had the opportunity to have counsel review this Agreement and, therefore, no rule of construction that any ambiguities are to be resolved against the drafting Party must not be employed to interpret this Agreement or any closing document.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute the same Agreement.   This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable Legal Requirements.

**Section 7.**     Whenever a date specified in this Agreement falls on a Saturday, Sunday, or federal holiday, the date will be extended to the next business day.

**Section 8.**     If any clause or provision of this Agreement is illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, then and in that event, it is the intention of the Parties hereto that the remainder of this Agreement shall not be affected thereby, and it is also the intention of the Parties to this Agreement that in lieu of each clause or provision of this Agreement that is illegal, invalid or unenforceable, there be added, as a part of this Agreement, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

**Section 9.**     Nothing contained herein or inferable herefrom shall be deemed or construed (i) to make any Party the agent, servant, or employee of any other Party, or (ii) to create any partnership, joint venture, or other association between or among BNSF or the Port.

**Section 10.**     If any action at law or in equity is necessary to enforce or interpret this Agreement, the prevailing Party will be entitled to reasonable attorneys' fees, costs, and discovery or investigation expenses in addition to any other relief to which that Party may be entitled.

**Section 11.**     Subject to the laws governing public records in the State of Washington, it is understood and agreed that this Agreement shall not be placed in the official public records of Clark County, but either Party may record, at such Party's expense, a memorandum of this Agreement ("**Memorandum of Agreement**") in the form of the attached **Exhibit D** in the official public records of Clark County.

**Section 12.**     If either Party is delayed or hindered in, or prevented from the performance required under this Agreement by reason of floods, earthquakes, landslides, strikes, lockouts, labor troubles, failure of power, riots, insurrection, war, acts of God or other reason of the like nature not the fault of the Party delayed in performance of its obligation, such Party is excused from such performance for the period of delay.  The period for the performance of any such act will then be extended for the period of such delay.

**Section 13**.     This Agreement is made and intended for the mutual benefit of the Parties hereto and their respective successors and permitted assigns and for no other parties.

**ARTICLE IX**

18

## ARBITRATION

**Section 1.**     If at any time a question or controversy shall arise between the Parties hereto in connection with this Agreement upon which the Parties cannot agree, either Party shall have the right to require a meeting of designated representatives with authority to settle the matter within 30 days of written notice of a desire to meet; if it cannot be resolved within 30 days of the meeting of the Parties, then the aggrieved Party may demand arbitration.   Unless other procedures are agreed to by the Parties, arbitration between the Parties pursuant to this **Article IX** shall be governed by the rules and procedures set forth in this **Article IX**.

**Section 2.**     If the Parties to the dispute are able to agree upon a single competent and disinterested arbitrator within twenty (20) days after written notice by one Party of its desire for arbitration to the other Party, then the question or controversy shall be submitted to and settled by that single arbitrator. Otherwise, any Party (the notifying Party) may notify the other Party (the noticed Party) in writing of its request for arbitration and nominating one arbitrator.  Within twenty (20) days after receipt of said notice, the noticed Party shall appoint an arbitrator and notify the notifying Party in writing of such appointment. Should the noticed Party fail within twenty (20) days after receipt of such notice to name its arbitrator, said arbitrator may be appointed by the American Arbitration Association, which shall designate said appointment from the CPR Panel of Distinguished Neutrals, or other similar body of competent neutral arbitrators which may be agreed upon between the Parties, upon application by either Party after ten (10) days' written notice to the other Party.  The two arbitrators so chosen shall select one additional arbitrator to complete the board.  If the arbitrators so chosen fail to agree upon an additional arbitrator, the same shall, upon application of a Party, be appointed in the same manner hereto before stated.

**Section 3.**     Upon selection of the arbitrator(s), said arbitrator(s) shall, with reasonable diligence, determine the questions as disclosed in said notice of arbitration, shall give both Parties reasonable notice of the time and place (of which the arbitrator(s) shall be the judge) of hearing evidence and argument, may take such evidence as the arbitrator(s) shall deem reasonable or as either Party may submit with witnesses required to be sworn, and hear arguments of counsel or others.  In no event shall the arbitrator(s) have authority to award indirect, special, consequential, punitive or exemplary damages.  If an arbitrator declines or fails to act, the Party (or Parties in the case of a single arbitrator) by whom the arbitrator was chosen or the American Arbitration Association, as the case may be, shall appoint another to act in the arbitrator's place.

**Section 4.**     After considering all evidence, testimony and arguments, said single arbitrator or the majority of said board of arbitrators shall promptly state such decision or award and the reasoning for such decision or award in writing which shall be final, binding, and conclusive on all Parties to the arbitration when delivered to them.  The award rendered by the arbitrator(s) may be entered as a judgment in any court in the United States of America having jurisdiction thereof and enforced as between the Parties without further evidentiary proceeding, the same as entered by the court at the conclusion of a judicial proceeding in which no appeal was taken.  Until the arbitrator(s) shall issue the first decision or award upon any question submitted for arbitration, performance under this Interchange Agreement shall continue in the manner and form existing prior to the rise of such question.  After delivery of said first decision or award, each Party shall forthwith comply with said first decision or award immediately after receiving it.

**Section 5.**     Each Party to the arbitration shall pay all compensation, costs, and expenses of the arbitrator appointed in its behalf and all fees and expenses of its own witnesses, exhibits, and counsel. The compensation, cost, and expenses of the single arbitrator or the additional arbitrator in the board of arbitrators shall be paid in equal shares by all Parties to the arbitration.

**Section 6**.     The Parties may obtain discovery and offer evidence in accordance with the Federal Rules of Civil Procedure, and Federal Rules of Evidence, as each may be amended from time to time.

**Section 7**     Interest computed annually, at a rate equal to the Prime Rate plus two (2) percentage points (or the maximum interest allowed by applicable law, if lower), shall be applied to any and all arbitration awards requiring the payment of money and shall be calculated from thirty (30) days following the date of the applicable arbitration decision.   The term "Prime Rate" shall mean the minimum commercial lending rate charged by banks to their most credit-worthy customers for short-term loans, as published daily in the Wall Street Journal.

[Signature page and exhibits follow.]

20

IN WITNESS WHEREOF, this Agreement has been duly executed to be effective as of the day and year first above written.

**PORT**:

PORT OF VANCOUVER

By: _Lawrence Paulson_

Print Name: _LAWRANCE L. PAULSAN_

Title: _Executive Director_

Port's SSN or EIN: _____

**BNSF**:

BNSF RAILWAY COMPANY

By: _____

Print Name: _CarlRice_

Title: _EVP & COO_

21

## EXHIBIT A-1

## DESCRIPTION OF TRACT 1

**"TRACT 1" (WEST OF THE CENTERLINE OF GATEWAY AVENUE)**

THAT PORTION OF THE FOLLOWING DESCRIBED PARCEL 1 LYING WESTERLY OF THE CENTERLINE OF GATEWAY AVENUE:

PARCEL 1

REAL PROPERTY SITUATED IN THE CITY OF VANCOUVER, CLARK COUNTY, WASHINGTON, LYING IN THE HENRY VAN ALMAN DONATION LAND CLAIM NO. 57 IN THE NORTHEAST QUARTER OF SECTION 19 AND THE NORTHWEST QUARTER OF SECTION 20, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE WILLAMETTE MERIDIAN, DESCRIBED AS FOLLOWS:

THAT PARCEL CONVEYED TO THE SPOKANE, PORTLAND, AND SEATTLE RAILWAY COMPANY BY DEED RECORDED UNDER AUDITOR'S FILE NO. E 24906 (DEED BOOK 284 AT PAGE 339), RECORDS OF SAID COUNTY.

SUBJECT TO EASEMENTS AND RESTRICTIONS OF RECORD.

## EXHIBIT A-2

## DESCRIPTION OF TRACT 2

**"TRACT 2" (EAST OF THE CENTERLINE OF GATEWAY AVENUE)**

THAT PORTION OF THE FOLLOWING DESCRIBED PARCEL 1 LYING EASTERLY OF THE CENTERLINE OF GATEWAY AVENUE:

PARCEL 1

REAL PROPERTY SITUATED IN THE CITY OF VANCOUVER, CLARK COUNTY, WASHINGTON, LYING IN THE HENRY VAN ALMAN DONATION LAND CLAIM NO. 57 IN THE NORTHEAST QUARTER OF SECTION 19 AND THE NORTHWEST QUARTER OF SECTION 20, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE WILLAMETTE MERIDIAN, DESCRIBED AS FOLLOWS:

THAT PARCEL CONVEYED TO THE SPOKANE, PORTLAND, AND SEATTLE RAILWAY COMPANY BY DEED RECORDED UNDER AUDITOR'S FILE NO. E 24906 (DEED BOOK 284 AT PAGE 339), RECORDS OF SAID COUNTY.

SUBJECT TO EASEMENTS AND RESTRICTIONS OF RECORD.

PARCEL 2

REAL PROPERTY SITUATED IN THE CITY OF VANCOUVER, CLARK COUNTY, WASHINGTON, LYING IN THE CHARLES PROULX DONATION LAND CLAIM NO. 52 IN THE SOUTHEAST QUARTER OF SECTION 20 AND THE SOUTHWEST QUARTER OF SECTION 21, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE WILLAMETTE MERIDIAN, DESCRIBED AS FOLLOWS:

THAT PARCEL CONVEYED TO THE SPOKANE, PORTLAND, AND SEATTLE RAILWAY COMPANY BY DEED RECORDED UNDER AUDITOR'S FILE NO. E 24907 (DEED BOOK 284 AT PAGE 343), RECORDS OF SAID COUNTY.

SUBJECT TO EASEMENTS AND RESTRICTIONS OF RECORD.

PARCEL 3

REAL PROPERTY SITUATED IN THE CITY OF VANCOUVER, CLARK COUNTY, WASHINGTON, LYING IN THE GEORGE AND ABIGAIL MALICK DONATION LAND CLAIM IN THE SOUTHWEST QUARTER OF SECTION 21 AND THE NORTHWEST QUARTER OF SECTION 28, AND THE AMOS SHORT DONATION LAND CLAIM IN THE NORTHEAST QUARTER OF SECTION 28, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE WILLAMETTE MERIDIAN, DESCRIBED AS FOLLOWS:

THAT PARCEL CONVEYED TO THE SPOKANE, PORTLAND, AND SEATTLE RAILWAY COMPANY BY DEED RECORDED UNDER AUDITOR'S FILE NO. E 25529 (DEED BOOK 284 AT PAGE 523), RECORDS OF SAID COUNTY.

SUBJECT TO EASEMENTS AND RESTRICTIONS OF RECORD.

PARCEL 4

REAL PROPERTY SITUATED IN THE CITY OF VANCOUVER, CLARK COUNTY, WASHINGTON, LYING IN THE HENRY VAN ALMAN DONATION LAND CLAIM NO. 57 IN THE SOUTHEAST QUARTER OF SECTION 20, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE WILLAMETTE MERIDIAN, DESCRIBED AS FOLLOWS:

THAT PARCEL CONVEYED TO THE SPOKANE, PORTLAND, AND SEATTLE RAILWAY COMPANY BY DEED RECORDED UNDER AUDITOR'S FILE NO. E 31036 (DEED BOOK 288 AT PAGE 568), RECORDS OF SAID COUNTY.

SUBJECT TO EASEMENTS AND RESTRICTIONS OF RECORD.

PARCEL 5

REAL PROPERTY SITUATED IN THE CITY OF VANCOUVER, CLARK COUNTY, WASHINGTON, LYING IN THE CHARLES PROULX DONATION LAND CLAIM NO. 52 AND THE GEORGE AND ABIGAIL MALICK DONATION LAND CLAIM IN THE SOUTHWEST QUARTER OF SECTION 21, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE WILLAMETTE MERIDIAN, DESCRIBED AS FOLLOWS:

THAT PARCEL CONVEYED TO THE SPOKANE, PORTLAND, AND SEATTLE RAILWAY COMPANY BY JUDGEMENT AND DECREE OF APPROPRIATION RECORDED UNDER AUDITOR'S FILE NO. E 36639 (DEED BOOK 292 AT PAGE 565), RECORDS OF SAID COUNTY.

SUBJECT TO EASEMENTS AND RESTRICTIONS OF RECORD.

## EXHIBIT B

## MASTER PLAN

(See attached)

25



## EXHIBIT C

## COMPLETION SCHEDULE

## Project Completion Schedule

| | Completion Dates | Project Milestones to be Completed |
|---|---|---|
| 1 | June 30, 2010<br>**WVFA Project #3** | (3). Alcoa/Terminal 5 Loop Track and Yard (Completion of 5 Yard Tracks, 2 Car Preparation Tracks and 1 Lead Track totaling 30,000 +/- Track Feet). Car Preparation Tracks and 1 Lead Track are of the highest priority, and shall be completed first |
| 2 | December 31, 2012<br>**WVFA Project # 1, 8, 9, 11 & 12** | (9/11/12). Grain Track Unit Train Improvements consisting of 5 unit train tracks containing approximately 52,940 new track feet of yard, lead, and inbound/outbound tracks.<br><br>(1/8). Grain Subdivision (UGC Tail Track extension). |
| 3 | December 31, 2017<br>**WVFA Projects #2, 4, 5, 6, 7, 10, 13, 14, 15, 16, 17 & 18** | (2). Utility Relocation Project (allowing for WVFA Unit Train Improvements).<br><br>(4/7). Kinder-Morgan Rail Car Unloading Facility (Completion includes of the Bottom Dump Pit, Conveyance Systems and Support Track).<br><br>(5). Property Acquisitions for former Schedules 2 & 4 (Aschieris, Lafarge, Clark Public Utilities & Clark County Sheriff).<br><br>(6). Terminal 4 Pond Reconfiguration (revised access to Terminal 2 & 3).<br><br>(10). Kinder Morgan Track Relocation.<br><br>(13/14). Great Western Malting Facility Relocation Phase A and B.<br><br>(15). Great Western Malting Company Drum House Demolition.<br><br>(16). Rail Trench Phase 1.<br><br>(17). Rail Trench Upland Work.<br><br>(18). Rail Trench Phase 2.<br><br>Entire Master Plan Complete including Removal of Gateway Avenue At-Grade Crossings. |

26

## **EXHIBIT D**

## **MEMORANDUM OF AGREEMENT**

(see attached)

27

**WHEN RECORDED MAIL TO:**

BNSF Railway Company
Attn:_____
2500 Lou Menk Drive - AOB3
Fort Worth, TX 76131

---

<u>**MEMORANDUM OF AGREEMENT**</u>

**BNSF:**          **BNSF RAILWAY COMPANY**

**PORT:**          **PORT OF VANCOUVER**

**Legal Description:** See <u>**Exhibit A**</u> attached hereto and incorporated herein (the "Property").

---

WHEREAS, BNSF RAILWAY COMPANY, a Delaware corporation ("**BNSF**"), and PORT OF VANCOUVER, USA, a port district formed pursuant to Chapter 53.04 RCW ("**Port**") entered into that certain Construction and Access Agreement ("**Agreement**") dated effective as of _____, 2008, wherein the parties agreed to certain construction, maintenance and operation rights and obligations affecting the property described on <u>**Exhibit A**</u> hereto ("**Property**") on and subject to the terms contained in said Agreement; and

WHEREAS, pursuant to the Agreement, BNSF also has the option ("**Purchase Option**") to purchase a portion of the Property (the "**Purchase Parcel**") from the Port, the Purchase Parcel being more particularly described on <u>**Exhibit A**</u>, pursuant to the terms and conditions set forth in the Agreement, which terms and conditions are incorporated herein by reference.  The Purchase Option may be exercised by BNSF if the Port if the Port fails to meet certain interim and final completion dates for construction of certain improvements on the Property; and

WHEREAS, pursuant to the Agreement, BNSF has the exclusive right to access, serve, operate and use the trackage located on the Property; and

WHEREAS, the parties agreed to execute this Memorandum of Agreement to provide notice to any third parties dealing with the Property of the existence of the Agreement and the construction, maintenance and operation rights and obligations contained therein;

NOW, THEREFORE, for Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, BNSF and the Port have executed this Memorandum of Agreement in order that third parties will have notice of the existence of the Agreement and the construction, maintenance and operation rights and obligations contained therein.  In the event of a conflict between this Memorandum of Agreement and the actual Agreement, the Agreement shall prevail.  Interested third parties may inquire about the Agreement by contacting either BNSF or the Port at the addresses specified below.

IN WITNESS WHEREOF, this Memorandum of Agreement is executed by the parties' authorized representatives to be effective as of the _____ day of _____, 2008.

**BNSF**:

BNSF RAILWAY COMPANY

By: _____
Name: _____
Title: _____

ATTEST:

By: _____
Name: _____
Title: _____

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § ss. |
| **COUNTY OF TARRANT** | § |

On this _____ day of _____, 2008, before me, the undersigned, a Notary Public in and for the State of Texas, duly commissioned and sworn, personally appeared _____ and Patricia Zbichorski, to me known to be the _____ and Assistant Secretary, respectively, of **BNSF RAILWAY COMPANY**, the corporation that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that they are authorized to execute the said instrument and that the seal affixed is the corporate seal of said corporation.

