UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PORT OF VANCOUVER USA,<br><br>　　　　　　　　Plaintiff,<br>　　v.<br><br>BNSF RAILWAY COMPANY,<br><br>　　　　　　　　Defendant. | CASE NO. 3:23-cv-05560-DGE<br><br>ORDER GRANTING MOTION TO DISMISS AND COMPEL ARBITRATION (DKT. NO. 21) |

**I**　　**INTRODUCTION**

This matter comes before the Court on Defendant BNSF Railway Company's Motion to Dismiss the Complaint and Compel Arbitration. (Dkt. No. 21.) Upon review of that motion, the Plaintiff's response (Dkt. No. 25), Defendant's reply (Dkt. No. 26), and the remaining record, the Court **GRANTS** the motion.

**II**　　**BACKGROUND**

Plaintiff Port of Vancouver USA (POV) and Defendant BNSF Railway Company (BNSF) are parties to the West Vancouver Freight Access and Industrial Track Agreement

(Agreement).  The Agreement was created because POV wished to expand and upgrade infrastructure and improve rail access to existing and potential customers at the port.  (Dkt. No. 1 at 4.)  BNSF, the sole rail operator at the port at the time, owned the land and rail track POV wanted to develop in its expansion plans.  (*Id.*)  Under the Agreement, BNSF sold tracks of the land to POV in exchange for memorializing BNSF's status as the "Exclusive Rail Operator" (ERO).  (*Id.*)  While BNSF was to remain the only railroad physically serving the port, BNSF became obligated under the Agreement to provide commercial access to the Union Pacific Railroad (UP), BNSF's major competitor, to make the port a competitive and desirable location for tenants.  (*Id.* at 5.)  The Agreement thus requires BNSF "to offer all Rail Customers Commercial Access to UP for so long as the Port is not in default under this Agreement," and the Agreement defines "Commercial Access" to include establishing rates and service on "reasonable and customary terms and conditions consistent with BNSF's own freight service for such freight business."  (*Id.* at 21–22.)  The Agreement also includes an arbitration clause:

> If at any time a question or controversy shall arise between the Parties hereto in connection with this Agreement upon which the parties cannot agree, either Party shall have the right to require a meeting of designated representatives with authority to settle the matter within 30 days of written notice of a desire to meet; if it cannot be resolved within 30 days of the meeting of the Parties, then the aggrieved Party may demand arbitration.

(Dkt. No. 1 at 32.)

In November of 2019, POV sent BNSF a demand letter noting BNSF's alleged violation of the Agreement, including unauthorized storage of railcars with hazardous materials, the presence of BNSF rail cars on port property not bound for the port (so-called "alien cars") and BNSF's failure to meet its obligations under the Agreement to "work with the Port to attract new business to the port."  *Port of Vancouver USA v. BNSF Railway Company*, Case No. 3:23-cv-05109-JNW, Dkt. No. 2-1 at 2–3 (W.D. Wash. 2023).  The parties could not come to an

agreement on their own. *Id.* at 3–6. They agreed to engage in private arbitration for damages and injunctive relief before a panel of 3 arbitrators. *Id.*, Dkt. No. 1 at 2. The panel issued a final award on December 19, 2022. *Id.* at 3. The arbitration award addressed three issues relevant to this action: (1) the establishment of reasonable rates; (2) competitive access to certain parts of the port; and (3) the storage of alien cars on port property. (*See* Dkt. Nos. 21 at 16–22; 25 at 7–17.)

**Rates.** First, the panel ordered "BNSF shall establish rates and other terms that offer Rail Customers a like opportunity, considering cost differences, to connect with both BNSF's and UP's linehaul services." (Dkt. No. 1 at 68.) BNSF's service connection "to the Port from UP linehaul traffic shall be at the same switching rates and terms as BNSF offers to its linehaul customers under the same or similar circumstances and freight." (*Id.* at 92.)

**Access.** Second, the panel found the Agreement "read in its entirety appears to contemplate competitive access to the entire Port (with the exceptions noted in Article III §3 A (iii)), especially as rail customers are likely to be those of either BNSF or UP." (*Id.* at 88.) Those exceptions include: (a) those with the ability to receive rail service from UP; (b) shipping commodities or equipment expressly excluded, with no rates established, or not addressed in a rate schedule (attached as Exhibit F to the agreement); and (c) those originating or terminating freight at a new transload facility which may be established on the property (unless BNSF agrees otherwise). (*Id.* at 22.)