Witness my hand and official seal hereto affixed the day and year first above written.

_____
Notary Public in and for the State of Texas

Residing at: _____, Texas

My appointment expires: _____

29

**PORT**:

PORT OF VANCOUVER

By: _____
Name: _____
Title: _____

ATTEST:

By: _____
Name: _____
Title: _____

**STATE OF WASHINGTON**　　§
　　　　　　　　　　　　　　§ ss.
**COUNTY OF CLARK**　　　　§

On this _____ day of _____, 2008, before me, the undersigned, a Notary Public in and for the State of _____, duly commissioned and sworn, personally appeared _____ and _____, to me known to be the _____ and _____, respectively, of _____, the corporation that accepted foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that they are authorized to accept said instrument for said corporation.

Witness my hand and official seal hereto affixed the day and year first above written.


_____
Notary Public in and for the State of _____

Residing at: _____

My appointment expires: _____


*[Exhibit "A" to be attached prior to execution.]*

30

## **EXHIBIT E**

### **Existing BNSF/Port ITAs include without limitation the following:**

1) BN 21758 - 1/30/86 - BN & POV
2) BF 27237 - 9/11/03 - BNSF & POV
3) BF 27558 - 8/7/03 - BNSF & POV
4) BF 35348 - 3/31/05 - BNSF & POV
5) BN 7097 - 10/22/76 - BN & POV
6) BN 16820 - 5/12/83 - BN & POV
7) BN 39505 - 5/22/95 - BN & POV
8) BN 39507 - 1/29/96 - BN & POV
9) BN 3561 - 8/13/73 - BN & POV

**EXHIBIT F**

**Commercial Access Rates**

| Description | Single Carload | In Unit Train | Dimen-sional | Auto Multilevel | | Auto Articulated | |
|---|---|---|---|---|---|---|---|
| | | | | Bi-Level | Tri-Level | Bi-Level | Automax |
| 2008 Terminal 4 & Parcel 1A Area | $500 | $400 | $600 | $500 | $650 | $800 | $850 |
| Former Alcoa & Evergreen Property | | $450 | $675 | | | | |

General notes
1  The rates described above are subject to an annual rate adjustment as set forth in the Agreement
2  The rates above are conditioned on BNSF-approved infrastructure being in place to handle traffic moving to or from each Rail Customer
3  Unit trains are defined as (i)100 cars or more or (ii) 6000 feet or more of one commodity in one car type moving to or from a single origin and consignor, or destination and consignee, handled in one piece
4  Dimensional loads are those that exceed 17' above the top of rail and/or 11' wide, or overhang the end sills of the car
5  All dimensional loads are subject to clearance review, processes, and approvals by BNSF prior to movement
6  Where no dollar amount is listed in the above chart, no limit applies.

Traffic excluded from the above quoted rates:
1  Dimensional traffic moving in the following configurations:
    Shipments over 13'2" wide or greater than 350,000 lbs net weight
    8-axle or greater equipment
    Bolstered loads
    Schnabel cars (including the Schnabel brand or cars of the same or similar technology and dimension)
    Combined center of gravity greater than 106"
    Special train service
2  Any traffic containing commodities deemed to be hazardous materials by BNSF, including without limitation, any TIH/PIH commodities.
3  Any traffic in BNSF system equipment
4  BNSF is not obligated under this Agreement to provide rates or commercial access for traffic excluded in (1) and (2).

32

## FIRST AMENDMENT TO
## WEST VANCOUVER FREIGHT ACCESS AND INDUSTRIAL TRACK AGREEMENT

THIS FIRST AMENDMENT TO WEST VANCOUVER FREIGHT ACCESS AND INDUSTRIAL TRACK AGREEMENT ("Amendment") is made and entered into to be effective as of the _21st_ day of January, 2009, by and between **BNSF RAILWAY COMPANY**, a Delaware corporation ("BNSF") and **PORT OF VANCOUVER, USA**, a port district formed pursuant to Chapter 53.04 RCW ("Port").

### RECITALS:

A.     BNSF and Port entered into a West Vancouver Freight Access and Industrial Track Agreement ("Agreement") on December 23, 2008;

B.     BNSF and Port desire to amend the terms of the Agreement as described below.

### AGREEMENTS:

NOW, THEREFORE, in consideration of the mutual covenants, premises, and agreements and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     The property description set forth on Exhibit A-1 of the Agreement is hereby replaced in its entirety with Exhibit A-1 attached to this Amendment. The property description set forth on Exhibit A-2 of the Agreement is hereby replaced in its entirety with Exhibit A-2 attached to this Amendment.

2.     Unless otherwise provided herein, all capitalized and/or defined terms herein shall have the same meaning given to such capitalized and/or defined terms in the Agreement.

3.     Except as amended hereby, all of the terms and provisions of the Agreement are hereby reaffirmed and remain in full force and effect. In the event there is a conflict between the terms and provisions of the Agreement and the terms and provisions of this Amendment, the terms and provisions of this Amendment shall control.

4.     This Amendment may be executed in multiple counterparts, each of which shall, for all purposes, be deemed an original but which together shall constitute one and the same instrument, and the signature pages from any counterpart may be appended to any other counterpart to assemble fully executed documents, and counterparts of this Amendment may also be exchanged via electronic facsimile machines and any electronic facsimile of any party's signature shall be deemed to be an original signature for all purposes.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment to be effective as of the day and year first set forth above.


BNSF

**BNSF Railway Company**

By: _____

Name: _____Mark D. ula_____

Title: _____AVP-Corporate Real Estate Developm_

1

Port

**Port of Vancouver, USA**

By: _Lawrence Paulson_
Name: _Lawrence L. Paulson_
Title: _Executive Director_

2

Exhibit A-1
(Tract 1)

LEGAL DESCRIPTION: Real property in the County of Clark, State of Washington, described as follows:

PARCEL 1

That Portion of the following described property lying Westerly of the centerline of Gateway Avenue:

That property acquired by Book 284, Page 339, Auditor's File No. E24906:

Parcels of land lying within those certain tracts of land conveyed to Grays Harbor Lumber Company by warranty deed from Joseph Mulligan as recorded on Page 575 of Book 133 Deed Records of Clark County Washington, and by warranty deed from Edson M. Rowley Estate as recorded on Page 42 of Book 134, Deed Records of Clark County, Washington, said parcels of land being more particularly described as follows;

BEGINNING at a point on the most Easterly line of the tracts of land aforesaid and from which point the Northeast corner of the Van Alman Donation Land Claim No. 57 bears North 13°09' East a distance of 1,258.96 feet; thence North 13°09' East a distance of 26.0 feet to a point that is 25 feet Northerly from when measured at right angles to the center line survey of the Spokane, Portland and Seattle Railway Company; thence North 60°56' West a distance of 4,369.68 feet to a point of curve, said point being 25 feet Northerly from when measured at right angles to said center line survey; thence on the arc of a curve to the left having a radius of 789.5 feet through an angle of 47°00' a distance of 646.79 feet; thence South 72°04' West and tangent to the last described curve a distance of 582.94 feet to a point on the most Westerly line of the tracts of land aforesaid; thence South 8°30' West along said most Westerly line of the tracts aforesaid a distance of 496.79 feet to a point that is 25 feet Southerly from when measured at right angles to the said center line survey; thence North 37°36' East a distance of 467.91 feet to a point of curve; thence on the arc of a curve to the right having a radius of 739.5 feet through an angle of 81°28' a distance of 1,051.18 feet to a point that is 25 feet Southerly from when measured at right angles to said center line survey; thence South 60°56' East and tangent to the last described curve a distance of 4,387.92 feet, to a point on the most Easterly line of the tracts of land aforesaid, said point being 25 feet Southerly from when measured at right angles to the said center line survey; thence North 13°09' East, a distance of 26.00 feet to the point of beginning.

EXCEPTING THEREFROM that certain strip of land over, across and upon that tract of land conveyed to Pacific Power and Light Company by warranty deed from the Grays Harbor Lumber Company as recorded on Page 119 of Book 212, Deed Records of Clark County, Washington.

ALSO EXCEPTING THEREFROM that certain strip of land over, across and upon the right of way of the Bonneville Project.

PARCEL 1A

Together with those certain rights set forth in Book 284, Page 339 under Auditor's File No. E24906 as follows:

Together with the right to extend the slopes of any fills constructed by the grantee on adjacent property of the grantor beyond the limits of the property above described.

PARCEL 2

That property acquired by Book 502 Page 164, Auditor's File No. G58171:

3

An easement for railroad spur track or tracks upon a tract of land situate in the Northeast quarter of the Northeast quarter of Section 19, Township 2 North, Range 1 East of the Willamette Meridian, Clark County, Washington, more particularly described as follows:

BEGINNING at a point where the present Northerly right of way line of the Spokane, Portland and Seattle Railway Company intersects the Westerly line of the Van Alman Donation Land Claim; thence along said Northerly right of way line North 72°04' East, 481.44 feet to a point on said right of way line which is distant 15 feet measured Northwardly at right angles from the center line of the new spur track No. 1; thence South 76°54' West, 47.2 feet to a point; thence Westwardly, on the arc of a tangential curve to the right, having radius of 622.27 feet, parallel with and distant 15 feet measured Northwardly from the center line of said new spur track No. 1, an arc distance of 388.09 feet to a point; thence on a tangent North 67°22' West, 9.78 feet to a point on said Westerly line of the Van Alman Donation Land Claim; thence along said Westerly line South 8°30' West, 174.5 feet, more or less, to the place of beginning.

PARCEL 3

That Portion of the following described property lying Westerly of the centerline of Gateway Avenue:

That property acquired by Auditors File No. 8207010016:

An easement for fill slopes over, upon and across the following described premises situated in Clark County, Washington:

Parcels being located in the North half of Section 20, Township 2 North, Range 1 East Willamette Meridian, described as follows:

A 25-foot wide strip of land adjacent to and adjoining each side (Northerly and Southerly) of the Burlington Northern Railroad Company right-of-way which bisects Aluminum Company of America property (Gray's Harbor Tract). BEGINNING at the Westerly property line of the Bonneville Power Administration Right-of-Way (Vancouver-Eugene Transmission Line, Circuit No. 1) and continuing Westwardly a distance of 3,400 feet.

The existing Burlington Northern Railroad Company right-of-way is a strip of land 50 feet wide extending 25 feet on each side of the following described centerline:

BEGINNING at a point South 13°09' West 1,258.96 feet from the Northeast corner of the Van Alman Donation Land Claim No. 57, thence North 60°56' West a distance of 4,369.68 feet to a point of curve, and continuing Westwardly to the Aluminum Company of America plantsite.

4

Exhibit A-2
(Tract 2)

LEGAL DESCRIPTION: Real property in the County of Clark, State of Washington, described as follows:

PARCEL 1

That Portion of the following described property lying Easterly of the centerline of Gateway Avenue:

That property acquired by Book 284, Page 339, Auditor's File No. E24906:

Parcels of land lying within those certain tracts of land conveyed to Grays Harbor Lumber Company by warranty deed from Joseph Mulligan as recorded on Page 575 of Book 133 Deed Records of Clark County Washington, and by warranty deed from Edson M. Rowley Estate as recorded on Page 42 of Book 134, Deed Records of Clark County, Washington, said parcels of land being more particularly described as follows;

BEGINNING at a point on the most Easterly line of the tracts of land aforesaid and from which point the Northeast corner of the Van Alman Donation Land Claim No. 57 bears North 13°09' East a distance of 1,258.96 feet; thence North 13°09' East a distance of 26.0 feet to a point that is 25 feet Northerly from when measured at right angles to the center line survey of the Spokane, Portland and Seattle Railway Company; thence North 60°56' West a distance of 4,369.68 feet to a point of curve, said point being 25 feet Northerly from when measured at right angles to said center line survey; thence on the arc of a curve to the left having a radius of 789.5 feet through an angle of 47°00' a distance of 646.79 feet; thence South 72°04' West and tangent to the last described curve a distance of 582.94 feet to a point on the most Westerly line of the tracts of land aforesaid; thence South 8°30' West along said most Westerly line of the tracts aforesaid a distance of 496.79 feet to a point that is 25 feet Southerly from when measured at right angles to the said center line survey; thence North 37°36' East a distance of 467.91 feet to a point of curve; thence on the arc of a curve to the right having a radius of 739.5 feet through an angle of 81°28' a distance of 1,051.18 feet to a point that is 25 feet Southerly from when measured at right angles to said center line survey; thence South 60°56' East and tangent to the last described curve a distance of 4,387.92 feet, to a point on the most Easterly line of the tracts of land aforesaid, said point being 25 feet Southerly from when measured at right angles to the said center line survey; thence North 13°09' East, a distance of 26.00 feet to the point of beginning.

EXCEPTING THEREFROM that certain strip of land over, across and upon that tract of land conveyed to Pacific Power and Light Company by warranty deed from the Grays Harbor Lumber Company as recorded on Page 119 of Book 212, Deed Records of Clark County, Washington.

ALSO EXCEPTING THEREFROM that certain strip of land over, across and upon the right of way of the Bonneville Project.

PARCEL 1A

Together with those certain rights set forth in Book 284, Page 339 under Auditor's File No. E24906 as follows:

Together with the right to extend the slopes of any fills constructed by the grantee on adjacent property of the grantor beyond the limits of the property above described.

PARCEL 2

That property acquired by Book 284, Page 343, Auditors File No. E24907:

5

A strip of land 50 feet wide, being 25 feet on each side of and parallel with the center line survey of the Spokane, Portland and Seattle Railway as same is now located over, across and upon those certain tracts of land as recorded to the California Barrel Company on Page 128 of Book 130, Deed Records of Clark County, Washington; said center line survey being more particularly described as follows:

BEGINNING at a point on the East line of the tracts of land aforesaid and from which the Northwest corner of the Amos and Esther Short Donation Land Claim bears East a distance of 1,909.4 feet and North 822.1 feet; thence North 36°12' West 735.6 feet to a point of curve; thence on the arc of a curve to the left having a radius of 1,910.1 feet through a central angle of 24° and 44' a distance of 824.4 feet; thence North 60°56' West and tangent to the described curve a distance of 841.5 feet to a point on the West line of the tracts aforesaid and from which point the Northwest corner of the Amos and Esther Short Donation Land Claim bears East 3,692.8 feet and South 721.7 feet.

### PARCEL 2A

Together with those certain rights set forth in Book 284, Page 343 under Auditor's File No. E24907 as follows:

Together with the right to extend the slopes of any fills constructed by the grantee on adjacent property of the grantor beyond the limits of the property above described.

### PARCEL 3

That property acquired by Book 284, Page 523 Auditors File No. E25529:

A tract of land located in the North half of Section 28 and the Southwest quarter of Section 21, Township 2 North, Range 1 East of the Willamette Meridian, Clark County, Washington, described as follows:

BEGINNING at a point on the North line of Industrial Street (formerly West 16th Street), Vancouver, Washington, said point being North 0°44'45" East 1,133.54 feet and South 89°24' East 267.0 feet from the Southwest corner of the Amos Short Donation Land Claim; thence North 89°24' West 556.2 feet; thence North 46°12' West 1,512.7 feet; thence North 9°51' East 120.54 feet; thence South 46°12' East 1,361.8 feet; thence on the arc of a curve to the left having a radius of 714.49 feet, through an angle of 36°50' a distance of 458.99 feet; thence South 81°22' East 239.38 feet to the point of beginning.

### PARCEL 3A

Together with those rights set forth in easement documents recorded as Auditor's File No. G571701 and G571702.

### PARCEL 4

That property acquired by Book 288, Page 568, Auditors File No. E31036:

A strip of land 50 feet wide, being 25 feet on each side of and parallel with the center line survey of the Spokane, Portland and Seattle Railway Company as same is now located over, across and upon that certain tract of land conveyed to the Pacific Power & Light Company by deed recorded December 23, 1930, in Book 212, at Page 119, Deed Records of Clark County, Washington, said center line survey being more particularly described as follows:

BEGINNING at a point on the Easterly line of the Van Alman D.L.C. No. 57 and 1,258.96 feet South 13°09' West from the Northeast corner thereof; thence North 60°56' West a distance of 466 feet to the Westerly line of the Grantors premises.

6

PARCEL 4A

Together with those certain rights set forth in Book 288, Page 568 under Auditor's File No. E31036 as follows:

Together with the right to extend the slopes of Railways' embankment outside the limits of the herein described strip of land.

PARCEL 5

That property acquired by Book 292, Page 565, Auditor's File No. E36639:

A strip of land 100 feet wide, being 50 feet on each side of, and parallel with the centerline survey of the Spokane, Portland and Seattle Railway as same is now located over, across, and upon those certain tracts of land as recorded to the Beard Fruit Company on Pages 596 and 597, Book 112, Deed Records of Clark County, Washington, said centerline survey being more particularly described as follows:

BEGINNING at a point on the East line of the tracts aforesaid and from which point the Northwest corner of the Amos and Esther Short Donation Land Claim bears East a distance of 1,403.6 feet and North 1,388.8 feet; thence North 46°12' West a distance of 255.9 feet to a point of curve; thence on the arc of a curve to the right having a radius of 1,910.1 feet through an angle of 10° a distance of 333.3 feet; thence North 36°12' West and tangent to the described curve a distance of 172.3 feet to a point on the West line of the tracts of land aforesaid and from which point the Northwest corner of the Amos and Esther Short Donation Land Claim bears East 1909.4 feet and North 822.1 feet.