**Alien cars.** Third, the panel found BNSF was not permitted to use POV property for purposes unrelated to the interests of POV, and the parking of rail cars not destined to pick up freight from, or deliver it to, the port or its tenants serves no purpose of POV. (*Id.* at 94.) POV

was awarded $86,226 for past storage of BNSF's alien cars, 12,318 days at $7 per day.  (*Id.* at 95.)

In February of 2023, POV filed suit in this District asking the Court to confirm the arbitration award.  *Port of Vancouver*, Case No. 3:23-cv-05109-JNW, Dkt. No. 1.  The parties stipulated to an order confirming the award, which Judge Whitehead entered June 7, 2023.  *Id.*, Dkt. Nos. 19 and 20.

Two weeks later, POV brought this action requesting enforcement of the judgment based on BNSF's noncompliance.  (Dkt. No. 1 at 8.)  According to the complaint, BNSF satisfied the judgment in part by paying for past track damage and later-occurring track damage, as well as paying for the alien cars for the February 2018–December 2022 period.  (*Id.*)  However, after the final award, BNSF allegedly continued to bring alien cars onto port property without authorization, failed to comply with the competitive access provisions of the Agreement, and did not provide a rate schedule of reasonable and customary rates.  (*Id.* at 9.)  POV therefore brought claims to enforce the award and for trespass of the alien cars.  (*Id.* at 10–11.)

BNSF filed a motion to dismiss the action.  (Dkt. No. 21.)  BNSF argues it is complying with the award and POV is using this lawsuit to reinterpret the award to "secure relief it sought but did not obtain in the arbitration."  (Dkt. No. 21 at 4.)  BNSF argues any dispute as to whether BNSF is complying with the award is itself subject to the arbitration clause.  (*Id.*)

### III     DISCUSSION

**A.  Rule 12(b)(6) governs motions to dismiss and compel arbitration.**

As a preliminary matter, the motion was asserted under either Rule 12(b)(6) or 12(b)(1).  BNSF argues either is appropriate, as either method leads to the same result.  (Dkt. No. 21 at 14–

15.) POV argues both rules test the legal sufficiency of a claim, but any facts must be viewed in the light most favorable to the non-movant, in this case, POV.  (Dkt. No. 25 at 6.)

District Courts disagree on which rule governs, and the Ninth Circuit has not resolved the issue.  *See Dodo Int'l Inc. v. Parker*, No. C20-1116-JCC, 2021 WL 4060402, at *5 (W.D. Wash. Sept. 7, 2021) ("Arbitration clauses are agreements to waive litigating in court; they do not deprive the court of subject matter jurisdiction."); *Filimex, L.L.C. v. Novoa Invs., L.L.C.*, No. CV 05-3792-PHX-SMM, 2006 WL 2091661, at *3 (D. Ariz. July 17, 2006) (analyzing motion to dismiss and compel arbitration under 12(b)(1)); *Wolff v. Tomahawk Mfg.*, No. 3:21-CV-880-SI, 2022 WL 377926, at *1 (D. Or. Feb. 8, 2022) (rejecting 12(b)(1) as proper vehicle), *aff'd*, No. 22-35145, 2022 WL 17749271 (9th Cir. Dec. 19, 2022).  The Supreme Court addressed a similar question in *Atlantic Marine Const. Co., v. United States Dist. Court for Western Dist. of Texas*, 571 U.S. 49 (2013), rejecting 12(b)(3)'s improper venue as a mechanism to assert a contract's forum-selection clause.  *Id.* at 55.  The Court found 12(b)(3) allows dismissal "only when venue is 'wrong' or 'improper'[,]" which "depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause."  *Id.*

The same logic applies here—12(b)(1) allows dismissal only when the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  Under 28 U.S.C. § 1332, this Court has original jurisdiction over this matter because the action is between citizens of different states and the value of the litigation exceeds $75,000 exclusive of costs and interests.  (Dkt. No. 1 at 1–2.) § 1332 says nothing about forum-selection clauses; that the parties agreed by contract to resolve their differences in a private forum does not rewrite § 1332 to deprive this Court of jurisdiction. Rule 12(b)(6) is a better vehicle because a complaint asserting a dispute between two parties who

have bound themselves to arbitration fails to state a valid claim under contract law.  *See City of Benkelman, Nebraska v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017) (proper vehicle is Rule 12(b)(6) which can be converted to Rule 56 summary judgment motion); *Guidotti v. Legal Helpers Debt Resolution*, L.L.C., 716 F.3d 764, 771 (3d Cir. 2013) (same).