PARCEL 5A

Together with those rights set forth in a letter from Bonneville Power Administration to Burlington Northern, Inc. dated February 24, 1971, regarding a 10'wide slope adjoining the North line of Parcel 5.

PARCEL 6

That property acquired by Book 300, Page 61, Auditors File No. E44661:

The right to construct maintain and operate a railroad spur track line over and across the transmission line right of way of the United States, described as follows:

A strip of land 100 feet wide, being 50 feet at right angles on each side of and parallel with the center line survey of the Spokane, Portland and Seattle Railway Company as same is now located over, across and upon the right of way of the Bonneville Power Administration 150 foot width in Section 20. Township 2 North, Range 1 East, Willamette Meridian, Clark County, Washington, said center line survey being more particularly described as follows:

BEGINNING at a point on the East line of the Bonneville Power Administration right of way aforesaid and from which point the Northeast corner of the Van Alman Donation Land Claim #57 bears South 60°56' East 828.3 feet and North 13°09' East 1,258.96 feet; thence North 60°56' West 150.3 feet to the West line of the Bonneville Power Administration right of way aforesaid.

The exact location and manner of construction of said spur track line, together with the more particular description and explanation thereof, are set forth in the drawings entitled "S.P. & S. Ry., VANCOUVER, Office of Assistant Superintendent, Date, 4-1-40" and "Sheet Number 1 of 1 of Spokane, Portland and Seattle Ry. From Survey Station 1+00 to Survey Station 106+04", dated March 15, 1940, which drawings were submitted to and approved by the Bonneville Power Administrator.

7

PARCEL 7

That Portion of the following described property lying Easterly of the centerline of Gateway Avenue:

That property acquired by Auditors File No. 8207010016:

An easement for fill slopes over, upon and across the following described premises situated in Clark County, Washington:

Parcels being located in the North half of Section 20, Township 2 North, Range 1 East Willamette Meridian, described as follows:

A 25-foot wide strip of land adjacent to and adjoining each side (Northerly and Southerly) of the Burlington Northern Railroad Company right-of-way which bisects Aluminum Company of America property (Gray's Harbor Tract). BEGINNING at the Westerly property line of the Bonneville Power Administration right-of-way (Vancouver-Eugene Transmission Line, Circuit No. 1) and continuing Westwardly a distance of 3,400 feet.

The existing Burlington Northern Railroad Company right-of-way is a strip of land 50 feet wide extending 25 feet on each side of the following described centerline:

BEGINNING at a point South 13° 09' West 1,258.96 feet from the Northeast corner of the Van Alman Donation Land Claim No. 57, thence North 60°56' West a distance of 4,369.68 feet to a point of curve, and continuing Westwardly to the Aluminum Company of America plantsite.

8

**SECOND AMENDMENT TO**
**THE WEST VANCOUVER FREIGHT ACCESS AND INDUSTRIAL TRACK**
**AGREEMENT**

This **SECOND AMENDMENT ("Second Amendment")** made and entered into as of this _____ day of _____, 2017 ("**Effective Date**") by and between **BNSF RAILWAY COMPANY**, a Delaware corporation (**"BNSF"**), and the **PORT OF VANCOUVER, USA**, a port district formed pursuant to Chapter 53.04 RCW (**"Port"**) BNSF and Port may be referred to herein sometimes individually as a "Party" and collectively as the "Parties".

      **WITNESSETH:**

      **WHEREAS**, BNSF and the Port have entered into the West Vancouver Freight Access And Industrial Track Agreement dated December 23, 2008 and the First Amendment to the West Vancouver Freight Access And Industrial Track Agreement dated January 21, 2009 (collectively, the "Agreement"), which provides for the construction and maintenance of the WVFA Project by Port, defines the timeline of construction, and delineates BNSF as the Exclusive Rail Operator of the WVFA; and

      **WHEREAS**, BNSF and Port desire to extend the Final Completion Date of the WVFA Project to June 30, 2018 and incorporate several material changes to the Master Plan.

      **NOW THEREFORE**, it is mutually agreed by and between the Parties:

1) Article I, Section 1. B (8) as provided in the Agreement shall be deleted in its entirety and replaced as follows:

> "If either Party at any time desires to make any modifications to the Project Plans and Specifications or the Project Completion Schedule, the Parties must agree to evidence any such revisions or modifications by executing an amendment to the Agreement signed by both Parties."

2) Article I, Section 1. B. (10) shall be deleted in its entirety.

3) Article I, Section 3. B. (1) shall be deleted in its entirety and replaced as follows:

> "The Port acknowledges and agrees that Final Completion of all Improvements and all other construction obligations under the Master Plan must be achieved by the Port, at the Port's sole cost and expense, no later than **June 30, 2018** (the **"Final Completion Date"**), with the exception of Article I, Section 3.B(5)"

4) A NEW paragraph (5) is added to Article I, Section 3. B. as follows:

"The Port acknowledges and agrees that the completion of the Tenant Specific Yard and Loop Tracks, as shown on the <u>NEW EXHIBIT B</u> and as described in the <u>NEW EXHIBIT C</u>, will be constructed at the Port's sole cost and expense when BNSF, in its reasonable discretion, determines the improvements are necessary to accommodate additional rail traffic from a Port tenant."

5) <u>EXHIBIT B</u> shall be deleted in its entirety and replaced by the attached <u>NEW EXHIBIT B</u> of even date.

6) <u>EXHIBIT C</u> shall be deleted in its entirety and replaced by the attached <u>NEW EXHIBIT C</u> of even date.

7) All capitalized terms used but not defined in this First Amendment shall have the same meaning ascribed in the Agreement.

8) Except as otherwise stated herein, all other terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF**, this Second Amendment has been duly executed to be effective as of the day and year first above written.

**BNSF RAILWAY COMPANY:**

By: _____

Printed: _____Matthew J. Igoe_____

Title: _Vice President Service Design_

**PORT OF VANCOUVER, USA:**

By: _____

Printed: _____

Title: _____

**NEW EXHIBIT C**

**COMPLETION SCHEDULE**

Project Completion Schedule with Dates

Revised April 11, 2017

Supersedes All Previous Versions

| | Completion Dates | Project Milestones to be Completed |
|---|---|---|
| 1 | June 30, 2009 | Jimmy Yard Track 3108 – Parcel 1A Wind Energy Track 2,000 +/- Track Feet |
| 2 | June 30, 2010<br>**WVFA Projects #1, #3** | **(1)** Grain Subdivision Phase A<br>**(3)** Alcoa/Terminal 5 Loop Track and Yard (Completion of 4 Tracks, 2 Car Preparation Tracks and 1 Lead Track Totaling 30,500 +/- Track Feet |
| 3 | December 31, 2011<br>**WVFA Project #3** | **(3)** Alcoa/Terminal 5 Yard Track (2,700 +/- Track Feet) |
| 4 | December 31, 2012<br>**WVFA Projects #2, #6, #8, #9, #13 and #21** | **(2)** WVFA Utility Relocations<br>**(6)** Terminal 3 Rail Access<br>**(8)** Grain Subdivision Phase B (UGC Tail Track Extension, and Bad Order Track (2,900 +/- Track Feet)<br>**(9)** Unit Train Improvements Phase A (Track 4805 and 4806 Empty Unit Train Tracks Totaling 15,000+/- Track Feet)<br>**(13)** Great Western Malting Facility Relocation Phase A<br>**(21)** Terminal 5 Rail Expansion for UGC Arrival/Departure Track (Track 3340 Totaling 7,400 +/- Track Feet |
| 5 | December 31, 2013<br>**WVFA Projects #4, #14 and #19** | **(4)** Kinder Morgan Bulk Facility Relocation Phase A<br>**(14)** Great  Western Malting Relocation Phase B<br>**(19)** Gateway Avenue Grade Separation |
| 6 | December 31, 2015<br>**WVFA Projects #5, #10, #11A, #15, #16, #17, and #18** | **(5)** WVFA Right of Way Acquisition<br>**(10)** Subaru Track Relocation, Including Re-Positioning of Subaru Yard and Construction of a New South Terminal Yard<br>**(11A)** Unit Train Phase B - Constructs Fourth Loop Track at Terminal 5<br>**(15)** Great Western Malting Facility Relocation Phase B<br>**(16-18)** Port Rail Access (South Lead and Rail Trench) |
| 7 | December 31, 2017<br>**WVFA Project #7** | **(7)** Kinder Morgan Bulk Facility Relocation Phase B, which is the relocation of an existing mineral bulk dump pit facility and construction of appurtenant yard tracks. |
| 8 | June 30, 2018<br>**WVFA Project #11B** | **(11B)** Unit Train Phase B - UGC Track Configuration and South Lead, which builds out UGC's full complement of track by constructing three final full-length unit train tracks for Grain; Project also completes dedicated South Lead. |
| 9 | To Be Determined<br>**WVFA Projects #12 and #20** | **(12)** Unit Train Phase C - Tenant Specific Yard and Loop Tracks (track footage to be determined) to be constructed by and at the expense of the Port at a time determined by BNSF in order to accommodate additional rail traffic from a Port tenant.<br>**(20)** BNSF C&M Agreement Requirements - Apple Tree Crossover construction, signalization and construction of Railroad Embankment; construction to be performed by BNSF at a time determined by BNSF with direct reimbursement to BNSF from Port at time of completion. |

**THIRD AMENDMENT TO THE**
**WEST VANCOUVER FREIGHT ACCESS AND INDUSTRIAL TRACK AGREEMENT**

This **THIRD AMENDMENT** ("**Third Amendment**") made and entered into as of this _29_ day of _June_____, 2018 ("**Effective Date**") by and between **BNSF RAILWAY COMPANY**, a Delaware corporation ("**BNSF**"), and the **PORT OF VANCOUVER USA**, a port district formed pursuant to Chapter 53.04 RCW (the "**Port**"). BNSF and Port may be referred to herein sometimes individually as a "**Party**" and collectively as the "**Parties**".

**WITNESSETH:**

**WHEREAS**, BNSF and the Port have entered into the West Vancouver Freight Access And Industrial Track Agreement dated December 23, 2008, the First Amendment to the West Vancouver Freight Access And Industrial Track Agreement dated January 21, 2009, and the Second Amendment to the West Vancouver Freight Access and Industrial Track Agreement dated April 12, 2017 (collectively, the "**Agreement**"), which provides for the construction and maintenance of the WVFA Project by Port, defines the timeline of construction, and delineates BNSF as the Exclusive Rail Operator of the WVFA; and

**WHEREAS**, BNSF requested changes to Project 11B as depicted on the attached Exhibit B ("**Modification to WVFA Master Plan**"), specifically reinstalling a realigned crossover track which allows a more efficient movement of cargo within the Port, considering that a prospective Terminal 5 tenant will not be constructing improvements at this time; and

**WHEREAS**, the Port's reinstallation of the crossover track involved additional costs to the Port and potential schedule delays; and

**WHEREAS**, BNSF and the Port desire to further amend the Agreement to extend the Final Completion Date of the WVFA Project to September 30, 2018 and incorporate changes to the WVFA Master Plan.

**NOW, THEREFORE**, it is mutually agreed by and between the Parties:

1) Article I, Section 3.B.(1) shall be deleted in its entirety and replaced as follows:

> "The Port acknowledges and agrees that Final Completion of all Improvements and all other construction obligations under the WVFA Master Plan must be achieved by the Port, at the Port's sole cost and expense, no later than **September 30, 2018** (the "**Final Completion Date**"). Except for the Port's obligations under (i) the WVFA Master Plan, as amended in this Third Amendment to the Agreement, and (ii) Article I, Section 3.B(5) of the Agreement, both Parties agree that Final Completion of all Improvements shall be deemed to occur on October 1, 2018. For the purpose of Article III, Section 3.A. of the Agreement, the Initial Access Period shall end on September 30, 2028."

2) <u>EXHIBIT B</u> of the Agreement shall be amended by the attached <u>NEW EXHIBIT B</u>.

3) <u>EXHIBIT C</u> of the Agreement shall be deleted in its entirety and replaced by the attached <u>NEW EXHIBIT C</u>.

4) All capitalized terms used but not defined in this Third Amendment shall have the same meaning ascribed in the Agreement.

5) Except as otherwise stated herein, all other terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF**, this Third Amendment has been duly executed to be effective as of the day and year first above written.

**BNSF RAILWAY COMPANY**:

By: _____

Printed: _____

Title: _____

**PORT OF VANCOUVER USA**:

By: _Julianna Marler_____

Printed: _Julianna Marler_____

Title: _CEO_____

NEW EXHIBIT B

MODIFICATION TO WVFA MASTER PLAN

See Attached

NEW EXHIBIT C

COMPLETION SCHEDULE

Project Completion Schedule with Dates

Revised June 29, 2018

Supersedes All Previous Versions

| | Completion Dates | Project Milestones to be Completed |
|---|---|---|
| 1 | June 30, 2009 | Jimmy Yard Track 3108 – Parcel 1A Wind Energy Track 2,000 +/- Track Feet |
| 2 | June 30, 2010 WVFA Projects #1, #3 | (1)  Grain Subdivision Phase A (3) Alcoa/Terminal 5 Loop Track and Yard (Completion of 4 Tracks, 2 Car Preparation Tracks and 1 Lead Track Totaling 30,500 +/- Track Feet |
| 3 | December 31, 2011 WVFA Project #3 | (3)  Alcoa/Terminal 5 Yard Track (2,700 +/- Track Feet) |
| 4 | December 31, 2012 WVFA Projects #2, #6, #8, #9, #13 and #21 | (2)  WVFA Utility Relocations (6)  Terminal 3 Rail Access (8) Grain Subdivision Phase B (UGC Tail Track Extension, and Bad Order Track (2,900 +/- Track Feet) (9) Unit Train Improvements Phase A (Track 4805 and 4806 Empty Unit Train Tracks Totaling 15,000+/- Track Feet) (13) Great Western Malting Facility Relocation Phase A (21) Terminal 5 Rail Expansion for UGC Arrival/Departure Track (Track 3340 Totaling 7,400 +/- Track Feet |
| 5 | December 31, 2013 WVFA Projects #4, #14 and #19 | (4) Kinder Morgan Bulk Facility Relocation Phase A (14) Great  Western Malting Relocation Phase B (19) Gateway Avenue Grade Separation |
| 6 | December 31, 2015 WVFA Projects #5, #10, #11A, #15, #16, #17, and #18 | (5) WVFA Right of Way Acquisition (10)  Subaru Track Relocation, Including Re-Positioning of Subaru Yard and Construction of a New South Terminal Yard (11A) Unit Train Phase B - Constructs Fourth Loop Track at Terminal 5 (15) Great Western Malting Facility Relocation Phase B (16-18) Port Rail Access (South Lead and Rail Trench) |
| 7 | December 31, 2017 WVFA Project #7 | (7)  Kinder Morgan Bulk Facility Relocation Phase B, which is the relocation of an existing mineral bulk dump pit facility and construction of appurtenant yard tracks. |
| 8 | September 30, 2018 WVFA Project #11B | (11B) Unit Train Phase B -  UGC Track Configuration and South Lead, which builds out UGC's full complement of track by constructing three final 3 full-length nit train tracks for train; Project also completes dedicated South Lead |
| 9 | To Be Determined WVFA Projects #12 and #20 | (12)  Unit Train Phase C - Tenant Specific Yard and Loop Tracks (track footage to be determined) to be constructed by and at the expense of the Port at a time determined by BNSF in order to accommodate additional rail traffic from a Port tenant. (20)  BNSF C&M Agreement Requirements - Apple Tree Crossover Construction, Signalization and Construction of Railroad Embankment; construction to be performed by BNSF at a time determined by BNSF with direct reimbursement from Port at time of completion. |

# EXHIBIT B

DocuSign Envelope ID: 18F90C4A-2E70-4692-A514-AE453765DE69

1  Vaughn R Walker
2  ADR/Law Office Vaughn R Walker
   4 Embarcadero Center, Suite 2200
3  San Francisco, CA 94111
   Tel: (415) 871-2888
4  Email: vrw@judgewalker.com

5

6

7

8              IN THE MATTER OF THE ARBITRATION

9                          BETWEEN

10

11  THE PORT OF VANCOUVER, USA,

12              Claimant,

13           vs                              PARTIAL FINAL AWARD

14                                           AFTER HEARING

15  BNSF RAILWAY COMPANY,

16              Respondent

17

18

19          This arbitration relates to the West Vancouver Freight Access and Industrial

20  Track Agreement ("WVFAA") entered between the above-named parties on December 23,

21  2008.  Claimant Port of Vancouver USA ("POV") is an independent public entity that was

22  formed more than one hundred years ago and owns the second largest port on the

23  Columbia River in Washington State.  BNSF Railway is a major interstate railroad that

24  serves the port and is the successor to other railroads that served the Port and had

25  agreements with POV or its predecessors.[1]  The Port itself is located west of the mainlines

26

27          [1] The story of the parties and their predecessors could weave a rich tapestry of

28  western railway and shipping history that is only hinted at in Appendix 3 of BNSF's Pre-

1  of BNSF and the Union Pacific Railroad ("UP"), BNSF's major competitor in the western

2  United States.

3          Article IX of the WVFAA contains the provisions that govern this arbitration.

4  Pursuant thereto, POV sent a demand letter to BNSF on November 7, 2019, noting the

5  existence of a dispute between the parties and asserting certain claims.  POV

6  supplemented this on February 5, 2020.  On March 3, 2020, BNSF responded, noting its

7  disagreement with POV's position.  After a further exchange, discovery and pre-hearing

8  proceedings, the parties proceeded to an arbitration hearing which was conducted before

9  the undersigned panel in Washington DC on February 28 through March 5, 2022, with

10  closing arguments on April 4, 2022.