The mechanism matters because a 12(b)(6) motion to dismiss requires the Court to make all factual inferences in the nonmovant's favor.  *Papasan v. Allain*, 478 U.S. 265, 286 (1986). BNSF argues POV misstates the legal standard governing the issues and that in deciding the motion, the Court is limited to determining only "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." (Dkt. No. 26 at 5) (citing *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). By focusing on the motion to dismiss standard, BNSF argues, POV attempts to end-run the arbitration clause and force the Court to accept all its allegations as true.  (*Id.*)  While the central question is certainly whether these claims are subject to arbitration, the Court agrees disputed facts should be resolved in favor of the non-movant, POV.

The parties provide the court with different accounts of BNSF's compliance with the award under the three disputed ongoing issues related to rates, access, and alien cars.

### 1.  Rates

In the final award, the panel ruled "BNSF must promptly create a schedule of the various applicable reasonable and customary switching rates to be charged.  BNSF's rates should be based on objective factors typically used to determine switch rates for access to the ports it serves.  This schedule is to be shared with POV and potential customers."  (Dkt. No. 1 at 92.) The panel explicitly avoided acting as a rate-setting board, but explained it intended to put

customers obtaining access to the port from BNSF and UP on equivalent footing.  (*Id.* at 90.)

Specifically, the panel:

> appreciates that certain shipments impose different costs from other shipments. While these cost differences may not be precisely captured in switching rates, the requirement that we impose on BNSF to provide its switching rates to the Port and Rail Customers will allow comparison with switching rates at other ports on the Pacific coast with which POV competes.  The panel anticipates that over time BNSF's rates at the Port will converge with the costs of providing these services and be competitive with rates at other alternative ports. To facilitate this convergence, the panel imposes, consistent with a plain reading of the [Agreement], a requirement that BNSF offer to UP customers switching rates no greater than rates BNSF offers to its own linehaul customers bringing comparable quantities and characteristics of freight under similar conditions.

(*Id.*)

The Complaint alleges BNSF did not provide a rate schedule of reasonable and customary rates, instead publishing rates for Terminal 4 and 5 ranging between $460 to $600 per car, and rates for Terminals 2 and 3 of $750 per car regardless of single car or unit, so long as the traffic is not hazmat or oversize. (*Id.* at 9.)  POV points out BNSF serves no traffic of its own at Terminals 4 and 5, and argues BNSF has spiked its rate artificially for those terminals to still be "equivalent" to UP and meet its obligation. (Dkt. No. 25 at 11–12.)  By contrast, BNSF charges switching fees of $105 per car for unit trains and $295 per car for single cars at competing ports in Grandview, Hoquiam, Interbay, Seattle, Spokane, Sunnyside, and Tacoma in Washington, and Portland, and Salem in Oregon. (Dkt. No. 1 at 9–10.)  The two parties dispute whether this course of action is consistent with the award.

### 2. Access

In the discussion regarding rates, the panel observed the Agreement, "read in its entirety[,] appears to contemplate competitive access to the entire Port (with the exceptions noted in Article III Section 3 A (iii)), especially as rail customers are likely to be those of either BNSF

1   or UP." (Dkt. No. 1 at 88.)  POV's complaint alleges BNSF's commercial access obligations

2   apply to the entire port except to the extent UP had service to particular port locations under

3   separate agreements between BNSF and UP.  (*Id.* at 7.)  BNSF argues the award does not require

4   setting competitive rates for the entire port, but rather acknowledged "access to the entire port" is

5   controlled by the definition of Rail Customers in the Agreement which is subject to the

6   exceptions at Article III Section 3 A (iii).  (Dkt. No. 21 at 19.)  One of those exceptions excludes

7   from "Rail Customers" customers who are not addressed in the rate schedule Exhibit F attached

8   to the Agreement.  (*Id.* at 19 n.5.)  The rates in Exhibit F only apply to Terminals 4 and 5, and

9   therefore, BNSF argues it is not required to provide rates beyond those two terminals.  (*Id.* at

10  19.)