11          Throughout the proceedings, POV was represented by Noah Jarrett and

12  Molly J Henry, Schwabe Williamson & Wyatt, Portland Oregon and Robert D Rosenberg

13  and Frank Pergolizzi, Slover & Loftus, Washington, DC; BNSF was represented by Steven

14  K Davidson, Molly Bruder Fox, Morgan P Lucas and Tara Woods, Steptoe & Johnson, LLP,

15  Washington DC.

16          The Panel has determined that it would be helpful to the parties and the

17  process to address certain aspects of the rate question in this Partial Final Award, as

18  discussed further herein.

19          **I.**       **The Parties' Respective Arguments Concerning Rates**

20          Under the WVFAA, BNSF is designated the Exclusive Rail Operator ("ERO")

21  for the Port properties.  As ERO, BNSF provides direct rail service to Port customers

22  receiving linehaul service to and from the Port via BNSF and provides switching services

23  for customers receiving linehaul service to and from the Port via UP.

24          BNSF's provision of switching services for UP customers who are "Rail

25  Customers" as defined by the WVFAA [Article III, Section 3.A (iii)] is governed by the

26  WVFAA.  The issues presented by POV regarding BNSF's provision of switching services

27  ———————————————

28  Hearing Brief.

1   for UP customers relate solely to those customers.

2        POV asserts that BNSF has abused its ERO position to exclude UP

3   customers from use of the Port, thereby depriving POV of access to the Port by customers

4   of the sole other significant interstate railroad in the area.  In POV's view, this has

5   hampered, if not made impossible, the realization of the benefits of the WVFAA that POV

6   anticipated when it entered into that agreement.

7        POV notes that recitals to the WVFAA state that POV "desires commercial rail

8   access to all of the Port's facilities for the Union Pacific Railroad Company in a manner that

9   protects the integrity of BNSF's exclusive rail operator and franchise rights as contemplated

10  by this agreement."  WVFAA Recital A.  The recitals note that BNSF's ERO status was

11  afforded "for the purpose of rail operations to provide rail switching services to all Port

12  customers"-- presumably including UP and its customers.  WVFAA Recital F.  The

13  operative terms of the WVFAA governing these matters are contained in Article III of the

14  WVFAA.  That article at Section 1A confers ERO status on BNSF.  Article III, Section 3A

15  provides that BNSF shall offer "all Rail Customers Commercial Access to UP for so long as

16  the Port is not in default under [the WVFAA]."

17       POV presses its theory that realizing the benefits of WVFAA has been

18  frustrated by BNSF's refusal to provide Rail Customers "competitive commercial access to

19  UP" "on reasonable and customary terms and conditions."  POV Post-Hrg. Br. at 5.  The

20  parties dispute the meaning of the phase "on reasonable and customary terms and

21  conditions" as used in Article III Section3 A (i).  POV contends that phrase includes "both

22  rates and non-rate terms."  POV Post-Hrg. Br, at 5.

23       BNSF argues this "conflates the pricing and service terms of the WVFAA,"

24  because the WVFAA does not "include any mechanism or standard by which to evaluate or

25  set rates."  BNSF Post-Hrg. Br. at 20.  Hence, in BNSF's view, the WVFAA does not saddle

26  BNSF with any reasonableness standard for rates it may charge UP customers.    BNSF

27  buttresses this argument with an interpretation that Art III Section3A(ii) "addresses

28  compensation," whereas Art III Section3A(i) does not specifically refer to rates.  BNSF

argues (in the vein of e*xpressio unis est exclusio alterius*) that even if the rates are subject to a reasonableness standard, the Exhibit F maxima exclude the importation of a reasonableness standard into the phrase of "reasonable and customary terms and conditions" in Art III Section3A(i).

## II.    Panel Partial Final Decision on Rates

The panel finds BNSF's arguments unpersuasive.  First, the WVFAA read in its entirety appears to contemplate competitive access to the entire port (with the exceptions noted in Article III Section 3 A (iii)), especially as rail customers are likely to be those of either BNSF or UP.  This makes it difficult imagine that POV would have agreed to allow BNSF as ERO to charge rates that would hobble POV from attracting business from UP customers.  The panel resolves any ambiguity in the evidence of the parties' negotiations for the WVFAA in favor of POV's position that "competitive access" includes both rates and other terms.  The two railroads are fierce competitors and dominant in the western United States.  A suggestion that POV would allow itself to be drawn into the vortex of this competition and give BNSF the upper hand by allowing it to set rates that would diminish utilization of the port by UP customers rubs against the grain of the evidence the panel heard and a fair reading of the WVFAA.

The very definition of "Commercial Access" is replete with references to a variety of mechanisms by which rates are set, such as switching agreements, tariffs, and public contract rates. The concept of reasonableness is reflected in multiple places in this provision. There is simply no textual interpretation that supports BNSF's reading that "reasonable and customary terms and conditions" somehow excludes rates, which would usually be the most critical piece of any agreement between a customer and BNSF, or between UP and BNSF.

With a tone of exasperation, POV asserts that a "mere declaration sustaining the Port's construction of commercial access [would be] inadequate in terms of the harm the Port has suffered and the additional harm that it will likely suffer in the future."  POV Post-Hrg. Br. at 30.  POV requests the panel to direct BNSF to establish public reciprocal

1    switching fees at rates comparable to those BNSF offers at other Washington ports.

2    Although POV acknowledges that this relief would remove "some rate discretion" from

3    BNSF, the relief is necessitated in POV's view to remedy BNSF's prior abusive practices

4    and ensure that they do not continue.  POV is clear-eyed enough to acknowledge that the

5    panel is "not well-equipped to engage in direct supervision of BNSF's rates for its own

6    traffic."  POV Closing Br. at 31.

7            At the hearing, the bulk of the evidence about rates was that put in by the

8    parties' expert witnesses.  That testimony reinforces the accuracy of POV's observation

9    that the panel is not well-equipped to supervise the parties' rates.  Accordingly, POV

10   suggests that the panel require BNSF to offer to UP customers the same rates that BNSF

11   offers to its customers.  BNSF counters that to impose such a requirement would deprive

12   BNSF of the "franchise value" which its witness ▮▮▮ described as the value a carrier

13   derives to earn rates "unconstrained by competition."

14           The trouble with BNSF's position, however, is that WVFAA does not liberate

15   BNSF from competition.  The express terms of the WVFAA contemplate that both BNSF

16   and UP will service port customers.  The presence of two railroads by definition should

17   exert a constraining influence on their pricing decisions.  Testifying for BNSF, witness

18   ▮▮▮'s description of BNSF's approach to pricing at the Port is more akin to that of a

19   monopoly.

20           POV's acknowledgement that the panel is incapable of serving as a rate

21   board limits the form of relief that can be offered in this context.  It seems apparent that

22   switching services are not homogeneous.  For example, testimony pointed to the different

23   rates charged for trainload commodities and rates for partial train load shipments.  And the

24   panel can appreciate that certain shipments may impose greater burdens or wear-and-tear

25   on port facilities and carry different costs from other shipments.  What the panel can

26   impose, consistent with a plain reading of the agreement, is a requirement that BNSF offer

27   to UP customers rates no greater than rates BNSF offers to its customers bringing

28   comparable quantities and characteristics of freight under similar conditions.  A practical

1   way to make such a requirement work would be to require BNSF to establish reasonable,

2   compensatory rates for its switching service that apply to both BNSF and UP customers,

3   which may differ by customer and type of service provided.  Whether this arrangement is

4   workable, time will tell.  But the panel rejects BNSF's contention that the only limit on

5   BNSF's rate-making lies in Exhibit F to the WVFAA.  That agreement contemplates that

6   both BNSF and UP compete to provide linehaul services to and from the Port and the

7   foregoing relief may bring a measure of competition to their efforts to do so.

8              Therefore, the Panel is issuing this Partial Final Award as follows:

9       1.  POV is awarded declaratory relief that term "reasonable and customary

10           terms and conditions" in Article III §3A(i) must be read to include

11           reasonable and customary rates for services provided Rail Customers,

12           including switching and trackage rights provided to connect Rail

13           Customers using UP's linehaul service to and from the Port, and other

14           non-monetary terms;

15      2.   BNSF shall establish rates and other terms that offer Rail Customers a

16           like opportunity, considering cost differences, to connect with both BNSF's

17           and UP's linehaul services.  Following further guidance from the panel,

18           BNSF will provide POV with a schedule of the various reasonable and

19           customary rates that BNSF shall charge for its services within the Port.

20           That rate schedule may be updated from time to time as circumstances so

21           justify.  While the Panel expects the Port and BNSF can develop a

22           mutually satisfactory schedule of rates, we recognize that if there are

23           disputes there must be standards and procedures to permit prompt

24           dispute resolution.  Ratemaking, however, can be complicated, even for

25           services as narrowly defined as those provided by BNSF as ERO. And

26           there is nothing in the record that would permit the Panel to determine

27           what readily applied, objective standards and procedures should govern

28           an assessment of whether BNSF's rates for its services to Rail Customers

are reasonable.

3. The Panel, therefore, requires additional briefing, to be filed simultaneously by June 17, 2022, on what those standards and procedures should be.  The Parties may solicit such expert advice as they may require, and to confer whether they could submit a joint proposal. Because the Panel is seeking guidance in the form of a proposed supplement to this Partial Award, counsel for the parties should be able to articulate their client's views on the needed standards and procedures and their justification (including any references to supporting record or extra record materials) competently without additional evidence. After briefing, the Panel will decide whether to permit replies and hear argument.

The Panel continues to deliberate regarding the other matters at issue and will make a Final Award to supplement this Partial Final Reward in due course.

Dated: May _9_, 2022

_____
Vaughn R Walker, Chair

_____
Nancy F. Lesser

_____
Paul A. Cunningham

# EXHIBIT C

Vaughn R Walker
ADR/Law Office Vaughn R Walker
4 Embarcadero Center, Suite 2200
San Francisco, CA 94111
Tel: (415) 871-2888
Email: vrw@judgewalker.com

IN THE MATTER OF THE ARBITRATION

BETWEEN

THE PORT OF VANCOUVER, USA,

Claimant,

vs

BNSF RAILWAY COMPANY,

Respondent

STATEMENT OF REASONS

FOR FINAL AWARD AFTER

HEARING AND FINAL AWARD

On December 23, 2008, claimant and respondent entered into the West Vancouver Freight Access and Industrial Track Agreement ("WVFAA").  Claimant, The Port of Vancouver, USA ("POV"), is an independent public entity that was formed more than one hundred years ago and owns the second largest port on the Columbia River in the State of Washington (hereinafter "Port").  Respondent BNSF Railway Company (hereinafter "BNSF") is a major interstate railroad that serves the Port.

The Port is located west of the mainlines of BNSF and the Union Pacific Railroad (hereinafter "UP"), BNSF's major competitor in the western United States.  These railroads are the successors of railroads that were parties to a 1909 agreement under which the predecessors shared possession and use of track providing access to the Port.  Exh

P0235.  The WVFAA allowed POV to purchase from BNSF two tracts of land on Port property that were formerly the site of an aluminum plant (aka "Alcoa Lead") to enable POV to improve the Port's infrastructure.  As part of this deal, BNSF was provided the right to serve as the Exclusive Rail Operator (hereinafter "ERO") for rail operations at the Port.  As ERO, BNSF provides direct rail service to POV customers receiving linehaul service to and from the Port via BNSF and is also able to provide switching services for customers receiving linehaul service to and from the Port via UP.  Consistent with longstanding practice as one of the WVFAA recitals states, and as the panel hereinafter finds, a principal objective of POV in agreeing to the WVFAA was to obtain "rail access to all of the Port's facilities for UP."  WVFAA, Recital A at 1.  The panel finds that this objective was fully understood and accepted by BNSF.  At its core, POV's complaint here is that BNSF has not provided commercially reasonable access to customers using UP linehaul service and that BNSF is "discriminating against the Port in establishing and making available rates and charges for prospective tenants that are considering locating at the Port and other competing locations." POV Aug 10, 2020 Demand at 26. Hence, along with various other claims, POV alleges it has been denied the benefit of the bargain struck in the WVFAA.

Before turning to the evidence at the hearing and the parties' contentions, the panel briefly summarizes the terms of the WVFAA.

- Article I of the WVFAA dealt with the construction of improvements to the Port infrastructure according to a master plan attached as Exhibit C to the WVFAA but did not limit BNSF's rights under the agreement without BNSF's prior written consent, "such consent not to be unreasonably withheld."  Art I §1 A-B.  Article I imposed on BNSF the obligation to cooperate with POV in infrastructure changes and to respond promptly to POV's proposals and consent thereto with the proviso, again, that such consent is not to be "unreasonably withheld." Art I §1 B.  This article obligated POV to pay for and obtain all necessary permits for improvements and established a final completion date of December 31, 2017.  Art I §§2-3.

- Article II imposed on POV the "sole right and responsibility to maintain" the trackage and improvements at the Port at POV's "sole risk and expense." Art II §1.  Maintenance was defined.  Id at §2.  BNSF was relieved of "any liability or obligation to furnish or pay for "maintenance," or "services or facilities."  Art II §5.

- Article III dealt with BNSF's access rights as ERO "to provide rail service consistent with applicable law" and provided that in the event the agreement were terminated, "BNSF's right as [ERO] shall nevertheless survive and shall not be affected by any such termination."  Art III §1 A.  This article provided that the Port could not abridge any contractual rights of BNSF and UP.  Section 3 obligated BNSF to offer all "Rail Customers" (as defined) commercial access rights to UP so long as POV is not in default under the agreement.  Art III §1 B, §3 A.  The latter provision defined "commercial access" to the Port as any arrangement between BNSF and UP "and/or" BNSF and a rail customer under which BNSF shall "tender or provide" such customers rail freight to UP at any commercially reasonable location designated in BNSF's sole discretion within a fifteen-mile radius of the Port.  Art III §3 A(i).  A "maximum total amount of compensation to BNSF" for commercial access was established in a schedule attached as Exhibit F to the WVFAA.  Art III §3 A(ii).  POV was afforded the right to establish a "reasonable Maintenance Fee" based on "the actual cost of maintenance" to be charged to rail customers.  Art III §3 B.  The Port was prohibited from requesting that BNSF "transport or otherwise handle" so-called Hazmat substances at the Port property.  Art III §4.

- Article IV dealt with compliance with legal and safety requirements.

- Article V gave BNSF a repurchase option to re-acquire Track 2 from POV in the event of the failure of certain specified completion deadlines and a "material default" by POV.  Art V §1 D.  The option exercise price was set at

the price in the purchase and sale agreement for Tract 2 less a transaction fee.  Art V §3 A, Recital E.

- Article VI provided certain indemnity obligations.

- Article VII provided default remedies.

- Article VIII provided that the agreement "shall continue unless terminated by an agreement in writing" between POV and BNSF and is "governed by and must be construed in accordance with the laws of the State of Washington." Art VIII §§2, 5.

- Article IX of the WVFAA contains the provisions that govern this arbitration. It precludes the arbitrators from awarding "indirect, special, consequential, punitive or exemplary damages."

Under Washington law, indirect damages is another name for consequential damages.  See *Bellevue Square, LLC v Whole Foods Mkt Pac Nw, Inc*, 6 Wn App 2d 709, 722 (Wn App 2018).  Although consequential damages are not an available remedy, Article IX does not otherwise foreclose the arbitrators' authority to interpret the WVFAA or to award compensatory, injunctive or other equitable relief.

Pursuant to Article IX, POV sent a demand letter to BNSF on November 7, 2019, noting the existence of a dispute between the parties and asserting certain claims. POV supplemented this on February 5, 2020.  On March 3, 2020, BNSF responded, noting its disagreement with POV's position.  On August 10, 2020, POV submitted its demand for arbitration under Article IX.  The demand sought declaratory relief and damages in five counts: (1) negligent and wrongful train operations on POV property; (2) improper use of POV property for "alien" rail cars; (3) improper use of POV property for "hazmat" rail cars; (4) failure to work with POV to attract new business to the Port; and (5) termination of the WVFAA without triggering BNSF's re-purchase option.  On January 8, 2021, BNSF responded to the demand for arbitration on the ground that POV's claims were barred by the express terms of the WVFAA and POV's demand amounts to nothing more than a futile effort to rewrite the terms of the WVFAA.