11          POV cites numerous statements within the award indicating the panel's alleged intent to

12  require BNSF to establish rates for all port facilities.  (Dkt. No. 25 at 7–8.)  If the commercial

13  access were limited to Terminals 4 and 5, POV argues, the panel would have said so rather than

14  stating access extends "to the entire Port" subject to the exclusions.  (*Id.* at 8.)  POV also points

15  out BNSF's interpretation of the Exhibit F exclusion renders the other two exclusions

16  superfluous.  (*Id.* at 8–9.)  The three exclusions address: (1) locations and customers covered by

17  other agreements existing as of the effective date; (2) certain types of commodities/equipment

18  "already excluded, with no rates established, or not addressed" in Exhibit F; and (3) intermodal

19  (trailer/container rail/truck) traffic.  POV points out Exhibit F does not establish or address any

20  rates for intermodal freight, so under BNSF's interpretation, the non-inclusion of intermodal

21  freight in Exhibit F means such traffic is excluded from UP commercial access not just at

22  Terminals 4 and 5, but throughout the Port as a whole.  (*Id.*)

23

24

### 3. Alien cars

The panel observed "it does not follow that BNSF's ERO status allows it to use POV property for purposes un-related to the interests of POV and parking of rail cars not destined to pick up freight from, or deliver it to, the Port or its tenants serves no purpose of POV." (Dkt. No. 1 at 94.) The panel indicated in "switching rail cars on POV trackage[,] some rail cars not destined for POV tenants may from time to time be included in switching cars. But BNSF's use of POV trackage appears far more extensive, including rail cars of essentially every description and for other than limited or short periods." (*Id.*) Thus, the panel awarded POV charges for storage of the alien cars. (*Id.* at 95.) POV's complaint brings a trespass claim based on the BNSF's improper storage of alien cars. (*Id.* at 11.) BNSF argues the storage of alien cars was not categorically banned by the award and interprets the panel's comments to mean the presence of some alien cars is permissible. (Dkt. No. 21 at 22.) In any event, BNSF argues, a trespass claim is an entirely new issue not addressed in the award, therefore subjecting it to arbitration under the Agreement. (*Id.* at 20.)

POV submits the trespass claim arises outside the enforcement of the award because the panel found storing alien cars does not fall within the scope of BNSF's privileges within the Agreement. (Dkt. No. 25 at 16.) According to POV, this language means alien cars are not covered or contemplated by the Agreement at all, and therefore the $7 per car recovery did not sound in contract but rather in tort. (*Id.*) Accordingly, POV believes the trespass claim does not arise out of the Agreement and is therefore not subject to arbitration. (*Id.*)

\* \* \*

Under the 12(b)(6) standard, POV argues any material factual questions regarding what the award requires, whether BNSF has complied with the award, and what remedies are

appropriate should be left for further proceedings. (Dkt. No. 25 at 6.) It argues if the award can reasonably be read as supporting POV's position, then BNSF's motion must be denied. (*Id.*) Although for the purposes of a motion to dismiss the Court must take all the factual allegations in the complaint as true, it is not bound to accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain*, 478 U.S. at 286.

Most of the disagreements outlined in this matter do not appear to be factual. For example, both parties agree BNSF has only provided rates for Terminals 4 and 5. The disagreement arises in whether BNSF's provision of rates for only Terminals 4 and 5 complies with the award. POV's assertion any "material factual questions" regarding whether BNSF is complying with the award should be assumed in POV's favor confuses factual assumptions and legal conclusions. Whether BNSF's conduct complies with the award is a legal conclusion and cannot be taken as true for purposes of a motion to dismiss. To the extent there are factual disputes, they are viewed in the light favorable to POV. For example, BNSF never actually admits to leaving alien cars on POV property. (*See* Dkt. No. 21 at 20–22.) In this instance, the Court assumes alien cars are being left on the property as asserted in POV's complaint. But whether leaving the cars on the property amounts to a violation of the award is a legal conclusion incapable of being construed in anyone's favor.

Assuming the well-pled facts in the complaint are true, the Court turns to whether the claims should be dismissed subject to the arbitration provision.

**B. The arbitration award is ambiguous and judicial interpretation is therefore inappropriate.**

At issue is what the Supreme Court has referred to as a "question of arbitrability," for its answer will determine whether the underlying controversies will proceed to arbitration on the merits. *Hosam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). "An order to arbitrate the

particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage." *United Steelworkers of America v. Warrior & Gulf Co.*, 363 U.S. 574, 582–583 (1960).