1       After an exchange of discovery and other pre-hearing proceedings, the

2   parties proceeded to an arbitration hearing which was conducted before the undersigned

3   panel in Washington DC on February 28 through March 5, 2022.

4       Throughout the proceedings, POV was represented by Noah Jarrett and

5   Molly J Henry (Schwabe Williamson & Wyatt, Portland Oregon) and Robert D Rosenberg

6   and Frank Pergolizzi (Slover & Loftus, Washington, DC); BNSF was represented by Steven

7   K Davidson, Molly Bruder Fox, Morgan P Lucas and Tara Woods (Steptoe & Johnson, LLP,

8   Washington DC).

9       The following persons appeared and gave testimony at the hearing that the

10  panel in pertinent part summarizes below:

11      • Todd James Krout is POV's director of operations, having joined POV in 2004

12          as facilities superintendent and became facilities manager in 2008, a position

13          he held until he was promoted to his present position.  Krout addressed the

14          history of the Port, its physical layout and operations, freight volumes and

15          characteristics and changes over time from the period before and after the

16          WVFAA.  RT 57 et seq.

17      • Curtis E Shuck was formerly director of economic development at POV and

18          was intimately involved in the negotiation of the WVFAA.  Shuck testified that,

19          in his view, the POV team involved in negotiating the WVFAA was competent

20          and dedicated.  Shuck described the governance issues faced by POV and

21          testified that in his view it was important for POV to have access to direct rail

22          service by UP and that this was an important element in POV's decision to

23          enter into the WVFAA.  Shuck testified that BNSF did not disclose that the

24          only rates it would offer to UP for access to the Port were the rates in Exhibit

25          F to the WVFAA.  Shuck testified that if he and the POV team had known this,

26          they would not have put the agreement before the Port commissioners for

27          approval.  RT 113 et seq.

28      • Kent Andrew Cash is POV's chief operating officer.  His testimony ranged

1    over several issues including the importance to POV of commercial access to

2    UP, BNSF's practice of bringing so-called "alien rail cars" onto POV property

3    and the handicap, as he saw it, of WVFAA provisions that shield BNSF from

4    liability for damage to POV property.  These issues are explained presently.

5    Cash provided his version of statements by prospective users of the Port that

6    BNSF's high rates were responsible for UP customers' decisions not to locate

7    at the Port.  Cash testified that POV's preference is not to terminate the

8    WVFAA, however.  Cash acknowledged that the City of Vancouver's policy on

9    renewable energy would preclude the use of POV facilities for crude oil

10    shipments.  RT 261 et seq.

11    • Wayne A Harner is the rail manager at POV having been in that position since

12    2015.  Harner described the rail operations and infrastructure, the track

13    maintenance program and manner in which POV and BNSF share the costs

14    of Port upkeep.  Although POV inspects track monthly, POV does not invoice

15    BNSF for track maintenance. RT 389 et seq.

16    • Brandon Ogden was formerly employed by BNSF in train operations until

17    2016.  Ogden's testimony related to BNSF operations at the Port.  He testified

18    that BNSF failed to adhere to reasonable and generally accepted standards

19    of train operations at the Port which had, in his view, the effect of imposing on

20    POV costs that should properly have been the responsibility of BNSF.  RT

21    480 et seq.

22    • Thomas D Crowley testified as an expert witness on the reasonableness of

23    rail rates, costing and similar issues.  Crowley testified about BNSF's ability to

24    use POV property to store rail cars not associated with deliveries to, or

25    shipments from, the Port ("alien rail cars").  Such use by BNSF of POV

26    property avoids displacing BNSF trackage elsewhere and affords a benefit to

27    BNSF while imposing on POV what Crowley characterized as undue costs

28    because of BNSF's lack of responsibility for maintenance under the WVFAA.

1   Crowley opined that rail customers having access to more than one carrier

2   generally experience lower rates and better service than customers limited to

3   one carrier.  He also testified that BNSF's fees for UP rail access to POV

4   exceed reasonable and customary fees.  RT 562 et seq.

5   • ███████████████████████ of BNSF who testified about the

6   negotiation and formation of the WVFAA, its duration or term and the

7   establishment of rates to reflect the "franchise value" of the BNSF's ERO

8   status at POV. This, she described, is the value to a carrier of having a facility

9   closed to a competitor carrier.  ████ was unable to identify any instance in

10   which BNSF offered less that the Exhibit F rates to a non-BNSF customer.

11   She acknowledged that major shippers are reluctant to use POV without it

12   being served by two Class I railroads.  RT 772 et seq.

13   • ███████████████████████████████ at

14   BNSF.  He testified about the negotiation, formation and drafting of the

15   WVFAA and BNSF's goals in that arrangement, including BNSF's rights to

16   operate on POV property for non-POV purposes (the "alien rail car" issue)

17   which he testified was integral to BNSF's agreement to the terms of the

18   WVFAA, including giving up the Alcoa Lead.  RT 993 et seq.

19   • █████████████████████████; he testified

20   about BNSF's efforts to generate rail and commercial business at POV.

21   ████ started working at BNSF in 2011 and became ██[Position]████

22   ████████████████████████  At the beginning, ████

23   characterized the relationship with POV as very favorable and without issues.

24   As time wore on, however, the relationship became strained.  ████

25   expressed his view that the City of Vancouver's moratorium affecting fossil

26   fuels impaired POV's ability to attract business to the Port.  He also cited what

27   he described as difficulties in getting UP to agree on exchanging rail cars as

28   an obstacle to concluding an agreement with ████████ for shipment to

the Port of Product from Prospective Customer A's, mining operation. RT 1120 et seq,

- Witness D is a BNSF director of marketing and testified about BNSF's business development efforts at POV. Witness D was unable to name a customer that BNSF has brought to POV. He acknowledged that BNSF can charge less than the Exhibit F rates. RT 1220 et seq.

- Witness E is BNSF's [Position]; he testified about rail operations at POV before and after the WVFAA. Witness E came to BNSF from the Santa Fe operation after the merger of the railroads that formed BNSF. He started working in the Vancouver vicinity about 1997. He described a deteriorating relationship with POV which he testified was exemplified by receipt of bills that BNSF had not previously received. RT 1364 et seq.

- James Charles Cunningham testified as an expert witness on railroad operations and the safety of such operations at POV relative to other locations. Cunningham previously worked for BNSF before moving on to the Port Authority of New York and New Jersey and then into consulting. Cunningham disputed Crowley's testimony that it was not railroad industry practice to store alien rail cars on a railroad's tracks. Cunningham said that he reviewed the WVFAA and found no restriction on bringing in alien rail cars onto POV property. He also said that his examination has not uncovered any hazmat incidents at POV. RT 1477 et seq.

- Michael Baranowski testified as an expert witness on railroad economics and was called to address the testimony of POV's witness Crowley. Baranowski testified that he failed to see any harm to POV in storing alien rail cars on POV tracks as POV does not operate a railroad. He opined that UP customers have effective access to the POV. He disputed Crowley's purported reasonable and customary fee analysis because it does not

1            account for the franchise value of BNSF's ERO status.  RT 1607 et seq.

2               At the conclusion of the hearing, the parties submitted post-hearing

3 memoranda.  For its part, POV asserted that the "hearing revealed little factual dispute," but

4 instead disclosed a "sharp disagreement over the [WVFAA's] interpretation."  POV Mar 28

5 Post-Hrg Br at 1.  POV accused BNSF of attempting to nullify the plain language of the

6 WVFAA and contradicting its own witness **Witness B**, who was BNSF's only witness

7 directly involved in the negotiation of the WVFAA.  Id.  POV invoked general principles of

8 contract interpretation under Washington law, the recitals of the WVFAA, extrinsic evidence

9 from the hearing and the doctrine of good faith and fair dealing.  Id. at 2-5.

10              While BNSF has argued throughout this proceeding that the panel may

11 discern the parties' intentions solely from the face of the document, we find that the inquiry

12 is not so clear. The WVFAA on its face does not provide all the answers to the issues

13 posed by the parties.  So, the panel turns to the context in which this agreement arose and

14 the various expressions of intention that accompanied the parties' negotiations to

15 understand and interpret the agreement. See, e g, *Berg v. Hudesman*, 801 P 2d 222, 229

16 (Wash 1990) (extrinsic evidence admissible as to the entire circumstances under which

17 the contract was made as aid in determining the parties' intent).

18              The operative terms of the WVFAA governing these matters are contained in

19 Article III of the WVFAA.  While that article, at §1A, confers on BNSF ERO status, BNSF

20 was obligated in POV's view under §3A(i) to afford UP access to the Port "on reasonable

21 and customary terms and conditions consistent with BNSF's own freight service for such

22 freight business."  This latter provision is central to the parties' dispute.  POV contended

23 that the evidence showed that BNSF has refused to provide UP rail customers "competitive

24 commercial access to UP * * * on reasonable and customary terms and conditions."  POV

25 Mar 28 Post-Hrg Br at 5.  POV contended that the quoted phrase includes "both rates and

26 non-rate terms."  Id.  In making this argument, POV pointed to its significant investment in

27 upgrading the Port.  Exh P0273.  RT 80 (Krout).  POV asserted that BNSF has abused its

28 ERO position to exclude UP customers from use of the Port, thereby depriving POV of

1   access to the Port by customers of the sole other significant interstate railroad capable of

2   serving the Port.  In POV's view, this has hampered, if not made impossible, the realization

3   of the benefits of the WVFAA that POV anticipated when it entered into that agreement and

4   denied POV a reasonable return on its investment in upgrading the Port.

5            POV noted that recitals to the WVFAA state that POV "desires commercial

6   rail access to all of the Port's facilities for the Union Pacific Railroad Company in a manner

7   that protects the integrity of BNSF's exclusive rail operator and franchise rights as

8   contemplated by this agreement."  WVFAA Recital A at 1.  The recitals note that BNSF's

9   ERO status was afforded "for the purpose of rail operations to provide rail switching

10  services to all Port customers" – presumably including UP and its customers.  WVFAA

11  Recital F at 1.  Article III §3A also provides that BNSF shall offer "all Rail Customers

12  Commercial Access to UP for so long as the Port is not in default under [the WVFAA]."

13           POV nonetheless asserted that a "mere declaration sustaining [POV's]

14  construction of commercial access [would be] inadequate in terms of the harm [POV] has

15  suffered and the additional harm that it will likely suffer in the future."  Mar 28 POV Post-Hrg

16  Br at 30.  POV requests the panel to direct BNSF to establish public reciprocal switching

17  fees at rates comparable to those BNSF offers at other Washington ports.  Although POV

18  acknowledges that this relief would remove "some rate discretion" from BNSF, the relief is

19  necessitated in POV's view to remedy BNSF's prior abusive practices and ensure that they

20  do not continue.  POV is clear-eyed enough to acknowledge that the panel is "not well-

21  equipped to engage in direct supervision of BNSF's rates for its own traffic."  Id. at 31.

22           BNSF responded once again that POV is attempting to re-write the terms of

23  the WVFAA, a heavily negotiated agreement between highly competent, well informed and

24  ably advised parties.  BNSF Mar 28 Post-Hrg Br at 1-3.  BNSF's post-hearing brief

25  contained several arguments: (1) the terms of the WVFAA are clear and unambiguous and

26  POV's evidence is nothing more than extrinsic evidence not admissible to re-write the

27  parties' agreement; (2) the recitals of the WVFAA cannot serve to re-write its operative

28  provisions; (3) viewed properly, the extrinsic evidence supports BNSF's position and (4) no

1   grounds warrant re-casting the parties' agreement.  See BNSF Mar 28 Post-Hrg Br at 13.

2            BNSF asserted that in amending the WVFAA agreement on three occasions

3   POV confirmed its terms, facts that alone are sufficient for the panel to dispose of POV's

4   arguments.  Id. at 14.  The "aspirational goals of the WVFAA's recitals do not change the

5   contractual obligations" of the parties, BNSF asserts. Id. at 15.  Furthermore, says BNSF,

6   POV's argument "conflates the pricing and service terms of the WVFAA," because the

7   WVFAA does not "include any mechanism or standard by which to evaluate or set rates."

8   BNSF Mar 28 Post-Hrg. Br. at 20.  Hence, in BNSF's view, the WVFAA does not saddle

9   BNSF with a reasonableness standard for rates it may charge UP customers.  BNSF

10  buttresses this argument with an interpretation that Article III §3A(ii) "addresses

11  compensation," whereas Article III §3A(i) by not specifically referring to rates does not

12  address compensation.  BNSF argues also that even if BNSF's rates as ERO are subject to

13  a reasonableness standard, the Exhibit F rates foreclose any differing interpretation of what

14  is reasonable under the phrase "reasonable and customary terms and conditions" in Article

15  III §3A(i).

16            In asserting its position, BNSF laid considerable emphasis on UP's apparent

17  indifference to the Port, as evidenced by UP's relinquishment of its access rights to the

18  Alcoa Lead, thereby allowing BNSF to transfer that interest to POV so that it could build out

19  a "world-class infrastructure."  Mar 28 Post-Hrg Br at 3.  Through no fault of BNSF, that

20  facility has simply been unable to attract any of the unit train opportunities that have

21  materialized since completion in 2018 of the Port infrastructure.  Id.

22            The panel heard closing argument on April 4, 2022, after which the panel, on

23  May 9, 2022, issued its Partial Final Award ("PFA").  The panel concluded that BNSF's

24  ERO status forecloses competition only in providing switching services. It does not allow

25  BNSF to preclude access to the Port by its competitor UP.  Hence, the PFA awarded POV

26  declaratory relief that the term "reasonable and customary" in Article III §3A(i) must be read

27  to include reasonable and customary rates and non-monetary terms for switching and

28  trackage rights provided to rail customers using UP's linehaul service to and from the Port.

1    For the reasons that presently follow, POV's contentions in this regard are consistent with a

2    fair reading of the WVFAA terms as well as the parties' historical relationship.

3                The July 1, 1909, contract between BNSF's predecessor Northern Pacific

4    Railway Company and UP's predecessor Oregon & Washington Railroad Company

5    granted "equal joint possession and use" of the "railway and appurtenant property" of the

6    Port and permitted UP's predecessor to "do and transact over, upon and by means of said

7    railway and appurtenances * * * all such business as hereafter may be carried on by a

8    railway company * * *."  Exh P0235.  This understanding does not appear to have been

9    altered by subsequent agreements over many years. See Exhs P0236 (1918), P0237

10    (1941), P0239 (1966).  BNSF has not produced evidence that the WVFAA was intended to

11    diminish or eliminate any right of access to the Port that UP's predecessors enjoyed.  The

12    WVFAA itself contains no suggestion of any such reduction or extinguishment of UP's

13    rights.  To the contrary, the recitals to the WVFAA appear to evidence the parties' long-term

14    recognition of that relationship.

15                The panel observed that railroad ratemaking entails inherently complicated

16    issues.  The panel nonetheless expressed the hope that based on the panel's reading of

17    Article III §3A(i), the parties with their vastly greater experience and knowledge of shipping

18    dynamics would be able to develop a "mutually satisfactory schedule of rates" and

19    "procedures to permit prompt dispute resolution" of any disagreements regarding such

20    rates.  PFA at 6.  The panel directed simultaneous additional briefing by June 17, 2022.

21                In its June 17 response, POV spelled out plainly the heart of its complaint

22    against BNSF.  POV noted that "BNSF can thus subsidize a very high published switching

23    fee at the Port with lower linehaul rates" whereas "UP can charge only linehaul rates and

24    must effectively absorb the switching charge relative to BNSF."  POV June 17 Resp at 5.

25    POV's description of the dilemma this situation presents is plain.  In POV's view, an

26    "excessive delivery switching rate is no impediment to BNSF, but [it] can effectively block

27    UP."  Ibid.

28                In its June 17 submission, BNSF suggested two alternatives to implement the

1    panel's conclusion that the WVFAA requires "reasonable and customary" switching rates.

2    BNSF noted that it presently charges a single "through rate" that covers the linehaul portion

3    of the movement as well as the "local service (switching)."  BNSF June 17 Resp at 2.

4    BNSF argued that if it established a separate switching rate for its customers, shippers

5    seeking access to the Port would "pay the same rate whether they use BNSF or UP [and]

6    the Panel's objective of equal treatment will be satisfied."  Id.  Alternatively, BNSF proposed

7    setting "Individual switching rates based on an assessment of market forces and shipper

8    demand."  BNSF June 17 Resp at 20.  BNSF described this approach as "setting

9    reasonable market-based rates" that entailed determining "a reasonable ceiling and

10   reasonable floor."  Id. at 23.