Neither party disputes the Federal Arbitration Act (FAA) governs the Agreement or that disputes arising out of the Agreement as a general matter must be arbitrated.  (*See* Dkt. No. 21 at 12; 25 at 4–6); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (finding federal law, in the FAA, governs the arbitrability of a dispute in either state or federal court.)  Rather, they disagree as to whether these claims arise out of the existing arbitration award, warranting judicial enforcement of the previous judgment, or are novel claims arising under the Agreement and therefore subject to the arbitration clause (with the exception of the trespass claim, which POV argues arises out of tort law).

But even if the claims arise out of the award, the Court can only enforce the award if it can be unambiguously interpreted.  "The Court may not improperly substitute its interpretation of the arbitration award for that of the arbitrator." *Int'l Bhd. of Elec. Workers v. ADT, LLC*, No. C18-0905-JCC, 2018 WL 6696694, at *2 (W.D. Wash. Dec. 20, 2018); *see also Sunshine Mining Co. v. United Steelworkers of Am.*, *AFL-CIO*, 823 F.2d 1289, 1295 (9th Cir. 1987) (finding district court erred in substituting its interpretation for arbitrator's); *Hanford Atomic Metal Trades Council*, *AFL-CIO v. Gen. Elec. Co.*, 353 F.2d 302, 307–308 (9th Cir. 1965) (remanding to a Board of Arbitration an opinion requiring clarification and interpretation—a "task to be first performed by the arbitration committee and not the court[.]").  "Courts should not interpret or enforce ambiguous awards, unless the ambiguity can be resolved from the

record." *Int'l Bhd. of Elec. Workers* 2018 WL 6696694, at *3 (finding arbitrator's use of the phrase "as soon as is practicable" too ambiguous for judicial enforcement).

Against this backdrop, and upon review of the award and the parties' arguments, the Court finds the award is too ambiguous regarding the parties' disagreements for this Court to interpret or enforce it against BNSF.  The award is unclear in many respects relevant to this dispute.

First, the panel was "not prepared to act as a rate-setting board" and imposed only a "requirement that BNSF offer to UP customers switching rates no greater than rates BNSF offers to its own linehaul customers bringing comparable quantities and characteristics of freight under similar conditions."  (Dkt. No. 1 at 90.)  In the same breath, the panel noted it "expected the Port and BNSF to develop a mutually satisfactory schedule of rates[,]" which the parties did not do, and only re-emphasized it was not equipped to serve as a rate setting body.  (*Id.* at 91–92.)  It therefore limited its ruling to a standard it believed consistent with the Agreement and the panel's capabilities by imposing "a requirement that henceforth BNSF offer to UP and its customers that access to the Port from UP linehaul traffic shall be at the same switching rates and terms as BNSF offers to its linehaul customers under the same or similar circumstances and freight."  (*Id.*)  The panel acknowledged BNSF "could match switching rates offered to UP and adjust linehaul rates downward to its customers to account for any give-back on switching rates" but emphasized such behavior would be contrary to the covenant of good faith and fair dealing.  (*Id.* at 92–93.)  The panel's comments of what it "expects" and what BNSF "could" do provide little to work with in terms of concrete instructions.  While recognizing BNSF's potential to misuse the standard, the panel did not set forth any remedy for that situation nor contemplate the situation POV alleges here.  On the one hand, the only explicit requirement is the equivalency of

rates between BNSF and UP; on the other, the panel spends a good part of its analysis acknowledging BNSF works off technicalities to avoid effectuating POV's intent to increase competition and attract new tenants to the port. (*Id.* at 92) ("What POV complains of here is the obvious fact that BNSF is not incented under the terms of the [Agreement], as BNSF has heretofore interpreted it, to drum up business for the Port.").

BNSF's proposed equivalent rate appears suspect compared to the "reasonable and customary" measure, but the panel failed to create any sort of concrete rate schedule or calculation with which to compare BNSF's proposed rates. The panel noted it would be "difficult to imagine that POV would have agreed to allow BNSF as ERO to charge rates that would hobble POV from attracting business from UP customers or from competing with other ports." (*Id.* at 88.) The panel also "anticipate[d] that over time BNSF's rates at the Port will converge with the costs of providing these services and be competitive with rates at other alternative ports." (*Id.* at 90.) This statement suggests, without defining when, the rate BNSF sets will eventually be competitive with other ports. Whether this is a requirement or merely something the panel "anticipates" will happen naturally is unknown. This commentary contains no standard or calculation capable of application with amount of certainty. What constitutes a "reasonable and customary" rate under the award is sufficiently ambiguous.