11            As for determining rates, POV argued that implicit in the concept of

12   "reasonable and customary" access is the requirement that the same rates apply whether

13   the linehaul movement to the Port comes via BNSF or UP.  This equivalence stems, in

14   POV's view, from the provisions of the WVFAA that make POV responsible for all "below

15   the wheel" costs, except those involving BNSF's negligence or misconduct.  POV June 17

16   Resp at 4 n1.  The panel concurs with POV's reading of the WVFAA as requiring similar

17   switching rates for BNSF and UP.

18            POV notes that the originating points for some freight mean that for all practical

19   purposes either BNSF or UP is tantamount to the exclusive carrier for that freight (a point

20   substantiated by testimony at the hearing). Id at 6.  Access points to the Port are another

21   factor that favor one carrier or the other. Id.  While costs and market rates over the long-

22   term may very well converge, idiosyncratic factors account for their divergence along the

23   path to convergence.  Id at 7.  Market rates and published rates thus frequently diverge.  Id

24   at 8.

25            Although POV did not admit the point expressly, POV's presentation made

26   evident to the panel that determination of cost-based rates requires considerable expertise

27   and experience.  Id at 10-15.  Complete equivalence in rates may never be uniformly

28   achieved as the nature of freight coming to the Port from BNSF may often differ from that

1   originating with UP.

2        POV sought clarification of two points in the PFA to the effect that: (1) the

3   "reasonable and customary" access mandated by the WVFAA does not expire at the

4   conclusion of the initial access period on September 30, 2028; and (2) the parties'

5   confidentiality agreement does not bar POV from sharing the PFA with existing and

6   prospective tenants and customers.  POV June 17 Resp at 1-2.

7        After considering the parties' June 17 submissions, the panel directed the

8   parties to confer on the process required to implement BNSF's alternatives.  Further Order

9   re PFA, July 8, 2022.  The panel observed that while "costs have obvious utility, they are

10  not a substitute for standards and procedures for determining rates that would provide

11  commercial access to the Port."  Order July 8, 2022 at 1.  The panel directed the parties to

12  confer on the process required to implement BNSF's alternatives to establishing

13  "reasonable and customary switching rates" and directed the Port to respond to BNSF's

14  alternatives and BNSF to address the feasibility of setting switching rates in the absence of

15  specific information about the freight involved.  Id at 1-2.  Finally, the panel ordered the

16  parties to address the confidentiality of the panel's decision and its term.  Id at 2.

17       The parties met and conferred in "an open and candid exchange" on July 28

18  and August 4.  Both acknowledge that they did not reach "any substantive agreement."

19  See POV Sept 1 Resp at 1; BNSF Sept 1 Resp at 2.  Thereafter, the parties dutifully

20  submitted separate statements of their positions.  POV's submission made the following

21  points:

22       •   POV should be allowed to share the PFA along with any subsequent awards

23           with UP, potential tenants and customers.

24       •   The requirement for "reasonable and customary" rates and procedures should

25           continue for the duration of the WVFAA for as long as POV is not in default.

26       •   The 8005-level switching rates provide the best evidence of reasonable and

27           customary rates for BNSF's switching services.

28       •   BNSF's reliance on published rates for terminal railroads amounts to

1    "monopoly rates," because those railroads incur substantial "below the wheel"

2    costs which POV absorbs under the WVFAA.

3  POV Sept 1 Resp at 1-6.

4              BNSF's submission made the following points:

5    • BNSF cannot establish an advance schedule of economically rational

6      switching rates without first knowing the potential shipper, commodity,

7      transportation characteristics and market circumstances.

8    • The commercial access rights under the WVFAA extend beyond the initial

9      access period so long as POV is not in default, but if the panel directs BNSF

10     to match the reciprocal switch rates of other Washington state locations or

11     require setting "a particular rate of any kind," the WVFAA must expire in 2028

12     as this was not the parties' bargain.

13   • The PFA and subsequent awards must remain confidential although BNSF

14     would agree to a "mutually agreed-upon public statement."

15 BNSF Sept 1 Resp at 1-4.

16             In a case of significant complexities, the panel must determine the relief, if

17 any, that the evidence and the law warrant should be afforded POV.  Part of that relief was

18 awarded in the PFA, namely that the term "reasonable and customary" in Article III §3A(i)

19 must be read to include reasonable and customary rates and non-monetary terms for

20 switching and trackage rights provided to UP or rail customers using UP's linehaul service

21 to and from the Port.  The reasons that the panel so concluded rests not only on the

22 language of the WVFAA, but also on the panel's discernment of the parties' mutual

23 intentions as reflected in the WVFAA and the parties' historical practice.  A fuller

24 explanation of that discernment than that provided in the PFA now follows.

25             Of the evidence presented at the hearing in light of the documentary evidence

26 submitted, the panel deems the most persuasive evidence of the parties' intent in agreeing

27 to the WVFAA to be that contained the record of the proceedings before the POV board of

28 commissioners meeting on December 23, 2008.  Exh P1112.  Both POV's Shuck and

1   BNSF's Witness B appeared and made presentations to the board.  At that meeting,

2   Shuck appeared to carry the laboring oar in the presentation.   Shuck repeatedly referred to

3   the importance of "[d]ual carrier accessibility" in helping to "maximize marine and industrial

4   business" for the Port.  Id at 4.  Shuck related that "BNSF Railway Company has agreed to

5   immediately provide commercial access to the Union Pacific Railway [sic] to all of the Port's

6   customers in both current and then for future expansion opportunities."  Ibid.

7           Responding to a commissioner's question evidently referring to the rates in

8   Exhibit F to the WVFAA, Shuck assured the board that "commercial access rates" could

9   "[a]bsolutely" be negotiated and they represent the "high end, the maximum amount, and

10  each customer has the ability to negotiate directly with the Port, the BNSF and the Union

11  Pacific, to try and develop a better scenario."  Id at 17.  Furthermore, these rates are a

12  "public tariff that BNSF publishes."  Ibid.  While Shuck, a POV executive, spelled out POV's

13  aims for the WVFAA, BNSF's Witness B also attended the commission meeting.

14  Witness B had a full opportunity to contradict, supplement or amend Shuck's

15  articulation of the intentions of the WVFAA.  Witness B's failure to avail himself of this

16  opportunity affords reason enough for the panel to conclude that the record of the

17  commission hearing encapsulates the parties' mutual intent for the WVFAA at least as it

18  relates to access by UP and its customers.

19          This interpretation of the parties' intent was buttressed by Cash's testimony.

20  Cash came to POV when it was about three-quarters finished with the upgrades to Port

21  infrastructure.  RT 277.  He testified to his understanding that POV made this investment

22  expecting that this investment would be rewarded with increased unit train traffic and

23  economic development and jobs.  RT 279.  BNSF presented nothing to undermine that this

24  was POV's reasonable expectation and one shared by BNSF.  Furthermore, the parties do

25  not dispute that following completion of the infrastructure improvements in 2018, essentially

26  no freight traffic has come to the Port from UP.  The parties dispute the reasons that this is

27  the case.

28          POV's contention that BNSF frustrated dual access to the Port is sufficient to

1   constitute a material breach is nonetheless complicated by events after completion of the

2   POV infrastructure.  The inconsistency of POV's aspirations for the Port and the City of

3   Vancouver's policy against new facilities for fossil-fuel shipments at the Port is especially

4   problematic for POV.  That policy appears largely to account for the failure of the

5   Vancouver Energy project which likely would have resulted in a significant increase in unit

6   train traffic at the Port.  Nothing in the present record suggests that BNSF played any role

7   in scuttling this opportunity.

8           POV thus looks elsewhere in the record for support of its positions, but

9   evidence supporting these positions appears limited.  Relying on Cash's testimony, POV

10  contends that BNSF's inability to provide competitive rates accounted for the loss of a

11  ▆Prospective Customer B▆ opportunity at the Port.  RT 276.  Cash was not at the Port during the ▆Prosp. Cust. B▆

12  negotiations, however.

13          ▆Witness A▆ did not deny Cash's interpretation, relying instead on a hazy memory,

14  RT 975-77.  An April 28, 2017 email from ▆Prospective Customer B▆ appears to confirm POV's

15  version of this setback to POV's aspirations.  Exh P0215.   Todd Coleman, the former

16  executive director of the Port was described by Shuck in his testimony as primarily

17  responsible for the negotiations with ▆Prosp. Cust. B▆ RT at 234.  Coleman was not called by either

18  party as a witness at the hearing, but he testified in his deposition that he did recall that

19  BNSF's switching rates were a factor in their termination to build the facility.  Coleman Dep

20  at 174.  Both Coleman and Shuck cited a variety of reasons why ▆Prosp. Cust. B▆ determined not to

21  proceed with locating at the Port.  See RT 234-35 (Shuck); Coleman Dep at 172-74.

22          POV also introduced a hearsay account by Shuck of a conversation with UP

23  personnel denying that POV can be considered a dual carrier Port.  RT 226-27.  This

24  account is substantiated by an email from UP's Brian Maher on February 19, 2014 that the

25  contractual commitments of the WVFAA and BNSF's quoted rates "effectively inhibits [sic]

26  UP's ability to compete for business" at POV.  Exh P1116.  POV did not call any UP

27  witnesses to substantiate or further explore this account.

28          When it came to the ▆Prosp. Cust. A▆ transaction, which occupied much attention at the

1  hearing herein, POV contended that BNSF's failure to deviate and offer rates lower than

2  those embedded in Exhibit F explain that lost opportunity.  See Mar 28 Post-Hrg Br at 26-8;

3  RT 1359-60.  BNSF's ▮Witness A▮ declined the opportunity to offer an alternative explanation.

4  See RT 959-61.  Indeed, ▮Witness A▮ expressed BNSF's desire to avoid handing "UP any undue

5  leverage."  RT 958-59.  Despite ▮Prosp. Cust. A▮'s obvious interest in a long-term arrangement, BNSF

6  "very likely" told ▮Prosp. Cust. A▮ that the WVFAA expired in 2028.  RT 1245.  That statement would

7  plainly have discouraged ▮Prosp. Cust. A▮'s interest.  Furthermore, BNSF's April 2019 offer to ▮Prosp. Cust. A▮

8  exceeded the Exhibit F maxima.  RT 1324-25.  Exh P093.  This represented a considerable

9  markup over BNSF's costs of service.  RT 1713.  There was evidence that over the course

10  of negotiations, BNSF offered ▮Prosp. Cust. A▮what Cash said was a "commercially acceptable rate"

11  below the Exhibit F rates and that this was communicated to the Port.  D014-1.  POV did

12  not call any witnesses from ▮Prosp. Cust. A▮

13         POV argues strenuously that given the rarity of unit train opportunities,

14  BNSF's hardnosed approach to the ▮Prosp. Cust. B▮ and ▮Prosp. Cust. C▮ negotiations reflects BNSF's bad faith

15  sufficient to support a claim that it violated the covenant of good faith implicit in the

16  WVFAA.  That violation, POV argues, warrants finding BNSF in breach of its obligations

17  under the WVFAA.  The panel finds the evidence adduced by POV insufficient to find that

18  BNSF acted in bad faith.  While the panel concludes that BNSF's insistence on Exhibit F

19  rates was inconsistent with BNSF's obligations under the WVFAA, there were other factors

20  that prevented consummation of deals in each of the three opportunities.  Hence, the panel

21  cannot conclude that BNSF"s insistence on Exhibit F rates proximately caused each of

22  these transactions to fall through and that BNSF acted in bad faith in each of those

23  instances.

24         As noted above, and in the PFA, the panel concludes that POV is entitled to

25  relief regarding BNSF's switching rates going forward.  First, the WVFAA read in its entirety

26  appears to contemplate competitive access to the entire Port (with the exceptions noted in

27  Article III §3 A (iii)), especially as rail customers are likely to be those of either BNSF or UP.

28  This makes it difficult to imagine that POV would have agreed to allow BNSF as ERO to

1   charge rates that would hobble POV from attracting business from UP customers or from

2   competing with other ports.  The panel resolves any ambiguity in the evidence of the

3   parties' negotiations for the WVFAA in favor of POV's position that "competitive access"

4   includes both rates and other terms.  BNSF and UP are fierce competitors and dominant in

5   the western United States.  A suggestion that POV would allow itself to be drawn onto

6   BNSF's side in this competition and give BNSF the upper hand by allowing it to set rates

7   that would diminish utilization of the Port by UP customers finds essentially no support in

8   testimony before the panel and is inconsistent with a fair reading of the WVFAA.

9           The provisions about "Commercial Access" are replete with references to a

10  variety of mechanisms by which rates are set, such as switching agreements, tariffs, and

11  public contract rates.  The concept of reasonableness is reflected in multiple places in this

12  provision. There is simply no textual interpretation that supports BNSF's reading that

13  "reasonable and customary terms and conditions" somehow excludes rates, which would

14  usually be the most critical piece of any agreement between a customer and BNSF, or

15  between UP and BNSF.  BNSF's provision of switching services for UP customers who are

16  "Rail Customers" as defined by the WVFAA [Article III, Section 3A (iii)] is governed by the

17  WVFAA.

18          At the hearing, the bulk of the evidence about rates was put in by the parties'

19  expert witnesses.  POV suggests that the panel require BNSF to offer to UP customers the

20  same rates that BNSF offers to its customers.  BNSF counters that to impose such a

21  requirement would deprive BNSF of the "franchise value" which its witness Witness A described

22  as the value a carrier derives to earn rates "unconstrained by competition."  The panel

23  disagrees.

24          The trouble with BNSF's position is that WVFAA does not liberate BNSF from

25  competition.  The express terms of the WVFAA contemplate that both BNSF and UP will

26  service Port customers.  The presence of two railroads by definition should exert a

27  constraining influence on their pricing decisions.  Testifying for BNSF, witness Witness A's

28  description of BNSF's unconstrained approach to pricing at the Port is inconsistent with

1   "reasonable and customary" standard mandated by the WVFAA.

2   Although the panel on the present record is not prepared to act as a rate-
3   setting board, this does not completely foreclose the panel from attempting to put
4   customers obtaining access to the Port from BNSF and UP on equivalent footing, which
5   should further the Port's objectives regarding competition with other Ports. The panel
6   recognizes that switching services are not homogeneous or fungible.  For example,
7   testimony pointed to the different rates charged for unit train load shipments and rates for
8   partial train load shipments and different rates for shipments of different commodities.  The
9   panel appreciates that certain shipments impose different costs from other shipments.
10  While these cost differences may not be precisely captured in switching rates, the
11  requirement that we impose on BNSF to provide its switching rates to the Port and Rail
12  Customers will allow comparison with switching rates at other ports on the Pacific coast
13  with which POV competes.  The panel anticipates that over time BNSF's rates at the Port
14  will converge with the costs of providing these services and be competitive with rates at
15  other alternative ports.  To facilitate this convergence, the panel imposes, consistent with a
16  plain reading of the WVFAA, a requirement that BNSF offer to UP customers switching
17  rates no greater than rates BNSF offers to its own linehaul customers bringing comparable
18  quantities and characteristics of freight under similar conditions.

19  A practical way to implement this requirement would be to require BNSF to
20  establish and make available to both its customers and those of UP rates for its switching
21  service that apply to both BNSF and UP customers.  The panel appreciates that these rates
22  may differ by a customer's switching requirements and type of service provided.  The panel
23  previously rejected BNSF's contention that the only limit on BNSF's rate making lies in
24  Exhibit F to the WVFAA and nothing submitted by the parties after the PFA prompts the
25  panel to revisit that rejection. BNSF's switching rates should be based on factors arising
26  from the nature of the switching services it provides at the Port.

27  The panel in issuing its Partial Final Award awarded POV declaratory relief
28  that the term "reasonable and customary terms and conditions" in Article III §3A(i) must be

1   read to include reasonable and customary rates for services provided Rail Customers,

2   including switching and trackage rights provided to connect Rail Customers using UP's

3   linehaul service to and from the Port, and other non-monetary terms.  BNSF was directed

4   to establish rates and other terms that offer Rail Customers a like opportunity, considering

5   cost differences, to connect with both BNSF's and UP's linehaul services.  BNSF was

6   directed to provide POV with a schedule of the various reasonable and customary rates

7   that BNSF shall charge for its services within the Port.  That rate schedule should be

8   subject to being updated from time to time as circumstances so justify.

9           While the panel expected the Port and BNSF to develop a mutually

10   satisfactory schedule of rates, the panel recognizes that if there are disputes there must be

11   standards and procedures to permit prompt dispute resolution.  Ratemaking, however, can

12   be complicated, even for services as narrowly defined as those provided by BNSF as ERO.

13   And there is nothing in the record that would permit the panel to determine what readily

14   applied, objective standards and procedures should govern an assessment of whether

15   BNSF's rates for its services to Rail Customers are reasonable. The panel, therefore,

16   requested further briefing on those standards and procedures.  That briefing did not point to

17   any agreed upon practical dispute resolution mechanism, however.

18           While BNSF has proposed what it called "an engagement process," intended

19   to be more expeditious and less formal than an arbitration, it does not appear that the

20   parties have come to agreement on such a process. BNSF Submission on Proposed

21   Alternatives at 9-13.  It would be beyond the panel's remit to fashion one out of whole cloth.

22   The parties could achieve an efficient process to resolve rate disputes by submitting

23   competing proposals to a pre-selected monitor who is authorized to select only one of the

24   proposals without altering the terms of the proposal selected.