Second, the award is similarly unclear when it comes to whether BNSF is required to provide rates to the entire port. The panel notes BNSF "may not simply rely on Exhibit F rates," and instead must "offer the same 'reasonable and customary' rates without regard to whether BNSF or UP provides linehaul service to access the Port." (*Id.* at 92). But the panel noted the Agreement "read in its entirety appears to contemplate competitive access to the **entire** Port (**with the exceptions noted in Article III §3 A (iii)**))." (*Id.* at 88) (emphasis added). Access to

the "entire" port is explicitly subject to the exception BNSF hangs its hat on.  The award does not address the question otherwise.  It does not identify Terminals 4 and 5 separate from "access to the port," nor does it interpret any of the exceptions at issue.  It fails to define "access" in any measurable way.  To determine what the panel meant by "access to the port" would resolve ambiguities by guesswork, requiring this Court to improperly substitute its interpretation of the award for that of the arbitrators.

Third, the panel's award on the storage of alien cars does not provide clarity to resolve the ongoing alien car dispute.  According to POV, the presence of the cars is not governed by the Agreement and therefore an action for trespass can be sustained outside the arbitration clause.  (Dkt. No. 25 at 16.)  But the panel interpreted the contract to foreclose BNSF from storing alien cars on POV property.  To the extent the alien car issue was not originally covered by the Agreement, the Court finds the parties brought the issue within the purview of the arbitration by presenting their arguments on the matter and the panel reaching a conclusion, largely based on the interpretation of the Agreement.  The panel found "at a fundamental level, BNSF's use of Port property for non-Port purposes is inconsistent with access to the Port by two Class I railroads which plainly emerges as central to both parties' intent and understanding in [forming the contract]." (Dkt. No. 1 at 93.)  The panel found  (1) BNSF's status as ERO does not allow it to use POV property for purposes unrelated to the interests of POV; (2) parking of rail cars not destined to pick up freight from or deliver it to the port or its tenants serves no purpose of POV; (3) BNSF's proposed $7 rate for past storage of alien cars was justifiable and (4) BNSF was ordered to pay the rate retroactively. (*Id.* at 93–95.)  But the panel did not say whether the rate applied prospectively.  The panel also did not say whether the presence of *any* alien car violates the agreement, commenting some cars not destined for POV tenants may "from time to time"

exist on the property, making no determination as to whether such behavior violated the Agreement, noting only "BNSF's use of POV trackage appears far more extensive." (*Id.* at 94.) The award leaves open how many alien cars BNSF is permitted to keep on the property, whether it incurs storage rates for those cars, and whether the rate is $7 in the future. This Court cannot answer these questions without additional clarity of the award, which cannot be obtained through further development of the record.

This Court cannot say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers*, 363 U.S. at 582–583. Any doubt about the Agreement's arbitration clause covering POV's claims should be resolved in favor of coverage. But the coverage issue need not even be determined because arbitration is appropriate in either event. If the award's ambiguity is a sign the award does not cover the issues here, the claims are then novel, but arise under the Agreement, subjecting them to arbitration. If the claims are indeed covered by the award (which the Court suspects they are– including the trespass claim), given the award's ambiguity, those claims must be resolved by the arbitrators. All three matters were addressed in some way by the panel but were not resolved conclusively. The Court is without the authority to interpret or enforce the panel's ambiguous award unless the ambiguity can be resolved from the record. *Int'l Bhd. of Elec. Workers* 2018 WL 6696694, at *2. Further discovery and fact development cannot resolve whether BNSF is complying with the panel's award. Therefore, dismissal and resolution by arbitration are appropriate.

## IV. CONCLUSION

Accordingly, and having considered BNSF's motion, the briefing of the parties, and the remainder of the record, the Court finds and ORDERS the Motion to Dismiss and Compel

1   Arbitration (Dkt. No. 21) is **GRANTED.**  BNSF's pending Motion to Stay Discovery (Dkt. No.

2   30) is stricken as moot, and the case is dismissed.

3       Dated this 15th day of January 2024.

David G. Estudillo
United States District Judge