25           Beyond POV's demonstration that the WVFAA terms require uniform,

26   reasonable and customary switching rates for BNSF and UP originated shipments, POV

27   can point to no claim, representation or promise from BNSF that UP sourced traffic would

28   materialize and, therefore, that this circumstance alone represents a material breach by

BNSF.  What POV complains of here is the obvious fact that BNSF is not incented under the terms of the WVFAA, as BNSF has heretofore interpreted it, to drum up business for the Port. The panel has now, however, clarified that BNSF may not simply rely on Exhibit F rates, but it must instead offer the same "reasonable and customary" rates without regard to whether BNSF or UP provides linehaul service to access the Port.

If POV failed to establish BNSF's breach of a promise to stimulate UP-sourced traffic, that failure nonetheless does not warrant the panel ignoring the clear evidence of the parties' mutual intentions and seeking to declare an appropriate remedy. The panel does not find itself equipped to serve as a rate setting body.  What is consistent with the terms of the WVFAA and the capability of the panel is the imposition of a requirement that henceforth BNSF offer to UP and its customers that access to the Port from UP linehaul traffic shall be at the same switching rates and terms as BNSF offers to its linehaul customers under the same or similar circumstances and freight.  The panel appreciates that rates offered to UP and its linehaul customers will reflect the nature and characteristics of the freight that UP brings to the Port.  Hence, there is no expectation that the switching rates for UP and its customers and BNSF switching rates will be the same in all instances.  But the differences should reflect the freight and train characteristics of the UP deliveries and be comparable to those associated with deliveries from BNSF linehaul traffic.  As we noted in the PFA, BNSF must promptly create a schedule of the various applicable reasonable and customary switching rates to be charged.  BNSF's rates should be based on objective factors typically used to determine switch rates for access to the ports it serves. This schedule is to be shared with POV and potential customers.    BNSF may update the rate schedule as circumstances warrant.

The panel is not oblivious to the fact that BNSF could match switching rates offered to UP and adjust linehaul rates downward to its customers to account for any give-back on switching rates.  While there does not appear to be any provision of the WVFAA that would expressly govern this conduct, a decision by BNSF going forward to undercharge what would otherwise be reasonable and customary on its linehaul rates in

1  order to boost its switching rate for UP linehauls would be contrary to the covenant of good

2  faith and fair dealing present in every contract under Washington law.  *Conway Constr Co v*

3  *City of Puyallup,* 197 490 P 3d 221, 226 (Wash July 8, 2021) ("There is an implied duty of

4  good faith and fair dealing in Washington contracts that obligates the parties to cooperate

5  with each other so that each may obtain the full benefit of performance. This duty arises

6  when the contract gives one party discretionary authority to determine a contract term."). In

7  any event, customers are interested in point-to-point charges.  Hence, BNSF

8  undercharging linehaul rates to raise switching rates would likely become apparent in time

9  triggering appropriate remedies when such undercharging comes to light.

10        The panel now turns to the remaining issues between the parties.  The first is

11  these is the issue of "alien rail cars."  On this issue, POV turned again to Shuck who

12  testified that neither he nor the Port commission considered that BNSF would use POV

13  property for non-Port purposes.  RT 177-78.  This testimony is, of course, self-serving, but

14  the panel credits it nonetheless in that it is consistent with the recitals and provisions of the

15  WVFAA, is not contradicted by BNSF's witnesses and was substantiated by what was told

16  to the Port commissioners.  See RT 1112 (Witness B  ).  Furthermore, at a fundamental

17  level, BNSF's use of Port property for non-Port purposes is inconsistent with access to the

18  Port by two Class I railroads which plainly emerges as central to both parties' intent and

19  understanding in agreeing to the WVFAA.  BNSF's use of POV trackage to store rail cars

20  not related to deliveries to or from the Port could displace or disrupt the potential availability

21  of that trackage to accommodate deliveries to or from UP.  POV's interest in avoiding

22  BNSF's storage of alien rail cars without compensation is obvious.  Witness B  's silence

23  with respect to this subject in earshot of Shuck's representations to the Port commissioners

24  connotes BNSF's acceptance of this understanding.

25        In responding to POV's claim regarding alien rail cars, BNSF disputes POV's

26  right to collect for the use of Port trackage under the terms of the WVFAA and challenges

27  the reasonableness of the $150 and $500 per car charges, but not the counting of days.

28  BNSF points to practices that pre-date the WVFAA and BNSF's access rights under Article

1   III of the WVFAA.  Those access rights afford BNSF "exclusive right to access, serve,

2   operate and use the Track and the Property" of the Port.  Art III §1 A.  BNSF further notes

3   that it is not liable for "any fees or charges whatsoever for access to or use of the Track,

4   Property, and/or any Port owned or controlled facilities, except where BNSF has granted its

5   prior written consent, such consent to be in BNSF's sole discretion."  Art III §3 B.

6          The panel finds that BNSF overreads the language of the WVFAA in

7   asserting that BNSF's use of POV trackage is essentially divorced from traffic related to

8   POV or its tenants.  It may well be that in switching rail cars on POV trackage some rail

9   cars not destined for POV tenants may from time to time be included in switching cars.  But

10   BNSF's use of POV trackage appears far more extensive, including rail cars of essentially

11   every description and for other than limited or short periods.  RT 426- (Harner).

12          As for pre-WVFAA practices, BNSF relied on the testimony of Witness E .  But

13   that witness' testimony largely concerned servicing a Customer which was not a

14   POV tenant and does not appear to establish a more general practice of BNSF in storing

15   rail cars for a variety of its customers.  RT 1377-79.  Furthermore, BNSF argues that

16   handling rail cars from different carriers is standard practice in a common switching area.

17   Harner testified that an "alien" rail car is one that has accessed POV owned or maintained

18   property that is not destined for a POV-served tenant.  RT 426.  In the panel's view, it does

19   not follow that BNSF's ERO status allows it to use POV property for purposes un-related to

20   the interests of POV and parking of rail cars not destined to pick up freight from, or deliver it

21   to, the Port or its tenants serves no purpose of POV.

22          In response to what POV regarded as BNSF's unauthorized use of Port

23   trackage to store what it deemed to be alien rail cars, POV adopted its Access and Dwell

24   Tariff effective January 1, 2018 and began invoicing BNSF for charges thereunder.  Exh

25   P1022a.  POV imposes a $150 per day charge for non-hazmat cars and $500 per day

26   charge for the latter.  The parties have stipulated that under those assumptions, the

27   charges thereunder for the period February 2018 through December 2020 is $1,811,050,

28   excluding interest.  Exh P0204.  This sum is based on the POV's calculation that during the

1  period, BNSF stored alien rail cars for 11,956 rail car-days and hazmat alien rail cars for

2  362 car-days.  BNSF has refused to pay any of these invoices.

3      The panel agrees with BNSF that POV's claim for $150 and $500 per day

4  charges appears untethered to evidence presented at the hearing that demonstrates the

5  reasonableness of such charges.  Indeed, Cash testified that the Port set the rates primarily

6  as a disincentive to BNSF.  Cash also conceded that to date there have been no issues

7  regarding space otherwise needed by the Port.  RT 363-65.  BNSF proposes that a fee of

8  $7 per day is the maximum reasonable fee.  The panel finds that BNSF's proposed rate for

9  past storage of alien cars justifiable in view of POV charging its tenants less than $7 per car

10  for costs.  Hence, the panel awards POV $86,226 based on a total of 12,318 rail car days.

11  The evidence was uncontradicted that there have been no hazmat spills, or that BNSF has

12  not followed all applicable protocols in the handling of hazmat.

13      Prior to the hearing herein, POV sent BNSF invoices totaling $209,156 for

14  negligence in train operation or operation in violation of applicable law.  BNSF failed to pay

15  $150,213 of these invoices.  POV seeks recovery of the unpaid invoices in this proceeding.

16      At the hearing, BNSF's witness Witness A asserted that the POV would be

17  responsible for all damage resulting from an event, including damage to third persons, even

18  if BNSF was solely at fault.  RT  979-80 Witness A.  "When you have to clean up something,

19  that's maintenance." RT 981  Witness A.  Other BNSF witnesses testified that BNSF might be

20  responsible for some of the costs, but not for damage to Port property.  RT 1444- 46

21  Witness E.  BNSF asserts that the WVFAA immunizes it from liability for damage to POV

22  property even if it is the fault of BNSF.

23      In taking its position, POV argues that BNSF ignores the overriding point that

24  casualty repair costs are not maintenance costs in the first place.  In that regard, the POV

25  has never invoiced BNSF for any maintenance costs, either spot or program/capital, at all.

26  RT 400 (Harner).  BNSF also claims immunity from charges under Art III §3 B, which states

27  that "BNSF shall not be liable for any fees or charges whatsoever for the access to or use

28  of the Track."  But use of the Port is not synonymous with misuse of the Port.

1      The panel concludes that the WVFAA does not shield BNSF from damage

2  caused by BNSF's improper operations.  Damage caused by negligence is not

3  "maintenance" by any sensible measure of the word's plain meaning.  BNSF is liable under

4  the WVFAA for damage caused by its failure "to provide rail service consistent with

5  applicable law."  BNSF's effort to invoke the "independent duty" doctrine to bar the Port's

6  claims (BNSF Brief at 52-53) is similarly flawed.  First, the WVFAA obligates BNSF "to

7  provide rail service consistent with applicable law," establishing a contractual duty for

8  BNSF.  Second, Washington has "limited the application of the independent duty doctrine

9  to a 'narrow class of cases * * * involving] claims arising out of construction on real property

10  and real property sales.'" *Donatelli v DR Strong Consulting Engineers, Inc*, 179 Wash 2d

11  84, 92 (2013).  The doctrine does not apply to damage to the Port's track.  Third, RCW

12  4.24.115 precludes contracts that relieve a railroad of responsibility for its sole negligence.

13  The independent duty doctrine cannot protect BNSF.

14      The panel determines that if the WVFAA purported to excuse BNSF from the

15  consequences of its own negligence, that aspect of the WVFAA would be unenforceable.

16  Under RCW 4.24.115, an "agreement * * * in, or in connection with * * *  contract or

17  agreement relative to the construction * * * or maintenance of, any * * * railroad…

18  purporting to indemnify, including the duty and cost to defend, against liability for damages

19  arising out of such services or out of bodily injury to persons or damage to property * * * is

20  against public policy and is void and unenforceable."   The policy expressed in RCW

21  4.24.115 "disfavors allowing an indemnitee to contract away liability resulting from its own

22  negligence.  Furthermore, BNSF's right to use POV property must be "consistent with

23  applicable law."  Art III §1 A.  The failure to observe reasonable care in railroad operations

24  does not comply with applicable law.  Failure "to provide rail service consistent with

25  applicable law" represents a breach of BNSF's responsibilities as the ERO under the

26  WVFAA, not merely a separate tort, for which the Port is entitled to contract-based relief.

27      BNSF asserts that the Port's track damage claims are barred in part by the

28  statute of limitations.  The panel rejects this argument as the limitations period is three

1   years for damage to personal property under RCW 4.16.080, as BNSF noted in its July 20,

2   2021, summary disposition letter, and not two years under the RCW 4.16.130 catchall for

3   damage to realty under RCW 4.16.130.  The track, of course, is not real property.

4   Furthermore, POV sent its initial dispute letter to BNSF pursuant to Article IX §1 on

5   November 7, 2019, and the parties met in-person on December 18, 2019, both within

6   Washington's three-year limitations period for the December 20, 2016, derailment.  Exh

7   P0500.  Under RCW 7.04A.090(1), "[a] person initiates an arbitration proceeding by giving

8   notice in a record to the other parties to the agreement to arbitrate in the agreed manner."

9   The initial demand letter gave BNSF timely notice that the Port had invoked the WVFAA's

10  arbitration provision.

11          Nor do laches bar POV's claim in this regard.  The panel finds consistent with

12  the testimony that BNSF's disavowal of responsibility for its actions became apparent

13  during consideration of the Vancouver Energy project.  RT 316-17 (Cash).  And POV's

14  claim was not unreasonably out-of-time.

15          Finally, POV's damage claims also rest on BNSF's breach of Article III §1 A,

16  BNSF's failure "to provide rail service consistent with applicable law."  The limitations

17  period for "[a]n action upon a contract in writing, or liability express or implied arising out a

18  written agreement" is six years. RCW 4.16.040.

19          POV seeks a declaration that it has the right to terminate the contract if and

20  when it concludes it is appropriate to do so.  Per the WVFAA, Article VIII, Section 5, the

21  panel is bound to apply the law of the State of Washington.  The trouble with POV's

22  position is manifold.  First, and most evident, POV in these proceedings has disclaimed any

23  present interest in termination of the WVFAA, making its claim in this regard a request for a

24  purely advisory ruling.  To obtain declaratory relief under Washington law, party must

25  present a "justiciable controversy between the parties."  *Everett Clinic, PLLC v Premera*, No

26  81684-5-I, 2021 Wash App LEXIS 2079 (Ct App Aug 16, 2021).

27          A justiciable controversy is (1) an actual, present, and existing dispute, or the mature
    seeds of one, as distinguished from a possible, dormant, hypothetical,
28  speculative, or moot disagreement, (2) between parties having genuine and
    opposing interests, (3) which involves interests that must be direct and substantial,

rather than potential, theoretical, abstract, or academic, and (4) a judicial determination of which will be final and conclusive.

Id at *6-7.

As conceded by the POV's counsel at oral argument, there is a dearth of relevant caselaw in Washington regarding the issue of termination at will for a contract of indefinite duration.  Those cases that do exist in Washington address very simple agreements that lacked any language whatsoever as to either duration or grounds for termination—in other words, the court could find no contractual language evincing the parties' intentions as to duration.  See, e g, *Institute of Cetacean Research v Sea Shepherd Conserv Soc'y*, 153 F Supp 3d 1291, 1322 (W D Wash 2015) ("simple" confidentiality agreement with no termination mechanism); *Cascade Auto Glass, Inc v Progressive Cas Ins Co,* 135 Wn App 760, 766 (2006) (contract for auto replacement glass: "the agreement said nothing about how or when either party could terminate it, [and] *the parties have agreed that it was terminable-at-will by either party.*") (emphasis supplied); *Robbins v Seattle Peerless Motor Co*, 148 Wn 197 (1928) (one-page agreement to wash cars, no termination provision); *Cromwell v Gruber*, 7 Wn App 363, 366 (1972) (sales agreement for typewriters silent as to duration or termination).

The common thread in these cases is the fundamental question of *what the parties intended*.  The doctrine of termination at will in these cases is not based upon any notion that such contracts are against public policy or should be unenforceable on equitable grounds. The purpose of the doctrine instead is to remedy a situation where there is an absence of contractual language or extrinsic evidence as to the intent of the parties concerning the duration of the agreement. In those circumstances, the Washington courts have used the terminable at will doctrine as a gap-filler for the missing durational term. In *Birkenwald Distrib Co v Heublein, Inc*, 776 P 2d 721, 724 (Wash App 1989), the Washington Court of Appeals noted that "[p]arties contracting in good faith for a continuing performance presumably *intend* a reasonable time *if they do not discuss duration*; for this reason, either party may terminate its obligations after a reasonable time has passed." (emphasis supplied).

While the POV has asserted that it is settled law nationwide that contracts

1   without fixed duration are terminable at will, it did not provide citations demonstrating that

2   proposition.  To the contrary, there are many cases, from a variety of jurisdictions, in which

3   the courts have declined to find an agreement terminable at will.  To cite just a few: see

4   *Burford v Accounting Practice Sales, Inc,* 786 F3d 582, 587 (7th Cir 2015) (contract

5   provision that simply provided that "APS cannot terminate this agreement unless it is

6   violated by Burford" sufficient to demonstrate parties' intentions as to termination; no

7   termination at will); *Sensormatic Sec Corp v Sensormatic Elecs Corp*, 249 F Supp 2d 703,

8   714 (D Md 2003) (default termination provisions in contract made clear intent of parties that

9   it was not terminable at will*); Johnson v Welch*, 2004 Tenn App LEXIS 86 (2004)( where

10  parties have indicated intent that their contractual obligations last indefinitely until the

11  occurrence of a particular event, contract terminable only upon the occurrence of that

12  event); *Zee Medical Distrib Ass'n v Zee Medical*, 80 Cal App 4th 1 (2000) (contract not

13  terminable at will when the parties made agreement terminable for cause when specified

14  conditions or events occurred).

15          The WVFAA is not unconscionable.  It is not a contract of adhesion.  POV

16  was not coerced into agreeing to its terms.  The evidence at the hearing was

17  uncontradicted that in the negotiations with BNSF, the POV was represented not only by

18  high level executives, but by outside counsel as well as railroad expert consultants in the

19  negotiations with BNSF. Those negotiations were extensive, with many drafts exchanged.

20          The parties expressly discussed, and agreed upon, the duration of the

21  WVFAA.  And where the parties' intentions are clear, as they are here, courts have

22  declined to permit termination at will.  Unlike the cases relied upon by POV, here the

23  parties specifically addressed the duration of the agreement in clear contractual language.

24          The WVFAA provides that it "shall continue unless terminated by an

25  agreement in writing between the Port and BNSF." Art VIII §2.  The WVFAA provides

26  specific termination provisions in the "Default and Remedies" provisions in Article VII.  That

27  section provides that "[i]f a Default Event occurs* * * BNSF may, without incurring any

28  liability to the Port, (i) terminate this Agreement * * * (iv) exercise Repurchase Option rights

1  and/or (iv) enforce specific performance of this Agreement." Art VII §2. The specific defaults

2  are defined in Section 1 of Article VII.

3         If more were needed, the evidentiary record supplies strong proof from POV

4  witnesses that the POV fully understood the durational terms and conditions of the WVFAA.

5  Shuck testified that the parties had agreed that the WVFAA was "perpetual" and would

6  continue as long as the parties were not in default. RT.251.  In fact, Shuck testified that he

7  had suggested alternative language on termination in the drafting process that was not

8  accepted by BNSF. Id.  Krout testified that he had POV internal conversations in 2008

9  regarding the duration of the agreement.  RT 96-7.  Kraut acknowledged the POV's "intent

10  in entering into this language was that the agreement continue[s] unless terminated in

11  writing." Id.

12         POV relies heavily on the *BNSF v Panhandle Northern Railroad* case from

13  the Fifth Circuit.  First, it bears noting that the opinion relies exclusively on the Fifth Circuit's

14  interpretation, in a diversity case, of Illinois law, a jurisdiction with no connection to this

15  dispute.  Indeed, the Fifth Circuit noted that it was engaged in an exercise of making an

16  "*Erie* guess" in terms of trying to ascertain what the highest court of Illinois, a state outside

17  the Fifth Circuit, would rule. 946 F 3d 705, 713 (5th Cir 2020).

18         Significantly, the contract at issue in that case, as the Fifth Circuit itself noted,

19  did not "even reference 'termination,' much less indicate a sole or exclusive basis for

20  termination." Id. at 713.  Here, the WVFAA specifically addresses termination, not just upon

21  mutual agreement, but also upon specifically defined events of default.  See WVFAA Art.

22  VII.  There was no similar termination by default provision in the *BNSF v Panhandle* case.

23         The transaction in that case was also fundamentally different.  Unlike the

24  agreement here, the agreement in *Panhandle* did not involve other agreements and

25  provisions which express an understanding and intention by the parties that the relationship

26  was to continue absent termination by default or agreement. Unlike the WVFAA, there were

27  no additional rights preserved by the railroad – no retention of ERO status, no rights

28  reserved in a quitclaim deed – as here.

In contrast to the Fifth Circuit, the Ninth Circuit (applying the same Illinois caselaw as the Fifth Circuit did in *Panhandle),* held in an unpublished opinion that a contract that permitted *only one party* to renew an initial five-year term indefinitely, but that contained a means of termination "upon the occurrence of a specified event" should not be held to be a contract of indefinite duration.  The court noted: "We respect the clear intent of the parties in their formation of this agreement, and refuse to add a termination provision in favor of Budget when such an addition would so clearly contradict the parties' intent." Budget Rent-A-Car Sys v Budget Rent a Car of S Cal, 119 F Appx 872, 874 (9th Cir. 2004).

This does not mean that there are no circumstances under which the WVFAA can be terminated apart from mutual agreement or from the termination provisions of the WVFAA itself.  BNSF has a duty to conduct all its future negotiations with potential customers in accord with the duty of good faith and fair dealing.  The Panel has provided clear direction to BNSF that it may not simply rely on the maximum Exhibit F rates in its negotiations with customers or UP but must provide "reasonable and customary switching rates."  If going forward BNSF commits a material breach – by, for example, disregarding our clear direction the rates it offers must be reasonable and customary – termination of the WVFAA might well be the appropriate remedy.  As the Supreme Court of Washington explained:

> If [a] breach is "material," the promisee has an election: He or she may treat the breach as a failure of a condition that excuses further performance, and thus terminate the contract, or he or she may waive the condition and allow performance to continue * * *  As one authority explains * * * If the breach is material, it is called a total breach, which gives to the injured party an election to substitute for his contractual rights the remedial right to damages for total failure of performance.

*Colo Structures, Inc v Ins Co of the W,* 161 Wn 2d 577, 588-89, 167 P 3d 1125-31 (Wash 2007)(internal quotes omitted).

As discussed above, the parties may also jointly agree to terminate the WFVAA.  While it appears that neither party wishes to do so at this time, there may come a point at which it is apparent that the contractual relationship is not mutually beneficial.  The recitals to the WVFAA and the evidence at hearing, establish that the POV undertook a major investment of in its infrastructure in order to "enhance the economic benefit to the

community by increasing the capacity of rail cargo movements at the Port and providing

additional employment opportunities to the community."

Putting fault aside, thus far POV's goals do not appear to have realized.  The

panel specifically declines to hold today that POV is nonetheless bound in perpetuity to the

current terms of the WVFAAA.  Where a fundamental purpose of the agreement has clearly

not been realized, the doctrine of "frustration of purpose" may apply. See, *Wash State Hop*

*Producers Liquidation Trust v Goschie Farms,* 773 P 2d 70 (Wash 1989).  Under such

circumstances, it might well be unreasonable for BNSF to withhold its consent to terminate

or at least modify its arrangement with POV.  The panel is not presented with that situation

today, and so declines to make an advisory ruling in that regard.

With respect to POV's request that the panel declare that the access

mandated by the WVFAA does not expire at the conclusion of the initial access period on

September 30, 2028, BNSF has conceded this point in its briefing by stating that "Rail

Customers would continue to have Commercial Access to UP beyond 2028 (under the first

sentence of Section 3.A of the WVFAA) so long as POV is not in default…" BNSF

Requested Submission on  Rate Alternatives at 16.

BNSF is quick to point out, however, that (1) Exhibit F rates for such

Commercial Access terminate in 2028 and are then subject to negotiations; and (2) "if the

Panel were to direct BNSF to charge a particular set of fixed rates prior to 2028 (a result

that BNSF believes would be improper and inconsistent with the WVFAA), those rates

would clearly expire in 2028.  A requirement that any particular set of rates continue past

2028 would be directly contrary to the expectations of both POV and BNSF." Id at 18.

The panel agrees that Rail Customers continue to have commercial access to

UP beyond 2028 so long as POV is not in default. That is not in dispute. We also find that

while commercial access will continue (assuming no default), the current Exhibit F rates,

which set the maximum switching rates that BNSF may charge, will expire in 2028. Under

the WVFAA, the parties contemplated that new Exhibit F rates would be agreed upon at that time. As far as BNSF's concerns regarding rate setting, we do not mandate any particular sets of rates, but rather that BNSF's switching rates at all times—through 2028 and beyond-- be reasonable and customary, as we have addressed above.  Accordingly, nothing in our rulings conflicts with the parties' agreement or their settled expectations.

Regarding the issue of attorney fees, the parties differ as to their interpretation of the WVFAA.  BNSF argues that it is entitled to its fees if it prevails in this arbitration.  BNSF relies on Art VIII §10.  By contrast, POV contends that the arbitration provision, Art. IX, requires that each party to an arbitration to bear its own fees and costs.  There are two provisions that address fees in the WVFAA. 1. Art. VIII, section 10: "if any action at law or in equity is necessary to enforce or interpret this Agreement the prevailing Party will be entitled to reasonable attorneys' fees, costs, and discovery**…**"
But in the arbitration provision, Art. IX, section 5 provides that "each party to the arbitration shall pay all compensation, costs, and expenses of the arbitrator appointed in its behalf and all fees and expenses of its own witnesses, exhibits, and counsel.  The compensation, cost, and expenses of the single arbitrator or the additional arbitrator in the board of arbitrators shall be paid in equal shares by all Parties to the arbitration."

It is a canon of contract law that all provisions of a contract should be given meaning, and we should not adopt an interpretation that renders a term ineffective or meaningless. *Cambridge Townhomes, LLC v Pac Star Roofing, Inc,* 209 P 3d 863-71 (Wash 2009).  First, we conclude that the language in Article VIII applies to arbitration proceedings.  Actions "at law or equity" go to the nature of the relief sought, not the forum. Second, the two provisions can be read consistently together. Article IX provides that each party will pay its own fees and costs in arbitration. That ensures that an arbitration can proceed efficiently without one party or the other bearing the entire cost.  Article VIII addresses which party should or should not bear that cost at the conclusion of the arbitration, and so does not prevent a party from seeking recovery of its fees and costs if that party has prevailed in the arbitration.

The fundamental question is whether it can be said that one party has prevailed in this proceeding.  The panel concludes that neither party has clearly prevailed. POV sought a variety of relief in its demand and during the course of the proceedings.  It has certainly prevailed on some of those requests—most significantly, that BNSF is bound to offer reasonable and customary switching rates--but the panel also denied a number of those requests, including very significant ones such as POV's request that the Panel fix switching rates, or the termination of the WVFAA.  As to those claims, it may be said that BNSF has prevailed.  There is no precise measure that can be applied to the question of which party's winning claims or defenses should carry the day.  Accordingly, the panel applies a measure of rough justice in holding that neither party can be considered "prevailing" here.  Accordingly, each party is to bear its own fees and costs incurred in this proceeding, including the costs and expenses of its chosen arbitrator, and to share evenly in the costs and expenses of the neutral arbitrator

The panel will retain jurisdiction to address POV's request to lift the protective order to allow it to circulate the PFA and this Final Award. The panel has received briefing regarding BNSF's proposed redactions for the PFA, and now requests that the parties engage in same process regarding the Final Award. Counsel is to confer regarding a briefing schedule for any proposed redactions to this award and report back to the panel on or before December 22, 2022 or due to the intervening holidays such other date as the parties may agree.

**(Dates and Signatures on the next page)**

Dated: December 19, 2022

_____

Vaughn R Walker, Chair

Dated: December    , 2022

_____

Nancy F Lesser

Dated: December    , 2022

_____

Paul A Cunningham

Dated: December 19, 2022

Vaughn R Walker, Chair

Dated: December    , 2022

Nancy F Lesser

Dated: December    , 2022

Paul A Cunningham

Dated: December 19, 2022

Vaughn R Walker, Chair

Dated: December    , 2022

Nancy F Lesser

Dated: December 19, 2022

Paul A Cunningham

# EXHIBIT D

THE HONORABLE JAMAL N. WHITEHEAD

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

8

WESTERN DISTRICT OF WASHINGTON

9

AT TACOMA

10

11 | PORT OF VANCOUVER, USA,     Case No. 3:23-cv-05109-JNW

12        Petitioner,     STIPULATED ORDER AND
                                 JUDGMENT CONFIRMING
13     v.     ARBITRATION AWARDS

14 | BNSF RAILWAY COMPANY,

15        Respondent.

16

17      This matter comes before the court on Petitioner Port of Vancouver, USA's ("Port")

18 Petition to Confirm Arbitration Awards ("Petition"). The Court has carefully reviewed the

19 Petition and supporting declaration and exhibits, Respondent BNSF Railway Company's

20 Response to the Port's Petition and supporting declaration and exhibits, the Stipulated

21 Motion for Entry of Order Granting Petition to Confirm Arbitration Awards (Dkt. #17) and

22 any other relevant pleadings and paper. The parties further stipulate to entry of this Order and

23 Judgment.

24      The redacted Partial Final Award attached hereto as Exhibit 1, and the redacted Final

25 Arbitration Award, attached as Exhibit 2, were properly issued by the duly appointed

26 arbitrators following arbitration proceedings. The referenced Partial Final Award and Final

STIPULATED ORDER AND JUDGMENT
CONFIRMING ARBITRATION AWARDS - 1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
U.S. Bank Centre
1420 5th Avenue, Suite 3400
Seattle, WA 98101-4010
Telephone 206-622-1711

Page 109

Award have not been modified, corrected, or vacated since entry.

Accordingly, it is **ORDERED, ADJUDGED, AND DECREED** that the Court enters Judgment in accordance with the Award as follows:

1. The redacted Partial Final Award and redacted Final Award are confirmed in their entirety.

2. The parties will bear their own costs and fees incurred in connection with this proceeding.

DATED this 7th day of June, 2023.

_Jamal W_____

Jamal N. Whitehead
United States District Judge

IT IS SO STIPULATED:

SCHWABE, WILLIAMSON & WYATT, P.C.

By: _s/ Noah Jarrett_____
    Noah Jarrett, WSBA #31117
    *Attorneys for Petitioner, Port of Vancouver USA*

STEPTOE & JOHNSON LLP

By: _s/ Molly B. Fox_____
Steven K. Davidson (*pro hac vice*)
    Molly B. Fox *(pro hac vice)*
        *Attorneys for Respondent BNSF Railway Company*

PACIFICA LAW GROUP LLP

By: _s/ Kai A. Smith_____
    Kai A. Smith, WSBA #54749
*Attorneys for Respondent, BNSF Railway Company*

STIPULATED ORDER AND JUDGMENT
CONFIRMING ARBITRATION AWARDS - 2

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
U.S. Bank Centre
1420 5th Avenue, Suite 3400
Seattle, WA 98101-4010
Telephone 206-622-1711

EXHIBIT E

Steven K. Davidson
202 429 8077
sdavidson@steptoe.com



1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

February 10, 2023

**By Email:  rdr@sloverandloftus.com**

Robert D. Rosenberg
SLOVER & LOFTUS LLP
1224 Seventeenth Street, NW
Washington, DC  20036

Re:    *POV v. BNSF*:  Final Award – Rate Schedule for Port of Vancouver

Dear Robert,

Attached please find the Switching Rate Schedule for the Port of Vancouver Terminal 4 and Terminal 5.  BNSF has provided Switching Rates for the nine commodities for which the Port requested rates in your January 6, 2023 letter.

These Switching Rates apply to all shipments via rail, regardless of the originating rail carrier.  BNSF is in the process of implementing the systems and back-office modifications necessary to apply the Switching Rate Schedule to BNSF's service to Terminals 4 and Terminal 5 at the Port.  The same Switching Rates will apply to customers receiving shipments originating on any interchange partner, including Union Pacific.  BNSF is prepared to honor these rates immediately, subject to agreement between the shipper, BNSF and, to the extent applicable, any interchange partner, regarding operational terms.

Developing new markets at the Port is an objective that BNSF and the Port share. However, without knowing the specific circumstances of potential future shippers interested in using the Port, it is very challenging to establish the market rate for that movement.  A pre-set rate schedule cannot consider all possible factors that may impact pricing.  BNSF will engage in good-faith negotiations with any potential shipper at the Port of Vancouver to consider its unique circumstances and to ensure that the rate provided under the Switching Rate Schedule is not too high, such that it would discourage movements that would otherwise occur.

To the extent that these Switching Rates conflict with the terms of the West Vancouver Rate Access and Industrial Track Agreement ("WVFAA"), these Switching Rates control. Absent any conflict in terms, the terms of the WVFAA still apply, subject to the Final Award.

February 10, 2023
Page 2 of 2

**Steptoe**

 BNSF reserves the right to update this Switching Rate Schedule as circumstances warrant.  *See* Final Award, p. 22.


       Sincerely,


       Steven K. Davidson


cc: Frank Pergolizzi (fjp@sloverandloftus.com)
   Noah Jarrett (NJarrett@schwabe.com)

## Switching Rate Schedule for the Port of Vancouver Terminals 4 & 5[1 2 3 4]
As of February 10, 2023

| Commodity | Rate per car (round trip) | Notes[5] |
|---|---|---|
| Grain | $460 | Applicable to unit trains of 100 or more cars |
| Corn | $460 | Applicable to unit trains of 100 or more cars |
| Soybeans | $460 | Applicable to unit trains of 100 or more cars |
| DDGS | $460 | Applicable to unit trains of 100 or more cars |
| Soda Ash | $475 | Applicable to unit trains of 67 or more cars |
| Potash | $460 | Applicable to unit trains of 100 or more cars |
| Copper Concentrate | $600 | Applicable to unit trains of 67 or more cars |
| Bentonite | $475 | Applicable to unit trains of 67 or more cars |
| Auto: Bi-Level and Tri-Level | $528 | Single car rate |
| Auto: Bi-Max (articulated Bi-Level) | $845 | Single car rate |

---

[1] Terminals 4 & 5 refers to "2008 Terminal 4 & Parcel 1A Area" and "Former Alcoa & Evergreen Property" as referenced in the West Vancouver Rate Access and Industrial Track Agreement ("WVFAA") Exhibit F to define "Rail Customers" in WVFAA Article III, Section 3.A(iii).

[2] These Switching Rates are subject to all standard BNSF terms and conditions.

[3] To the extent that these Switching Rates conflict with the terms of the WVFAA, these Switching Rates control. Absent any conflict in terms, the terms of the WVFAA still apply.

[4] These Switching Rates are conditioned on BNSF-approved infrastructure being in place to handle traffic moving to or from each customer.

[5] A unit train must consist of cars carrying one commodity in one car type moving to or from a single origin and consignor, or destination and consignee, and be handled in one piece.